**2012-1632**

### IN THE
## UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

_____

EOLAS TECHNOLOGIES INCORPORATED and
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,

*Plaintiffs-Appellants*,

v.

AMAZON.COM INC. and YAHOO! INC.,

*Defendants-Appellees*,

v.

GOOGLE INC. and YOUTUBE, LLC,

*Defendants-Appellees*,

v.

J.C. PENNEY CORPORATION, INC.,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for the Eastern District of Texas in
case no. 09-CV-0446, Chief Judge Leonard Davis.

_____

### BRIEF OF PLAINTIFFS-APPELLANTS
### EOLAS TECHNOLOGIES INCORPORATED and
### THE REGENTS OF THE UNIVERSITY OF CALIFORNIA

_____

| | |
|---|---|
| Kevin L. Burgess | Mike McKool, Jr. |
| John B. Campbell | *Principal Attorney* |
| Joel L. Thollander | Douglas A. Cawley |
| MCKOOL SMITH, P.C. | MCKOOL SMITH, P.C. |
| 300 W. 6th Street, Suite 1700 | 300 Crescent Court, Suite 1500 |
| Austin, TX 78701 | Dallas, TX 75201 |
| (512) 692-8700 | (214) 978-4000 |
| | *Attorneys for Plaintiffs-Appellants* |

November 28, 2012

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellants Eolas Technologies Incorporated and The Regents of the University of California certifies the following:

1.    The full name of every party or amicus represented by me is:

Eolas Technologies Incorporated and

The Regents of the University of California.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Eolas Technologies Incorporated and

The Regents of the University of California.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**MCKOOL SMITH P.C.:** Mike McKool, Jr.; Douglas A. Cawley; Kevin L. Burgess; John B. Campbell; Joel L. Thollander; Joshua W. Budwin; Matthew Rappaport; Phillip Aurentz; John R. Johnson, II; Daniel Pearson; Gretchen Curran; Christopher Mierzejewski; John F. Garvish; Lindsay Martin Leavitt; Holly Engelmann; Rosemary Snider; Sam Baxter; Ivan Wang; James Quigley; Thomas Fasone; Gayle Klein; Ada Brown

**PARKER BUNT & AINSWORTH:** Robert M. Parker; Robert C. Bunt; Andrew T. Gorham

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ....................................................................i

TABLE OF AUTHORITIES .......................................................................v

STATEMENT OF RELATED CASES ................................................. viii

I.    STATEMENT OF JURISDICTION ..............................................1

II.   STATEMENT OF THE ISSUES ...................................................1

III.  STATEMENT OF THE CASE ......................................................2

IV.   STATEMENT OF THE FACTS ....................................................4

    A.   The Invention Makes Interactivity on the Internet Possible.............................................................................4

    B.   The '906 Patent Is Tested in High-Profile Litigation With Microsoft. ........................................................7

    C.   The Industry Works to Secure Multiple Reexaminations of the '906 Patent; Viola, Mosaic, and HTML+ Are Considered and Distinguished..............................................7

    D.   Eolas Settles the Microsoft Suit and Initiates This One; Numerous Defendants Take Licenses to the '906 and '985 Patents. .........................................................10

    E.   In an Invalidity-Only Trial, Defendants Offer Critically Deficient Testimony and Probative Nonobviousness Evidence Is Excluded. ......................................................11

    F.   The District Court Denies JMOL. ......................................16

V.    SUMMARY OF THE ARGUMENT ..........................................18

VI.   STANDARD OF REVIEW .........................................................21

VII.  ARGUMENT...............................................................................23

A.  The District Court Erred in Denying JMOL on Invalidity By Anticipation—Multiple Claim Elements Are Missing from the Viola References Offered as Allegedly Anticipating Prior Art...........................................................................23

    1.  Proof of anticipation requires clear and convincing evidence that each element of each asserted claim is disclosed in a single prior art reference.................................23

    2.  There is no clear and convincing evidence of anticipation with respect to at least three claim elements missing from the prior art. .........................................24

        a.  "type information to identify and locate".......................25

        b.  "embed text format specifies the location of at least a portion of an object".........................................30

        c.  "distributed application"...................................................32

    3.  There is no clear and convincing evidence of anticipation by any single prior art reference. ...........................33

B.  The District Court Erred in Denying JMOL on Invalidity By Obviousness—Defendants Offered Critically Deficient Testimony and Probative Nonobviousness Evidence Was Never Considered. ........................................................37

    1.  Proof of obviousness requires clear and convincing evidence with respect to the prior art's scope, content, differences, and motivation to combine, as well as careful consideration of all objective evidence of nonobviousness. .....................................................37

    2.  There is no clear and convincing evidence of obviousness with respect to the prior art's scope, content, and differences—and no evidence at all with respect to any motivation to combine..............................39

        a.  MediaView does not render the asserted claims obvious. ................................................................40

      b.     Viola does not render the asserted claims obvious..........................................................................46

      c.     Mosaic and HTML+ do not render the asserted claims obvious. ..................................48

    3.    There is no clear and convincing evidence of obviousness in light of the objective evidence of nonobviousness—critical pieces of which were never considered by the fact-finder. ........................................51

      a.     Defendants never addressed the objective nonobviousness evidence admitted at trial....................51

      b.     Other admittedly probative nonobviousness evidence was excluded at trial, and never considered by the fact-finder. .........................................53

VIII.  CONCLUSION AND RELIEF REQUESTED............................................56

# TABLE OF AUTHORITIES

Page(s)

CASES

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012) .................................. 24, 37, 38, 45-50

*Alza Corp. v. Mylan Labs., Inc.*,
    464 F.3d 1286 (Fed. Cir. 2006) .........................................38, 47

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
    239 F.3d 1343 (Fed. Cir. 2001) ...........................................49

*Ashland Oil v. Delta Resins & Refractories*,
    776 F.2d 281 (Fed. Cir. 1985) ..............................37-39, 45, 51, 53-55

*Eli Lilly & Co. v. Aradigm Corp.*,
    376 F.3d 1352 (Fed. Cir. 2004) ...........................................22

*Enzo Biochem, Inc. v. Calgene, Inc.*,
    188 F.3d 1362 (Fed. Cir. 1999) ...........................................49

*Eolas Tech. Inc. v. Microsoft Corp.*,
    399 F.3d 1325 (Fed. Cir. 2005) .....................................2, 7, 14, 25, 35

*Ford v. Cimarron Ins. Co.*,
    230 F.3d 828 (5th Cir. 2000) .............................................21

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule
    Patent Litig.*, 676 F.3d 1063 (Fed. Cir. 2012) .......................51, 53, 55

*Jamesbury Corp. v. Litton Indus. Prods.*,
    756 F.2d 1556 (Fed. Cir. 1985) ........................... 22, 24, 30, 32, 33, 50

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
    292 F.3d 728 (Fed. Cir. 2002) ...........................................22

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
    381 F.3d 1142 (Fed. Cir. 2004) .....................................23, 35, 36, 38

*Krippelz v. Ford Motor Co.*,
    667 F.3d 1261 (Fed. Cir. 2012) ...........................................23

*Kyocera Wireless Corp. v. ITC*,
  545 F.3d 1340 (Fed. Cir. 2008) ..........................................................34

*Microsoft Corp. v. i4i Ltd. P'ship*,
  131 S. Ct. 2238 (2011)..........................................................23, 24, 39

*Mintz v. Dietz & Watson, Inc.*,
  679 F.3d 1372 (Fed. Cir. 2012) ............................................ 24, 30, 39, 51, 53-56

*Mirror Worlds, LLC v. Apple, Inc.*,
  692 F.3d 1351 (Fed. Cir. 2012) ..........................................................21

*Motorola, Inc. v. Interdigital Tech. Corp.*,
  121 F.3d 1461 (Fed. Cir. 1997) ............................................ 23, 30, 43, 47, 49, 50

*Muniauction, Inc. v. Thomson Corp.*,
  532 F.3d 1318 (Fed. Cir. 2008) ..........................................................49

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
  520 F.3d 1358 (Fed. Cir. 2008) ..........................................................38, 46, 48

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
  536 F.3d 1256 (Fed. Cir. 2008) ..........................................................23, 38

*Rothman v. Target Corp.*,
  556 F.3d 1310 (Fed. Cir. 2009) ..........................................................39, 54

*Schumer v. Lab. Computer Sys.*,
  308 F.3d 1304 (Fed. Cir. 2002) ..........................................................23, 30, 36, 47, 49

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
  655 F.3d 1364 (Fed. Cir. 2011) ..........................................................38, 39, 54

*Tech. Patents LLC v. T-Mobile UK, Ltd.*, No. 2011-1581,
  2012 U.S. App. LEXIS 23508 (Fed. Cir. Oct. 17, 2012) ....................................30

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
  No. 2011-1555,
  2012 U.S. App. LEXIS 23486 (Fed. Cir. Nov. 15, 2012) ...................... 39, 54-56

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
  721 F.2d 1540 (Fed. Cir. 1983) ..........................................................39, 54, 55

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ............................................................................35

*WMS Gaming Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999) ...........................................................38, 39, 54

*Zenith Elecs. Corp. v. PDI Commc'n Sys.*,
    522 F.3d 1348 (Fed. Cir. 2008) ...................................................................23, 36

## STATUTES

28 U.S.C. § 1295 ...............................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

28 U.S.C. § 1338 ...............................................................................................1

28 U.S.C. § 2107 ...............................................................................................1

## OTHER AUTHORITIES

FED. R. APP. P. 4 ...............................................................................................1

FED. R. CIV. P. 50 ............................................................................................21

## STATEMENT OF RELATED CASES

Pursuant to FED. CIR. R. 47.5, Plaintiffs-Appellants Eolas Technologies Incorporated and The Regents of the University of California (collectively, "Eolas") note that:

(a) there have been no other previous appeals in this case; and

(b) there are three cases pending in the U.S. District Court for the Eastern District of Texas that will be directly affected by this Court's decision in this appeal, including: *The Regents of the University of California and Eolas Technologies Incorporated v. Facebook, Inc.*, No. 6:12-CV-619; *The Regents of the University of California and Eolas Technologies Incorporated v. Wal-Mart Stores, Inc.*, No. 6:12-CV-620; and *The Regents of the University of California and Eolas Technologies Incorporated v. The Walt Disney Company, ESPN Internet Ventures, and American Broadcasting Companies, Inc.*, No. 6:12-CV-621.

# I.  STATEMENT OF JURISDICTION

This U.S. District Court for the Eastern District of Texas had jurisdiction over the civil action giving rise to this appeal pursuant to 28 U.S.C. §§ 1331 and 1338(a). The U.S. Court of Appeals for the Federal Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a). The notice of appeal from the amended final judgment entered on July 19, 2012 was timely filed under 28 U.S.C. § 2107(a) and FED. R. APP. P. 4(a) on August 17, 2012. JA2; JA20253.

# II.    STATEMENT OF THE ISSUES

**Issue:** Whether the district court erred in denying judgment as a matter of law ("JMOL") that the asserted claims are not invalid, and in entering judgment reflecting that denial. JA1-18. This issue encompasses at least two sub-issues:

**Sub-issue 1.** Whether the district court erred in denying JMOL with respect to invalidity by anticipation when: a) Defendants offered an anticipation opinion that failed to identify multiple claim elements in the allegedly invalidating "Viola" system—including one critical element that the PTO has expressly confirmed was missing from that art; and b) in an effort to obscure these and other missing elements, Defendants offered an anticipation opinion that improperly considered an amalgam of separate Viola code bases as a single prior art reference.

**Sub-issue 2.** Whether the district court erred in denying JMOL with respect to invalidity by obviousness when: a) Defendants offered obviousness opinions

1

that failed to identify missing claim elements, never addressed any motivation to combine, and rested on fabricated evidence; and b) admittedly probative nonobviousness evidence was excluded and never considered by the fact-finder.

## III.   STATEMENT OF THE CASE

The patents-in-suit—U.S. Patent No. 5,838,906 (the "'906 patent") and its continuation, U.S. Patent No. 7,599,985 (the "'985 patent")—made possible the interactive web as we know it today. The '906 patent was before this Court seven years ago on Microsoft's appeal of a $520 million infringement and damages verdict against its web browser, Internet Explorer. Chief Judge Rader, writing for the panel, left the infringement and damages findings untouched, but remanded the case for additional invalidity proceedings on two separate Viola references: one code base from May 12, 1993, and another from May 27, 1993. *Eolas Tech. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1329-30, 1341 (Fed. Cir. 2005).

In the years since that opinion, the invention disclosed in the patents-in-suit became one of the most closely scrutinized in the history of the PTO. Its novelty over the prior art, including the Viola art, was confirmed in two reexaminations— including a rare director-ordered reexamination—and yet again in the prosecution of the '985 patent. The director-ordered reexamination, which had been initiated at the request of an industry consortium led by one of Defendants' witnesses in this case, was particularly noteworthy. It concluded in 2006 with a 73-page statement

2

of reasons for patentability, which explained in detail why the Viola references neither anticipated nor rendered obvious the invention of the patents-in-suit. JA6026-54. By the time the '985 patent issued in 2009, some twenty-five examiners had reviewed these patents and confirmed the novelty of the invention they disclose over every relevant prior art system.

Following the conclusion of the PTO's director-ordered reexamination in 2006—in which the Viola-related invalidity arguments were rejected by those with expertise—Microsoft settled with Eolas and received a license to practice the patents-in-suit. And following the issuance of the '985 patent in 2009, Eolas brought the present patent-infringement suit against some twenty-four companies operating in this space. JA20229-30. Most sought licenses and settled out, but a handful pushed on to an initial invalidity trial set by the district court. JA20251.

These Defendants focused their case on a parade of web-related pioneers— some of whom had been working for a decade to invalidate the patents-in-suit— offering as a drumbeat the recurrent theme that these pioneers had shared their own ideas "freely with the public" and wanted "to make sure that this technology remains open to the web." JA2419; JA2404; JA2228; JA2551-52. As Defendants' trial time was winding down, they finally brought their invalidity expert to the stand. He briefly discussed two prior art systems: 1) the Viola art that had by now been considered and distinguished on three occasions by the PTO; and 2) a

"MediaView" program that had nothing to do with the web, and that the industry had never considered sufficiently relevant to merit the PTO's consideration.

The resulting trial record falls far short of providing clear and convincing evidence that the asserted claims of the '906 and '985 patents are invalid. Defendants' expert failed to identify multiple missing elements in the prior art; improperly treated three separate Viola references as a single piece of art; did not attempt to explain how or why the PTO's findings of patentability over the relevant references could have been incorrect; offered no obviousness testimony relating to motivations to combine or secondary considerations; and relied upon purportedly prior art MediaView code that was in fact fabricated during the litigation. These deficiencies were compounded by the district court's exclusion of nonobviousness evidence that, in consequence, was never considered by the fact-finder.

The invalidity verdict resting on this legally insufficient evidence—along with the district court's corresponding judgment—cannot stand, and JMOL that the asserted claims are not invalid should be entered. JA1-20.

## IV.    STATEMENT OF THE FACTS

### A.    The Invention Makes Interactivity on the Internet Possible.

The invention at issue took the web from a primitive and static world to today's seamlessly interactive environment, where millions of web users routinely interact with objects displayed in browser-controlled windows. JA2142-46.

In 1993, web browsers were "designed for working with documents that didn't change … [and] for viewing only data that was downloaded to the local computer." JA2143. Then researchers at the University of California developed a new and revolutionary approach to acquiring and delivering information over the web: a browser that embedded applications and allowed for interaction with external objects in the browser-controlled window. These researchers initially set out to create a web-based medical journal that would make cutting-edge studies available to physicians around the world. JA2142. To that end, they sought to find a way to deliver an enormous set of data relating to the human embryo, with an associated application enabling interaction with that data, to physicians working on 1993-era computers with limited processing power. JA2146; JA33-40.

The invention of the '906 and '985 patents resulted from that effort. As inventor Dr. Michael Doyle explained, the researchers

> created a system whereby the user's PC could actually tap into …
> powerful remote supercomputers; and the user could access that
> without having to download the data to the local machine. The actual
> programs could run remotely, but the user could interact with that data
> within the documents as if they had a control panel to the
> supercomputer right there in the middle of the document that they
> were reading.

JA2146. From the standpoint of the user, the invention enables the use of embedded applications and objects within a web page by simply typing the address of the web page into the browser. JA35-36. Rather than adding the code for every

potential application to the browser, the invention gives the browser the ability to identify and locate the proper application approved for use on the client computer; to seamlessly integrate that application into the web page; and to deliver it automatically to the user's screen. JA35-41; JA2142-46. Today this powerful tool is widely used to deliver interactive content over the web.

The claims at issue[1] typically teach, in relevant part, a browser that:

identif[ies] an embed text format which corresponds to a first location in the [distributed hypermedia] document, where the embed text format specifies the location of at least a portion of an object external to the file, where the object has type information associated with it;

utiliz[es] the type information to identify and locate an executable application external to the file; and

automatically invok[es] the executable application, in response to the identifying of the embed text format, to execute on the client workstation in order to display the object and enable an end-user to directly interact with the object while the object is being displayed within a display area created at the first location within the portion of the hypermedia document being displayed in the browser-controlled window.

JA81-82; *see also* JA53-54. Other claims teach that the enabling text formats are "HTML tags," and still others that the application is "distributed." JA82-84.

The University of California researchers conceived of their invention on September 7, 1993; demonstrated it on November 16, 1993; and filed the

---

[1] Thirteen claims are asserted in this litigation: claims 1 and 6 of the '906 patent, and claims 1, 3, 10, 16, 18, 20, 22, 36, 38, 40, and 42 of the '985 patent. JA19-20.

application for the parent patent on October 17, 1994.[2] JA2150-62; JA22. The PTO

completed its first review and issued the '906 patent on November 17, 1998. JA22.

## B.     The '906 Patent Is Tested in High-Profile Litigation With Microsoft.

In February of 1999, Eolas brought a patent-infringement action against

Microsoft, alleging that its web browser, Internet Explorer, infringed claims 1 and

6 of the '906 patent. *Eolas*, 399 F.3d at 1328. A jury found the claims infringed

and not invalid, and awarded over $520 million in damages. *Id.* at 1332. On appeal

in 2005, this Court left the infringement and damages findings untouched, but

remanded the case for invalidity proceedings on two separate Viola references: one

code base from May 12, 1993, and another from May 27, 1993. *Id.* at 1329-41.

## C.     The Industry Works to Secure Multiple Reexaminations of the '906 Patent; Viola, Mosaic, and HTML+ Are Considered and Distinguished.

The litigation with Microsoft generated intense interest in the industry. In

2003—while the suit was still pending in the trial court—the World Wide Web

Consortium (or "W3C") announced that the invention of the '906 patent was

"essential" to the development of the interactive web, and formed a patent action

group tasked with finding some way to invalidate that patent. JA2367; JA2876-77.

The action group was led by Tim Berners-Lee, director of the W3C, and was

comprised of the key industry players. JA2367-70; JA2876-77. In October of 2003,

---

[2] Defendants contested the conception date at trial, arguing that the invention was first conceived *after* it was publicly demonstrated. JA2739. That position is obviously untenable, but in any event, it has no bearing on any issue in this appeal.

this group sent a letter to the PTO highlighting the significance of the '906 patent and requesting that the invention it disclosed be subjected to the heightened scrutiny of a director-ordered reexamination. JA2367-70; JA9176-80. The letter, drafted by Berners-Lee, was accompanied by the prior art references that, after substantial research, the W3C found most relevant. JA9176-80. These included "Mosaic" and "HTML+," but not—though they had been identified and considered by the W3C—the Viola or MediaView systems. JA2370-74; JA9182.

The PTO granted the W3C's request, and initiated a rare director-ordered reexamination of the '906 patent. JA2877-78. In light of the Viola-related arguments being presented in the Microsoft litigation, the University of California also submitted those references, including the May 12 and May 27 code bases, for consideration by the PTO. JA2877; JA2917-18. In early 2006, about a year after this Court's decision in the *Eolas* appeal, the PTO confirmed the patentability of the invention at issue—in a carefully reasoned, 73-page statement—over all the art that had been submitted, including Mosaic, HTML+, and Viola. JA6026-54.

With respect to Mosaic and HTML+, the PTO found that even the combination of these references would not have taught a browser with interactive processing of external objects. JA5984.

With respect to Viola, after a "thorough and comprehensive review" of over 1,000 code-base files, the PTO found that this system used a different architecture

8

from that taught in the '906 patent. JA6027. As the PTO explained, the invention's browser "uses a type element associated with the external object (i.e., 'type information' as claimed) to identify and locate an executable application to the distributed hypermedia document." JA6033. The Viola browser, in contrast, used "no arguments or additional elements beyond a directory path and filename. The Viola <VOBJF> tag simply loads the Viola script using path and filename specified between the <VOBJF> and </VOBJF> tags." JA6032-33. This simplistic run-the-named-file approach—ultimately incompatible with a web that includes pages specifying the names of malicious files—did "not fairly teach nor suggest where the browser application uses type information associated with the external object to identify and locate an external executable application." JA6033 (PTO's emphasis). The PTO also found that the Viola art did not fairly teach nor suggest the external object or the executable application of the '906 patent. JA6033-35.

This same art—and more—was considered again in a second ex parte reexamination that Microsoft had also requested in 2005. JA45-52. The second reexamination, like the first, ended with a confirmation of patentability. JA45. By the time the '985 patent issued in October of 2009, therefore, some twenty-five PTO examiners had reviewed these patents and confirmed the novelty of the invention they disclose over scores of prior art references, including Viola, Mosaic, and HTML+. JA21-87. The only remaining system at issue in this appeal that had

9

not been considered on multiple occasions by the PTO was MediaView—and that was only because, notwithstanding the industry's intensive effort to invalidate the patents through reexamination, no one had ever considered the MediaView system sufficiently relevant to merit submission to the PTO. JA2370-74; JA9182.

**D.    Eolas Settles the Microsoft Suit and Initiates This One; Numerous Defendants Take Licenses to the '906 and '985 Patents.**

Following the conclusion of the director-ordered reexamination, Microsoft decided to settle its $520 million liability with Eolas rather than continue to press its now-rejected Viola-related invalidity arguments. Microsoft thus sought and received from Eolas, in 2007, a license to practice the patents-in-suit. JA9170-74.

After issuance of the '985 patent in 2009, Eolas brought the present suit asserting infringement of the '906 and '985 patents against some twenty-four companies operating in this space. JA20229-37. The majority sought and received licenses to practice the patents, settling out of the litigation. JA9091; JA9094; JA9122; JA9124-26; JA9145; JA9149-52; JA335; JA373-79; JA383-85; JA420. As trial approached, ten defendants remained. JA20251-52. The district court entered a trial plan in which these defendants would press their invalidity claims collectively in a first trial, with separate defendant-specific trials on Eolas' infringement and damages claims to follow as necessary. JA20251-52. Five more defendants sought and received licenses during the invalidity trial, leaving only the

current Appellees: Amazon.com Inc., Google Inc., J.C. Penney Corporation, Inc., Yahoo! Inc., and YouTube, LLC (collectively, "Defendants"). JA441-45.

## E. In an Invalidity-Only Trial, Defendants Offer Critically Deficient Testimony and Probative Nonobviousness Evidence Is Excluded.

The district court allowed both sides about two days' worth of trial time to present their validity-related evidence and arguments to the jury. JA20252. Rather than using that time to focus on the rigorous, element-by-element proof required to invalidate the patents-in-suit, Defendants spent most of it proving that other pioneers of web-related technology had dedicated their own work to the public, thus ensuring that the Internet would be available "free of charge." JA2404.

Defendants started with Eric Bina, a developer of the early Mosaic browser that had been designed for use in a static web environment. JA2228-53. Bina conceded that "despite working on Mosaic for several years," he never released a version "that could do … the university's invention." JA2264. But he did repeatedly emphasize that his Mosaic software had been "dedicate[d] to the public" and "release[d] freely on the Internet." JA2228; JA2253.

Next came Berners-Lee, the man credited with inventing the World Wide Web—who had also been working for a decade against the patents-in-suit. JA2324; JA2354-55. Like Bina, Berners-Lee never suggested that he had come up with the invention at issue. But he did testify that his own ideas had been dedicated to the public so that "the web that we all own" would remain free. JA2330-32.

11

Defendants then offered David Raggett, the inventor of a tag used in HTML+ to embed static images. JA2384-85. Raggett conceded that he had never seen an instance "where someone has embedded an active object using HTML+." JA2407. But he did make clear that he would never have chosen to patent his invention and "keep the embed tag all to [him]self"—instead he "wanted to make it possible for anybody to implement web technologies free of charge." JA2403-04.

Next came Scott Silvey, developer of the "VPlot" code. JA2417. Defendants alleged that this code was the "application" linked with the May 1993 versions of Viola through a VOBJF file path specifying the name of a small program called "plot.v"—which in turned called VPlot—on the local computer. JA2503; JA2588. Though Silvey offered no VPlot code for demonstration, and no evidence that VPlot had been a distributed application, he did have much to say regarding the moral imperative of dedicating web-related technology to the public:

> I think that it would be important for the jury to know that, you know, we came up with a lot of ideas that are—that are relevant here, and we shared them freely with the public.…We were basically giving something back for the public good. And we derived a lot of personal satisfaction from doing that, and we'd like to make sure that this technology remains open to the web.

JA2419; JA2423-24.

Then came Pei Wei, developer of the Viola browser at the center of Defendants' invalidity case. JA2524-25. Wei admitted that—before he was hired as a consultant to work against the patents-in-suit—he found comparing Viola to

these patents "like comparing apples to kiwis." JA2565-69. He also conceded that the patents' teaching of "type information" was "a difference" between the two systems. JA2589. But like Defendants' other witnesses before him, he took care to highlight his belief that web-related software should always be "releas[ed] for free to the world. And I don't think it's—we want to keep it free." JA2551-52.

The reason for this "keep it free" approach became clear when Defendants' expert, Dr. Richard Phillips, finally came to the stand: he had little to offer in the way of rigorous invalidity evidence. After spending many hours with their anti-patent web pioneers, Defendants spent a mere thirty minutes on direct examination with Phillips going over the Viola system—offered for anticipation and obviousness purposes—and another some thirty minutes going over the MediaView system—offered only for obviousness purposes. JA2725. The implicit thrust of Defendants' case was thus clear: the jury was encouraged to invalidate these patents not because they were anticipated or obvious, but because to do otherwise would threaten the continued availability of a "free" Internet. JA2552.

With respect to Viola, Phillips' brief testimony left gaps in the trial record regarding multiple claim elements: he failed to offer any explanation for how Viola's simplistic run-the-named-file approach used "type information to identify and locate" an executable application; he failed to offer any explanation for how that simplistic approach "specifie[d] the location of at least a portion of an object";

and he failed to offer any testimony showing that Viola had used a "distributed application." JA2690-709. In addition to these failings, Phillips also explained that his anticipation testimony treated the various Viola code bases—recognized by this Court as separate references, *Eolas*, 399 F.3d at 1329-30—as "a single piece of prior art." JA2685. This misguided approach was necessary because Phillips had testified in deposition that the earlier May versions of Viola did not satisfy the "HTML" limitations, JA2749, and the later versions dropped the connection to VPlot that was critical to his invalidity analysis, JA2697.

With respect to MediaView, Phillips' brief testimony again left significant gaps in the trial record. MediaView had no connection to the web—it was simply a program that allowed for the display of custom images internal to the file. JA2709-28. Not surprisingly, therefore, Phillips failed to offer any coherent explanation for how MediaView satisfied the multiple claim elements also missing from Viola. JA2709-28. Phillips did highlight one possible use of MediaView with an external application called "Mathematica." JA2719; JA2729-30. But Mathematica was not automatically invoked, and did not run embedded in MediaView. JA2719; JA20165. It was, in short, not the application of the patents-in-suit. JA81-82. Furthermore, the code upon which Phillips based his MediaView testimony was neither prior art nor in evidence. It was instead—as Defendants later conceded— fabricated during the litigation and incompatible with the prior art version of the

14

software. JA3232-33; JA3269-70. Ignoring these evidentiary deficiencies, Phillips opined that a 1993-era combination of MediaView with a CERN browser—a primitive browser relevant only because, like MediaView, it "was written on a NeXT computer," JA2722—rendered every asserted claim obvious. JA2724-25.

In addition to his gap-filled testimony regarding Viola and MediaView, Phillips offered an entirely conclusory, one-sentence opinion that "the combination of Mosaic, plus HMTL+ render[s] all of the claims obvious even before September of 1993." JA2725-26. There was no element-by-element testimony in the record, however, regarding either of those references—both of which had been considered and distinguished multiple times by the PTO. JA23; JA43-52; JA58-64.

At no point in Phillips' obviousness-related testimony did he explain how a person of ordinary skill in the art would have been motivated to combine any of the references at issue. JA2724-26. Phillips also provided no substantive testimony regarding any secondary considerations. JA2697. Eolas, on the other hand, demonstrated that the repeated failure of others, the industry's praise of the patents-in-suit, and the teaching away by another of Mosaic's developers all reflected powerful and objective evidence of nonobviousness. JA2865-78. But when Eolas tried to offer additional nonobviousness evidence regarding the many substantial licenses to the patents-in-suit, the district court denied that effort on the ground that this evidence would be prejudicial to the invalidity question before the

jury. JA16. The fact-finder thus never considered this admittedly probative evidence that the patents were not obvious. JA16-17.

As a telling footnote to the trial, Defendants argued in closing that their clear and convincing proof of invalidity was found in Viola's code-base files, and they encouraged the jury to "[w]rite … down" particular exhibits it should review while deliberating—including "most importantly, [JDX]272 through 295 are what all of this code is we've presented to you." JA3171. But Defendants had not shown the jury that Viola code, and the cited exhibits were incomprehensible as admitted. So, responding to Defendants' exhortation, the jury sent a note during its deliberations asking for "a computer to view a CD of JDX272 through 275." JA3184-85. Two of the exhibits requested, JDX273 and 275, had never been admitted. JA3189. And Defendants actually objected to the jury's request with respect to the others: "If they're trying to use the code thinking that they're going to get something they're not going to get, then that disappointment could be unfairly prejudicial." JA3196. In any event, the district court had difficulty opening the exhibits, and the jury ultimately returned its verdict—invalidity on every asserted claim—before it had an opportunity to review the requested CDs. JA3200-01.

## F.    The District Court Denies JMOL.

Following the verdict, Eolas renewed its motion for JMOL—first made at the close of evidence—on invalidity by both anticipation and obviousness. JA5-6.

The district court had acknowledged that the principal thrust of Defendants' case had been encouraging the jury "to invalidate [the] patent[s] merely because [it] believe[s] the invention should be dedicated to the public." JA3038-39 ("I think it's been y'all's argument, and I think it is a misstatement of the law."). But the court nevertheless denied JMOL without addressing most of the critical failures of proof highlighted by Eolas. JA3-15.

With respect to anticipation, the district court found that Defendants provided legally sufficient evidence that each of the three principal prior art Viola references—the May 12, May 27, and October 16, 1993 code bases—anticipated each of the thirteen asserted claims. JA13. But the court failed to address the facts that: the PTO expressly rejected the theory that Viola's failed run-the-named-file approach met the "type information" limitation; Phillips never attempted to explain how or why that rejection could have been incorrect; Phillips never identified additional claim elements missing from all of the Viola art; and Phillips conceded that at least one element was missing from the May 1993 code bases, and another was missing from the October 1993 code base. JA6-12.

With respect to obviousness, the district court found that Defendants provided legally sufficient evidence that every prior art combination they had suggested at any time—including one combination addressed by their expert in a single sentence—rendered every asserted claim obvious. JA17. But again, the court

failed to address the facts that: MediaView did not automatically invoke or embed Mathematica; Phillips based his MediaView testimony on fabricated code not in evidence; Phillips never identified an allegedly invalidating combination of Viola references; Phillips never offered any element-by-element testimony regarding either the Mosaic or HTML+ references; and the PTO considered and distinguished most of these references on multiple occasions. JA13-15. The district court did acknowledge that the fact-finder never considered certain probative nonobviousness evidence, but held that this was permissible because some other nonobviousness evidence was considered. JA16-17.

The court thus issued its judgment finding all thirteen of the asserted claims invalid, and this appeal followed. JA1-2; JA20253.

## V.    SUMMARY OF THE ARGUMENT

**A.**    The district court denied JMOL on invalidity by anticipation, concluding that Defendants offered clear and convincing evidence at trial that three separate Viola references anticipated all thirteen asserted claims of the patents-in-suit. JA6-13. That conclusion was in error for two fundamental reasons.

**First**, at least three critical elements—collectively covering every asserted claim—are missing from each of the allegedly anticipating Viola references. None of these references, for example, discloses "type information" associated with an object and utilized by the browser to identify and locate the proper executable

application for use with that object. Instead each of these references "simply loads the Viola script using path and filename specified between the <VOBJF> and </VOBJF> tags." JA6033. During its director-ordered reexamination, the PTO explained how Viola's simplistic run-the-named-file functionality did "<u>not fairly teach nor suggest where the browser application uses type information associated with the external object to identify and locate an external executable application</u>." JA6033 (PTO's emphasis). No witness at trial offered any reason to disagree with the PTO's considered judgment on this point. JA2774-75. Each of the allegedly anticipating Viola references is also missing the "specifies the location … of an object" and "distributed application" claim elements.

**Second**, while Defendants' invalidity expert conceded on cross examination that, "[f]or purposes of anticipation," the three separate Viola references had "to be considered one at a time on their own merit," JA2742-43, he offered no such testimony at trial. Instead, as Defendants later admitted, he considered the three separate references "from the May 12th, all the way to the [October] Alpha code as one single reference. And he did that in his analysis." JA3282; JA2685. There is thus no clear, element-by-element testimony in the trial record that any single Viola reference anticipates any asserted claim.

JMOL with respect to invalidity by anticipation is thus required in this case.

**B.**     The district court also denied JMOL on invalidity by obviousness, concluding that Defendants offered clear and convincing evidence at trial that three separate prior art combinations rendered every asserted claim obvious: MediaView with a CERN browser, Viola with itself, and Mosaic with HTML+. JA17. That conclusion was also in error for two fundamental reasons.

**First**, the allegedly invalidating combinations each suffer from critical failures of proof. The proposed MediaView-with-CERN browser combination fails to disclose numerous claim elements, including those missing from every Viola reference. JA82. And the MediaView code that Defendants' expert based his testimony upon—shown to the jury in a trial demonstrative—was fabricated during the litigation and is not in evidence. JA3235-36; JA3270. The proposed Viola-with-itself combination also again fails to disclose at least the three claim elements noted above—including the critical "type information" limitation. And given that Defendants' expert treated multiple versions of Viola as a single reference, he never explained what elements were allegedly to be found in which version, or how the versions would need to be combined in order to render obvious any asserted claim. JA2685; JA2725. Finally, the proposed Mosaic-with-HTML+ combination suffers from a total failure of proof, as there is no element-by-element testimony regarding either of these references in the trial record. JA2725-26. In

addition to all of this, Defendants' expert also failed to offer testimony regarding any motivation to combine any of the prior art references at issue.

**Second**, the objective evidence of nonobviousness further precludes any legally permissible determination of obviousness. The nonobviousness evidence admitted at trial was unrebutted, and other probative nonobviousness evidence— relating to the substantial licensing activity involving the patents-in-suit—was excluded at trial and never considered by the fact-finder. JA2865-78; JA2817-21.

JMOL with respect to invalidity by obviousness is thus also required in this case. And because Defendants offered only their legally insufficient anticipation and obviousness arguments to the jury, the invalidity verdict resting on those unsupported arguments—along with the corresponding judgment entered by the district court—cannot stand. JA1-18.

## VI.    STANDARD OF REVIEW

The district court's denial of JMOL is subject to *de novo* review in this Court. *Mirror Worlds, LLC v. Apple, Inc.*, 692 F.3d 1351, 1356 (Fed. Cir. 2012). Under the governing Fifth Circuit rules, JMOL must be granted when a party has been fully heard on an issue and "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." *Ford v. Cimarron Ins. Co.*, 230 F.3d 828, 830 (5th Cir. 2000); FED. R. CIV. P. 50.

Legally sufficient evidence—also referred to as "substantial evidence"—is "not a fixed quantum of evidence: What is or is not substantial may only be determined with respect to the burden of proof that the litigant bore in the trial court." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004). The quantum of evidence necessary to support a verdict under the rigorous "clear and convincing" burden applicable in this appeal is thus greater than that necessary to support a verdict under the lower "weight of the evidence" burden. *Id.*; *see also Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 738 (Fed. Cir. 2002); *Jamesbury Corp. v. Litton Indus. Prods.*, 756 F.2d 1556, 1560-61 (Fed. Cir. 1985) ("The precise question here is whether reasonable persons could conclude that [Defendants] proved by clear and convincing evidence that each and every limitation of [the asserted claims] is disclosed by [the allegedly invalidating references]."). If the trial record does not contain clear and convincing evidence of invalidity, in other words, then Eolas is "entitled to have the question removed from the jury and decided as a matter of law." *Jamesbury*, 756 F.2d at 1560.

# VII.  ARGUMENT

**A.    The District Court Erred in Denying JMOL on Invalidity By Anticipation—Multiple Claim Elements Are Missing from the Viola References Offered as Allegedly Anticipating Prior Art.**

### 1.    Proof of anticipation requires clear and convincing evidence that each element of each asserted claim is disclosed in a single prior art reference.

Because a patent is presumed valid, invalidity must be proved by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). Anticipation in particular "requires a showing that each element of the claim at issue, properly construed, is found in a single prior art reference." *Zenith Elecs. Corp. v. PDI Commc'n Sys.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008).

Where—as here—the technology is sufficiently complex to fall beyond the grasp of ordinary laypersons, expert testimony is required to establish anticipation. *Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1267 (Fed. Cir. 2008); JA3017-18. Such testimony "must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference." *Schumer v. Lab. Computer Sys.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002). In short, it "must be clear as well as convincing." *Id.* Testimony that is confusing, conclusory, or generic, on the other hand, is legally insufficient to establish anticipation. *See id.* at 1315-16; *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997); *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004); *Krippelz v. Ford*

23

*Motor Co.*, 667 F.3d 1261, 1268-69 (Fed. Cir. 2012); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012).

This requirement for clear and convincing expert testimony is particularly important where—as here—the allegedly anticipating reference has already been considered by the PTO. *Jamesbury*, 756 F.2d at 1563; JA46-52. In these circumstances the expert's proffered evidence and analysis must have such force that it can overcome the deference naturally due to the PTO's considered judgment and expertise. *Jamesbury*, 756 F.2d at 1563; *see also Microsoft*, 131 S. Ct. at 2251; *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012) ("the examiner found that the prior art applied in this case had not precluded patentability even before the clear and convincing standard came into play").

### 2. There is no clear and convincing evidence of anticipation with respect to at least three claim elements missing from the prior art.

Defendants offered only one witness at trial prepared to provide limitation-by-limitation testimony on anticipation—Dr. Richard Phillips. And Phillips attempted to provide such testimony for only one set of prior art references—the so-called "Viola" art. JA2725. The short time that Defendants spent discussing Viola with Phillips, however, left substantial gaps in the trial record with respect to at least three significant claim elements: a) "type information to identify and locate"; b) "embed text format specifies the location of at least a portion of an object"; and c) "distributed application." Because these three limitations

24

collectively cover every asserted claim, JA53-54; JA81-84; JA9-11, JMOL on invalidity by anticipation should have been granted.

### a.    "type information to identify and locate"

Nine of the thirteen asserted claims contain a "type information" limitation requiring an interactive object that "has type information associated with it." JA53-54; JA82-83; JA10. Such information denotes, as this Court has explained, application types such as "spreadsheets" or "databases." *Eolas*, 399 F.3d at 1328-29. The claims further require that the invention's browser utilize this associated "type information to identify and locate" the right executable application to enable interaction with the object in the browser-controlled window. *Id.*; JA82. Again, as this Court has emphasized, the "identify and locate" functions "are performed by the browser." *Eolas*, 399 F.3d at 1331.

The trial record reflects that Viola does not use type information associated with an object to identify and locate the right executable application to enable interaction with that object. Indeed, after its own "thorough and comprehensive review" of the Viola source code, the PTO confirmed that the Viola browser uses

> no arguments or additional elements beyond a directory path and filename. The Viola <VOBJF> tag simply loads the Viola script using path and filename specified between the <VOBJF> and </VOBJF> tags …. In contrast, the browser [of the asserted claims] uses a type element associated with the external object (i.e., 'type information' as claimed) to identify and locate an executable application to the distributed hypermedia document …. Significantly, the Viola browser application does not fairly teach nor suggest where the browser

> application uses type information associated with the external object to identify and locate an external executable application.

JA6033 (PTO's emphasis); JA6027.[3] Dr. David Martin further confirmed at trial the obvious point underlying the PTO's conclusion—the name of a file is not type information associated with an interactive object and identifying an executable application; it is simply the name of a file. JA2841. And, again echoing the PTO, "what Viola does is whatever name is given between the VOBJF tag, it simply goes and gets that file and does whatever that file tells it to do. It treats that file as a program. And the program can do anything." JA2841.

Martin also explained—in uncontroverted testimony—that this run-the-named-file approach was a principal source of the security problems that plagued Viola: "one of the things [that file] could do is run and delete the user's hard drive." JA2844. Pei Wei agreed that Viola's failure to use "quote/unquote TYPE" was "a difference" between his browser and that of the patents-in-suit, JA2589, and conceded that he held back the public release of Viola due to the security problems caused by its run-the-named-file architecture, JA2844-45. Wei in fact

---

[3] Defendants pointed out that this analysis was directed in particular to the May 12 and May 27, 1993 versions of the Viola code, thereby suggesting that it was not applicable to the October 1993 (or "Alpha") version of the code that was not before the PTO in the first reexamination. JA2714. That suggestion was flatly rejected by Phillips: "Q. Okay. So the Examiner's thorough and comprehensive review of the May 12th and May 27 code also applies to the other code bases that the Examiner didn't have, because according to you, they share the same operation and architecture? A. That's right." JA2766-67.

never solved these problems, but the inventors of the patents-in-suit did—through the use of type information. JA2840-42; JA2147-48. The asserted claims teach a browser that does not simply run any program named in a web page's file path, but instead uses type information to first identify and locate a program recognized as safe and approved for execution on the user's computer. JA2842. Not surprisingly, the interactive web as we know it today uses the type-information approach, and not Viola's failed run-the-named-file approach. JA2147-48; JA2845.

Defendants were well aware of this deficiency in the prior art, and Phillips' expert report offered no coherent theory at all with respect to Viola's alleged use of type information. JA2663. At his deposition, Phillips offered for the first time the theory expressly rejected by the PTO—that the name of the file to be run, with nothing more, somehow satisfied the "type information" limitation. JA2663-64. Before Phillips took the stand at trial, the district court heard argument on whether he could offer testimony with respect to this rejected theory. JA2658-65. When Defendants' counsel conceded that this theory was not in Phillips' expert report, the court sustained Plaintiffs' objection to its admission. JA2665. During his brief direct testimony discussing Viola, therefore, Phillips failed to identify any type information in the prior art. JA2690-709.

Recognizing this failure, Defendants' counsel began to ask Phillips about the missing limitation on redirect. Another objection was interposed, but this time it

was overruled by the district court. JA2773-74. Counsel then queried: "What is the type information in Viola that's used to find the Plot.V executable application that's used to identify and to locate it?" JA2774. Phillips responded: "That would be the name, Plot.V, that is at the end of the information after the VOBJF." JA2774. That conclusory assertion was it. There was no explanation of how the name of a file could be type information; no explanation of how it could be associated with an external object; no explanation of how it could be used by the browser to identify and locate a particular executable application. JA2774-75. Nor could there be any such explanations because, as the PTO had already pointed out, the filename after the VOBJF tag in Viola is not the "type information" required by the asserted claims. JA6032-33; JA2841.

As the trial came to its conclusion, Defendants continued to acknowledge their evidentiary troubles with this issue. Just prior to the close of all evidence, they attempted to re-call Scott Silvey to testify that the Viola code "identified type information." JA3017. The court denied that attempt, however, as this was expert testimony and Silvey was not qualified as an expert. JA3017-18. When the Silvey gambit failed, counsel attempted to offer new "testimony" on this point in the closing argument: "They also said yesterday Viola doesn't have type information. Look at this slide. You can read this. TYPE=percent. TYPE=radio. … That page is filled with type information. No one can fool you and say Viola didn't have

TYPE=. You have the code in front of you." JA3172-73. But of course no witness had suggested that the "TYPE=" references in that slide were associated with external objects or used to identify executable applications—because they play no such role.[4] This attorney argument thus could not help but mislead and confuse the jury. And the fact that Defendants felt the need to mislead and confuse the jury on this point only confirms that, as Defendants have long known, Viola does not meet the critical "type information" limitation. JA6032-33; JA2841-45.

The district court nevertheless found otherwise, concluding that the simple statement "[t]hat would be the name, Plot.V" was sufficient to prove "that the type information limitation is met by the designation of a filename for the target Viola object file." JA11. This was error. As a matter of law, Phillips' conclusory and unsupported assertion regarding the plot.v filename—an assertion considered and expressly rejected by the PTO during its director-ordered reexamination, JA6032-33—cannot constitute clear and convincing evidence of anticipation by Viola's

---

[4] The slide that Defendants' counsel pointed to in closing contained a snippet from the file "testInputAll.hmml," located in JDX272 and JDX290. JA20037; JA20059-61. The "TYPE=" references in that file are within INPUT tags, not within the VOBJF tags identified by Phillips. These particular INPUT tags simply define the appearance of a form for ordering a pizza; they have nothing to do with embedding interactive objects, or with identifying or locating executable applications. JA20037; JA20059-61. And again, there is no testimony in the record, expert or otherwise, linking these "TYPE=" references within INPUT tags to the claim limitations. *See Koito*, 381 F.3d at 1152.

failed run-the-named-file approach.[5] *Jamesbury*, 756 F.2d at 1560, 1563; *Mintz*, 679 F.3d at 1377; *Schumer*, 308 F.3d at 1315-16; *Motorola*, 121 F.3d at 1473. JMOL on invalidity by anticipation was thus required for claims 1 and 6 of the '906 patent, and claims 1, 3, 10, 16, 18, 20, and 22 of the '985 patent. The district court clearly erred in concluding otherwise. JA11.

### b.  "embed text format specifies the location or at least a portion of an object"

Viola's simplistic run-the-named-file approach also accounts for its failure to meet another limitation, found in all thirteen asserted claims, requiring that the "embed text format specifies the location of at least a portion of an object." JA53-54; JA82-85. That is, the claims teach an embed text format specifying the location

---

[5] In trying to make sense of Phillips' conclusory colloquy regarding plot.v on redirect—which identified no object, and identified plot.v as both the type information and the executable application, JA2774—the district court ultimately concluded that plot.v constituted not only the "type information," but also the "executable application" *and* the "object" of the asserted claims. JA11. That is, the court reasoned that the plot.v within the VOBJF tags: a) represents the "object file"; b) functions as the "external executable program"; and c) further "conveys the type information necessary to identify and locate" itself. JA11. This view is untenable—plot.v was simply the name of a file that, when called, ran another file. JA2695; *see Tech. Patents LLC v. T-Mobile UK, Ltd.*, No. 2011-1581, 2012 U.S. App. LEXIS 23508, at *31-35 (Fed. Cir. Oct. 17, 2012). As Defendants themselves told the jury in closing, "plot.v was never interactive. It never showed anything … you couldn't like interface with it and interact with it." JA3170. Plot.v thus cannot be the object of the asserted claims (which is interactive); it cannot be the executable application of the asserted claims (which enables interaction with the object); and—as the PTO confirmed—it cannot be the type information of the asserted claims. JA82; JA6032-33. Again, it was simply the name of a file that, when called, ran another file. JA2695; JA2774.

of an interactive object that will be displayed in the browser-controlled window. JA82. But the VOBJF tag—identified by Phillips as Viola's embed text format, JA2694—"simply loads the Viola script using the path and filename specified between the <VOBJF> and </VOBJF> tags." JA6032-33. The VOBJF file path thus specifies a filename, and nothing more. JA2774; JA2841. As discussed above, the filename Phillips pointed to was plot.v, and "plot.v was never interactive. It never showed anything." JA3170; JA2774. Plot.v thus cannot be the interactive object, and—by logical necessity—the VOBJF file path that specifies only the plot.v filename does not specify the location of at least a portion of the object.

Phillips was asked about this claim limitation at trial, but rather than explaining how the "embed text format specifies the location of at least a portion of an object," he testified only that the alleged embed text format specifies an "executable location." JA2695 ("Q. [C]an you explain how embed text format would specify the location of the object? A. [R]emember that VOBJF, textual information I mentioned, following that is some information that allows a Viola browser to determine where an executable location can be found."). That is, the alleged embed text format specifies only "the name, Plot.V, that is at the end of the information after the VOBJF." JA2774.

There is thus a complete failure of proof with respect to this limitation—not only did Phillips fail to explain how the alleged embed text format specifies the

31

location of the interactive object; he failed even to identify the object that must be located. This failure perhaps explains the district court's confused assumption that plot.v could itself represent the "external Viola object files … for display within the browser." JA10; JA12. Again, while Phillips never identified the alleged interactive object in Viola, there is no question that plot.v cannot be such an object. JA3170. JMOL on anticipation was thus additionally required for claims 1 and 6 of the '906 patent, and claims 1, 3, 10, 16, 18, 20, 22, 36, 38, 40, and 42 of the '985 patent. The district court again clearly erred in concluding otherwise. JA10; *Jamesbury*, 756 F.2d at 1563.

### c.    "distributed application"

Four of the asserted claims contain yet another limitation missing from the relevant prior art—one requiring that "the executable application is part of a distributed application." JA84-85. With respect to Viola, Phillips highlighted only one alleged executable application—VPlot. JA2754. But Phillips never testified that VPlot was a distributed application, or was capable of being distributed as written. His testimony instead reflected only a conclusory opinion of obviousness:

> Q. Let's look at the distributed application limitation that we were talking about in Claims 36 and 40. And back in 1993, would it have been obvious to make the executable application as a distributed application based on Viola?
>
> A. It would have been obvious from several standpoints. …

32

JA2705. Phillips further confirmed on cross examination that he was not "aware of any instance, prior to the end of 1994, where VPlot was, in fact, implemented as a distributed application." JA2754. Phillips thus provided some high-level testimony that it "would have been obvious" to "make the executable application as a distributed application," but provided no testimony indicating that Viola actually anticipated this claim element. Martin, on the other hand, provided unrebutted testimony that "none of the … versions of Viola satisfy the limitations associated with distributed applications." JA2856. JMOL on anticipation was thus further required for claims 36, 38, 40, and 42 of the '985 patent, and the district court clearly erred in concluding otherwise.[6] JA11-12; *Jamesbury*, 756 F.2d at 1560.

### 3.    There is no clear and convincing evidence of anticipation by any single prior art reference.

The elements discussed above are missing from each of the Viola versions offered by Defendants as prior art, and this collective failure of proof requires JMOL on anticipation for each of the thirteen claims asserted in this litigation. JA53-54; JA81-84; JA19-20. JMOL is also appropriate for another reason: while Phillips ostensibly provided an opinion that Viola anticipated the asserted claims,

---

[6] The district court also suggested that plot.v might be the distributed application, JA11-12—something Phillips never proposed, and Defendants never argued. For good reason: the claimed application must enable interactive manipulation of the object, JA82, and again, Defendants made clear that "plot.v was never interactive … you couldn't like interface with it and interact with it." JA3170. Plot.v thus cannot be the claimed executable application, distributed or otherwise.

the "Viola system" he addressed was not a single prior art reference—it was a collection of distinct code bases modified over time. As Phillips explained:

> Q. And for purposes of your testimony today, can we agree that the Viola system we're talking about is the Viola code as it was developed through, on October 16th of 1993? …
>
> A. Yes, that entire collection. …
>
> Q. … does it make sense to consider that collection of Viola code through October 16th of 1993 as a single piece of prior art?
>
> A. Sure. I think it does.

JA2685.

Phillips thus offered a generalized opinion that the "Viola system" anticipated the asserted claims, but defined that "system" for the purposes of his testimony as the "entire collection" of code bases including the October 1993 "Alpha code," the "May 1993 Viola code," and "other Viola code." JA2685-86. Defendants later confirmed that "Phillips says one of ordinary skill in the art would have considered the entire thing a single reference. He would have considered it all the way from the May 12th, all the way to the Alpha code as one single reference. And he did that in his analysis." JA3282.

This misguided approach rendered Phillips' testimony legally insufficient to show anticipation of the asserted claims. As a matter of law, a collection of distinct versions of program code developed and modified over time cannot be a single device, method, or publication. *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340,

1351 (Fed. Cir. 2008); JA3099-100. Indeed, this amalgam approach conflicts with the opinion in *Eolas*, where this Court distinguished between the "different" May 12 and May 27 versions of the Viola code, and treated each as separate reference. 399 F.3d at 1329-30. The approach also mirrors the one rejected in *Koito*, where the defendant entered five references into the record and then its expert "offered a conclusion of invalidity relating to [that] quintet of prior art patents." 391 F.3d at 1151-52. Such generalized testimony over an "entire collection" of references "does not suffice as substantial evidence of invalidity." JA2685; *Koito*, 391 F.3d at 1152; *see also Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 24 (Fed. Cir. 2012) (noting that *Koito* rejected an approach in which "the defendant's expert testified about [five] prior art patents simultaneously").

Defendants are in no position to argue otherwise, as Phillips himself conceded this point on cross examination:

> Q. … For purposes of anticipation … [i]t's not proper to pick from the different Viola code bases and stick them together, is it?
>
> A. No.
>
> Q. They have to be considered one at a time on their own merit?
>
> A. Yes.

JA2742-43. Notwithstanding this concession, Phillips failed to offer any element-by-element testimony considering the Viola code bases "one at a time on their own

merit." JA2742-43.[7] That failure is fatal to Defendants' anticipation case. *See Zenith*, 522 F.3d at 1363; *Schumer*, 308 F.3d at 1315-16; *Koito*, 391 F.3d at 1152.

The district court found no deficiency with this expert "testimony generally applied to all three code bases" because, according to the court, Phillips "distinguished between the code bases when necessary during his invalidity analysis at trial." JA9. In particular, the district court pointed out that Phillips was forced to agree, on cross examination, "that the May 12th Code and May 27th Code do not use HTML to embed." JA9; JA2753. But this concession hardly demonstrates, as the court found, that Phillips' testimony indicated "that all three Viola references anticipated the asserted claims of the '906 and '985 patents." JA13. Indeed, five of the thirteen asserted claims require the use of HTML to enable embedding. JA20038-39. Phillips' HTML-related concession with respect to the May 12 and May 27 references thus merely confirms that those versions of Viola are missing additional limitations even beyond the three outlined above.

_____

[7] Phillips had good reason to avoid pointing to any particular Viola code base in his anticipation analysis, and to improperly treat the entire collection as a single reference—he had testified in deposition that the earlier versions did not satisfy the "HTML" limitations, JA2749, and the later versions dropped the connection with VPlot that was critical to his analysis, JA2697; JA2489-90. The only way he could opine that "Viola" anticipated the asserted claims, therefore, was to improperly treat the different versions of Viola as a single reference. Indeed, Phillips confirmed that in his view, considering the references separately would lead only to a finding of obviousness: "Q. [I]f we put the Alpha code base aside and just looked at code before that for Viola, would the—would asserted Claim 1 be obvious based on Viola? A. Yes, I believe it would." JA2699.

As this example reveals, the amalgam approach was designed to obscure the many claim elements missing from the various Viola references. JA2697-99. It further rendered Phillips' testimony legally insufficient to show anticipation by the prior art, and the district court clearly erred in concluding otherwise. JA9.

**B.    The District Court Erred in Denying JMOL on Invalidity By Obviousness—Defendants Offered Critically Deficient Testimony and Probative Nonobviousness Evidence Was Never Considered.**

> **1.    Proof of obviousness requires clear and convincing evidence with respect to the prior art's scope, content, differences, and motivation to combine, as well as careful consideration of all objective evidence of nonobviousness.**

To invalidate a patent claim based on obviousness, a challenger must demonstrate "by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *ActiveVideo*, 694 F.3d at 1327. The ultimate determination of obviousness is a legal conclusion for the Court, based on underlying factual questions addressed by the jury. *Id.*; *Ashland Oil v. Delta Resins & Refractories*, 776 F.2d 281, 291 (Fed. Cir. 1985) ("This court reviews the ultimate conclusion of obviousness as one of law on which it must exercise independent judgment."). Those underlying factual questions include:

> (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness.

*WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999).

With respect to differences between the invention and the prior art, "a flexible TSM test"—requiring evidence of teachings, suggestions, or motivations pointing toward the invention in the relevant timeframe—"remains the primary guarantor against a non-statutory hindsight analysis" that might otherwise improperly suggest obviousness. *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364-65 (Fed. Cir. 2008); *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1376 (Fed. Cir. 2011); *ActiveVideo*, 694 F.3d at 1327-28.

As with anticipation, "[e]ach fact forming the factual foundation upon which the court bases its ultimate conclusion regarding the obviousness of the claimed subject matter as a whole must be established by clear and convincing evidence." *Ashland*, 776 F.2d at 292. And where—as here—the subject matter is sufficiently complex to fall beyond the grasp of ordinary laypersons, expert testimony is required to establish invalidity on the grounds of obviousness. *See Proveris*, 536 F.3d at 1267; *Koito*, 381 F.3d at 1152. That expert testimony must be detailed, and cannot be conclusory. *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1290 (Fed. Cir. 2006); *ActiveVideo*, 694 F.3d at 1327. Again, this requirement is particularly important when the obviousness argument involves art previously considered by the PTO, for in these circumstances the PTO has determined "that the prior art …

had not precluded patentability even before the clear and convincing standard came into play." *Mintz*, 679 F.3d at 1377; *see also Microsoft*, 131 S. Ct. at 2251.

Of importance to this appeal is the additional rule that all objective evidence of nonobviousness must be considered by the fact-finder before it is legally permissible to conclude that a claim is obvious. *Ashland*, 776 F.2d at 306; *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1555 (Fed. Cir. 1983); *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2012); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, No. 2011-1555, 2012 U.S. App. LEXIS 23486, at *13 (Fed. Cir. Nov. 15, 2012). Excluding nonobviousness evidence from the relevant calculus constitutes an "error as a matter of law." *Ashland*, 776 F.2d at 307. And such evidence includes that relating to licensing activity involving the patents-in-suit. *Transocean*, 2012 U.S. App. LEXIS 23486, at *25-27; *Mintz*, 679 F.3d at 1380; *WMS Gaming*, 184 F.3d at 1359; *Star*, 655 F.3d at 1375-76; *Rothman v. Target Corp.*, 556 F.3d 1310, 1322 (Fed. Cir. 2009) (approving charge "that the jury 'must consider' objective indicia of nonobviousness, such as … licensing activity").

**2.    There is no clear and convincing evidence of obviousness with respect to the prior art's scope, content, and differences—and no evidence at all with respect to any motivation to combine.**

Defendants offered only one witness at trial prepared to provide obviousness testimony relating to the prior art's alleged scope, content, and differences—

Phillips. And Phillips attempted to offer obviousness opinions on just three proposed prior art combinations—MediaView with a CERN browser; Viola with itself; and Mosaic with HTML+. JA2725-32. The brief testimony on each of these proposed combinations, however, again reflects critical failures of proof.

### a.     MediaView does not render the asserted claims obvious.

Defendants made much of the fact that MediaView had not been considered by the PTO in connection with the patents-in-suit. JA2714. But that is only because, through two prosecutions and two reexaminations—with the industry's zealous involvement and intense scrutiny—no one ever considered MediaView sufficiently relevant to merit submission to the PTO. JA58-64; JA2370-74; JA9182. This is not surprising: MediaView was not a web browser at all; it was a media viewer that allowed for the display of custom images internal to the MediaView file. JA2713. That plainly has little to do with the invention of the patents-in-suit, which allows for automatic invocation of executable applications to permit interaction with an external object inside a browser-controlled window. JA82. Phillips nevertheless opined that MediaView combined with a primitive CERN browser rendered every asserted claim obvious. JA2725. The district court's one-paragraph conclusion that this opinion provided legally sufficient evidence of invalidity constitutes clear error for at least three reasons. JA15.

**First**, numerous limitations are missing from the proposed combination. While MediaView was principally a self-contained program, Phillips alleged that it could be used with one external application—"Mathematica." JA2719. To that end, Phillips offered the conclusory assertions that a so-called "ViewCell" in MediaView was the "embed text format" of the asserted claims, and a so-called "TIFF button" was the "type information." JA2717-19; JA82-84.

But Phillips never testified that ViewCell, as required by the claims, specified the location of at least a portion of an object. JA2717-18; JA82. He briefly suggested that "Figure 4" in JDX5—an article he wrote in 1991—depicted the relevant "object data." JA2718; JA9189. JDX5, however, does not teach that ViewCell specifies the location of a portion of this data, and Phillips provided no reason to think that it does.[8] JA9188-90; JA2718. Phillips likewise never testified that TIFF button was associated with the alleged object data, or that it was used as type information to identify and locate the executable application for interaction with that object data. JA2718-19; JA82. He again briefly suggested that JDX5 was

---

[8] Phillips had good reason to avoid testifying that ViewCell was linked in any way to the object in Figure 4. Another article he wrote in 1991—JDX7—explains that there are fundamentally different "ways to construct MediaView documents." JA9204. Figure 4 reflects one approach, using a so-called "source document structure," in which a MediaView document is rendered from a Unix directory containing "a huge number" of ".obj" and ".anm" files. JA9204; JA9188-90; JA2718. ViewCell and TIFF button are elements connected with another approach, using a so-called "binary document structure," in which a MediaView document is rendered from an ".mvw" file. JA9204; JA3268-70.

relevant, but—again—JDX5 does not teach that TIFF button is associated with the data in Figure 4, nor that it is used to identify and locate an executable application of any kind. JA2719; JA9188-90. Phillips also failed to demonstrate that Mathematica was implemented as a distributed application. JA2723; JA84. And JDX5 in fact confirms that Mathematica was not so implemented, but instead came "bundled with [the] Next computers" on which the MediaView system would run. JA9188. The trial record reflects, in other words, that the three claim elements missing from Viola are also missing from MediaView.[9]

And those are not the only elements missing from MediaView. The Mathematica application identified by Phillips was, in addition, neither automatically invoked nor embedded within a MediaView-controlled window. Phillips suggested that his custom, internal-to-the-file images could work that way, but admitted that with respect to the alleged application, "the idea is you can click on this, and that links to an external [Mathematica] program [which has] nothing to do with MediaView." JA2718-19; JA20165 ("[b]y clicking on this, we bring another window up"). There is no evidence, therefore, that MediaView teaches

> automatically invoking the executable application, in response to the
> identifying of the embed text format, to … enable an end-user to

---

[9] Phillips never opined that it might have been obvious to combine one or more of the Viola references with MediaView. JA2717-23. But even if he had, the fact that all of these references are missing at least the three identified claim elements confirms that such an opinion would not have supported a finding of obviousness.

directly interact with the object while the object is being displayed …
in the browser-controlled window.

JA82.

Adding a CERN browser would not have filled these many gaps. The only testimony Phillips offered with respect to the CERN browser was to point out that, like MediaView, it "was written on a NeXT computer," and so—according to Phillips—it could have been combined "with MediaView to produce the full HTML capability." JA2722; JA2867. But as demonstrated, MediaView was missing far more than just "HTML capability." This proposed combination was thus insufficient as a matter of law.[10] *Motorola*, 121 F.3d at 1473.

**Second**, Phillips' MediaView opinion lacks record support. Phillips explained that he had been unable to locate source code for the version of MediaView offered as prior art. JA2711 ("I have no idea what happened to it."). Defendants did ultimately find a disk—submitted at trial as JDX184—containing executable code for a few of the custom images internal to the prior art MediaView

---

[10] The district court suggested that Phillips also opined that MediaView could be combined with a Mosaic browser. JA15. In fact Phillips only opined that it would have been obvious to combine MediaView with a CERN browser. JA2722-25. In any event, Phillips' brief discussion of the Mosaic browser makes clear that it suffered from the same deficiencies as MediaView—it did not teach, among other things, automatic invocation of an executable application for interaction with an external object inside the browser-controlled window. JA2683.

43

file. JA2713; JA20174. Critically missing, however, was any code showing the alleged link between MediaView and Mathematica.

Instead of admitting this deficiency to the jury and the district court, Defendants created—during the pendency of this litigation—their own so-called "MediaView Hypermedia File Excerpt" containing new code for an alleged "embed text format" and "type information associated with Mathematica object." JA3229-32; JA20073-74; JA20125. They then pasted that newly written code into a trial demonstrative—but cited it as an excerpt from JDX184. JA20073-74; JA20125. And each time Phillips discussed MediaView at trial, he based his brief testimony on the code in that demonstrative: "we see that view cell character …. That's the embed character … what we're also seeing is the type information highlighted in blue." JA2718; JA2775-76.[11]

When Defendants were called on this point after the trial, they suggested that the code excerpt had been "inadvertently marked as JDX184," but conceded that they had "absolutely no excuse. It is not part of JDX184." JA3268-70. In fact the prior art version of MediaView could not even run the newly written code. JA3235-36. Defendants' alleged "mistake" regarding this fabricated code is

---

[11] This emphasis on the newly written code shown in the MediaView trial demonstrative was particularly striking given Phillips' assertion elsewhere that, with respect to the prior art Viola code, he "would never have shown the jury any of those files because it would not have been meaningful." JA2765-66.

troublesome, JA3270, but the critical point here is that the demonstrative excerpt on which Phillips relied to show the alleged existence of an externally-linking capability in MediaView is nowhere in evidence. For this reason as well—left unaddressed by the district court, JA15—Phillips' MediaView-related testimony is necessarily insufficient to establish obviousness as a matter of law. *See Ashland*, 776 F.2d at 292; *ActiveVideo*, 694 F.3d at 1327-28.

**Third**, Phillips' testimony on the proposed MediaView-with-CERN browser combination is deficient under this Court's opinion in *ActiveVideo*. Like the expert in that case, Phillips "failed to explain … which combination(s) of elements in specific references would yield a predictable result, or how any specific combination would operate or read on the asserted claims." 694 F.3d at 1327. He simply noted that, because MediaView and the CERN browser were both "written on a NeXT computer," it would have been obvious to combine them "to produce the full HTML capability." JA2722; JA2725. Such testimony "is not sufficient and is fraught with hindsight bias." *ActiveVideo*, 694 F.3d at 1327.

And Phillips' testimony "regarding the motivation to combine references"— he offered none—"was likewise insufficient." *Id.* at 1328. Like the expert in *ActiveVideo*, Phillips failed "to explain why a person of ordinary skill in the art would have combined elements from specific references *in the way the claimed invention does*." *Id.* In fact the most relevant—and uncontroverted—evidence at

trial suggested that such a combination would not have been obvious to one of ordinary skill in the art at the time of the invention:

> Q. Now, Dr. Phillips, you worked on MediaView for about six years; you had a Ph.D.; you were at one of the … foremost research laboratories in the United States; and nobody in the world was a bigger expert on MediaView than you; and you never combined MediaView with the CERN web browser, did you?

> A. I did not.

JA2735-39. The highly probative TSM test thus points away from an obviousness finding on the MediaView-with-CERN browser combination, and Phillips' failure even to address that test is fatal to his obviousness opinion. *Ortho-McNeil*, 520 F.3d at 1364; *ActiveVideo*, 694 F.3d at 1327-28.

### b. Viola does not render the asserted claims obvious.

Phillips also offered an obviousness opinion based on some unspecified combination of the various Viola code bases: "all the asserted claims [are] obvious based upon Viola … and it's obvious to combine any of the prior art to fill any gaps, for example." JA2725; JA2699. The district court—without discussing any purported Viola-with-itself combination—also found clear and convincing evidence of invalidity on this ground. JA14. This conclusion again constitutes clear error for at least three reasons.

**First**, there is inherent ambiguity as to the allegedly invalidating combination of Viola references. As noted above, Phillips improperly treated the

"entire collection" of Viola code bases as a "single piece of prior art." JA2685. In consequence, Phillips never clearly explained to the jury what claim elements were allegedly to be found in which versions of Viola, or how the various versions would need to be combined in order to render obvious any particular asserted claims. The conclusory and generic nature of his Viola-related testimony—"it's obvious to combine any of the prior art to fill any gaps, for example," JA2725—is insufficient to establish obviousness as a matter of law. *See Alza*, 464 F.3d at 1290-91; *Schumer*, 308 F.3d at 1315-16. Like the evidence rejected in *ActiveVideo*, "[t]his testimony is generic and bears no relation to any specific combination of prior art elements." 694 F.3d at 1328.

**Second**, even if Phillips had offered clear testimony that, for example, one of the May 1993 versions of Viola combined with the October 1993 Alpha version of Viola rendered obvious particular asserted claims—though he did not—that testimony would still fail to support an obviousness finding because, as shown above, none of the prior art versions of Viola satisfies the "type information to identify and locate," "embed text format specifies the location of at least a portion of an object," and "distributed application" limitations required by the asserted claims. JA53-54; JA82-85; JA19-20. The across-the-board failures of proof with respect to these significant claim elements cannot be cured by any combination of the various Viola code bases. *Motorola*, 121 F.3d at 1473.

**Third**, the development of the Viola code bases over time teaches away from any obviousness-related combination that Defendants might have suggested. Phillips' invalidity analysis relied heavily upon the connection between VPlot and the earlier versions of Viola, and that connection was dropped in the later versions of Viola.[12] JA2697; JA2489-90. The highly relevant TSM test—with respect to which Phillips again offered no testimony—thus points away from an obviousness finding on any combination of the Viola code bases. *Ortho-McNeil*, 520 F.3d at 1364. And again, Phillips' failure even to address that test is fatal to his obviousness opinion. *ActiveVideo*, 694 F.3d at 1327-28.

### c.    Mosaic and HTML+ do not render the asserted claims obvious.

Phillips also offered, as a one-sentence throw away, an entirely conclusory obviousness opinion with respect to Mosaic and HTML+:

> Q. And does the combination of Mosaic, plus HTML+ render all of the claims obvious even before September of 1993?
>
> A. I believe so.

---

[12] Phillips offered the conclusory assertion on this point that "it would have been obvious to combine the Alpha code base with VPlot." JA2697. But history disproves this assertion: Wei in fact believed that the obvious step was to remove the connection between VPlot and the later code bases. JA2697; JA2489-90. In any event, Phillips conceded that there was no evidence that VPlot had ever been publicly distributed. JA2744; JA2587. It could not possibly have been obvious to a person of ordinary skill, therefore, to combine any later code base with some VPlot code that was unavailable and unknown to the public. JA2744.

48

JA2725-26. That was it. There was no element-by-element discussion of Mosaic or HTML+; no discussion of how this combination would read on any asserted claim; no discussion of why a person of ordinary skill in the art would have been motivated to combine elements from these references in the manner of the claims. *ActiveVideo*, 694 F.3d at 1328. The district court nevertheless found clear and convincing evidence of invalidity with respect to this combination as well—on the ground that one fact witness had talked generally about Mosaic, and another fact witness had talked generally about HTML+. JA14-15; JA2225-33; JA2384-96. This conclusion once again constitutes clear error for at least three reasons.

**First**, it fails to acknowledge the rigors of proving invalidity based on obviousness. *Motorola*, 121 F.3d at 1473. When "testifying on invalidity, an expert must compare the construed claims to the prior art." *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1325 (Fed. Cir. 2008). This comparison must be done on a patent-by-patent, claim-by-claim, and element-by-element basis. *Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1379 (Fed. Cir. 1999); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001). In short, an asserted claim cannot be invalidated in the absence of testimony providing an element-by-element comparison of the construed claims to the prior art at issue. *See Schumer*, 308 F.3d at 1315-16. There is no such testimony anywhere in this record—from expert or fact witnesses—regarding either Mosaic or HTML+.

Phillips' conclusory testimony on the proposed combination is also fundamentally deficient under *ActiveVideo*, 694 F.3d at 1327-28. And this deficiency is particularly significant given the fact—again left unaddressed by the district court—that this very Mosaic-with-HTML+ combination was considered and distinguished in great detail by the PTO during its director-ordered reexamination of the '906 patent. JA5984-6025; JA14-15; *Mintz*, 679 F.3d at 1377.

**Second**, the court's conclusion fails to acknowledge that the inventor of the HTML+ embed tag, David Raggett, testified that he had never seen an instance "where someone has embedded an active object using HTML+." JA2407. There is no evidence at all, in other words, that combining HTML+ with Mosaic would meet the interactivity-related limitations of the asserted claims. JA53-54; JA82-85; JA5984; *Motorola*, 121 F.3d at 1473; *Jamesbury*, 756 F.2d at 1563.

**Third**, the court's conclusion fails to acknowledge that Mosaic developer Marc Andreessen had expressed his belief that it was inadvisable to provide browser support for embedded interactive objects. JA2868; JA5338-39. Again, therefore, the highly relevant TSM test—which Phillips did not address—points away from an obviousness finding on the proposed Mosaic-with-HTML+ combination. *ActiveVideo*, 694 F.3d at 1327-28; *Mintz*, 679 F.3d at 1377-78.

**3.  There is no clear and convincing evidence of obviousness in light of the objective evidence of nonobviousness—critical pieces of which were never considered by the fact-finder.**

The preceding confirms that JMOL on obviousness is appropriate because Defendants failed to offer clear and convincing evidence that any proposed prior art combination would have rendered obvious any of the asserted claims. The highly probative nonobviousness evidence offered by Eolas—some of which was admitted, and some of which was excluded from consideration by the fact-finder— also requires JMOL for each of the thirteen claims asserted in this litigation.

**a.  Defendants never addressed the objective nonobviousness evidence admitted at trial.**

This Court has "repeatedly emphasized that the objective indicia" of nonobviousness—also referred to as "secondary considerations"—"may often be the most probative and cogent evidence … in the record." *Mintz*, 679 F.3d at 1378; *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1075-76 (Fed. Cir. 2012). Indeed, such evidence can "be entitled to such weight that it may be decisive." *Ashland*, 776 F.2d at 306. That was true in this case: the objective nonobviousness evidence admitted at trial was the most probative evidence available to the jury—and it was unrebutted. Phillips offered just one conclusory (and confusing) sentence regarding secondary considerations: "I did consider those and, still, I find that Viola is obvious." JA2697.

Martin, in contrast, offered cogent testimony on the objective and powerful evidence that the asserted claims were not obvious. As he explained, Defendants brought in a parade of web-related pioneers to testify regarding the work they had dedicated to the public. JA2865-74. But aside from its obvious emotional appeal, that testimony did not support Defendants' invalidity case. Instead it simply demonstrated that all of these pioneers, operating with every resource and incentive in the relevant timeframe, had failed to come up with the invention in the asserted claims. JA2264; JA2407; JA2738-39; JA2865-74. Martin further explained that some of those pioneers had in fact believed, in the relevant timeframe, that it was inadvisable to provide—as the asserted claims taught— browser support for embedded interactive objects. JA2868; JA5338-39.

The objective evidence did not end there. Having failed to come up with the invention themselves, a number of these pioneers later worked tirelessly, hand-in-hand with the industry, to invalidate the patents-in-suit. JA2358-60; JA2367-70; JA2567-69. Under the direction of web-inventor Berners-Lee, the W3C—a consortium of leading high-tech companies—"recognized that the invention was important" and "essential" to the development of an interactive web. JA2874-77. Berners-Lee and the W3C thus led a concerted effort to secure multiple reexaminations, including a rare director-ordered reexamination, of the '906 patent. JA2367-70; JA2877-78. After substantial research into potentially relevant

art, the W3C submitted Mosaic and HTML+ for the PTO's review. JA9176-80. The University of California—seeking to put these invalidity challenges to rest—submitted the Viola art. JA2877. Though Berners-Lee had identified MediaView during his research, he determined that this reference was not sufficiently relevant to merit the PTO's review. JA2370-74; JA9182. Notwithstanding this intensive effort from these pioneers and the industry, the patents survived their multiple reexaminations, as well as another subsequent prosecution. JA21-55; JA56-87; JA6026-54. The invention at issue has thus been repeatedly considered, and repeatedly found patentable, by those with expertise at the PTO. JA2877-79.

All of this constituted probative and cogent objective evidence of nonobviousness admitted at trial—and Defendants rebutted none of it. JA2697. But perhaps even more critically, additional nonobviousness evidence was excluded at trial, and never considered by the jury. JA16-17; JA2817-21.

> ### b.    Other admittedly probative nonobviousness evidence was excluded at trial, and never considered by the fact-finder.

This Court has also repeatedly emphasized that whatever objective evidence of nonobviousness is present—all of it—must be considered by the fact-finder before it is legally permissible to conclude that a claim is obvious. *Mintz*, 679 at 1378-79; *Ashland*, 776 F.2d at 306-07; *Cyclobenzaprine*, 676 F.3d at 1077. Indeed, the Court recently confirmed that when "the ultimate question of obviousness is put to the jury, the jury must be able to review all of the evidence of obviousness."

*Transocean*, 2012 U.S. App. LEXIS 23486, at *13-14; *see also Rothman*, 556 F.3d at 1322. And such must-be-considered evidence includes a proposed showing that "other companies have been accused of infringement by [the patentee] and … requested to license the [patents-in-suit]." *Mintz*, 679 F.3d at 1380; *see also Transocean*, 2012 U.S. App. LEXIS 23486, at *25-27 (finding licenses in excess of litigation costs substantial evidence of nonobviousness); *WMS Gaming*, 184 F.3d at 1360 (finding licenses to the patent-in-suit "strong indicia that the patent is not obvious"); *Star*, 655 F.3d at 1376 (concluding licenses to the patent-in-suit supported JMOL overturning jury verdict on obviousness).

Eolas proposed to show the jury that, as in *Mintz*, *Transocean*, *WMS Gaming*, and *Star*, other companies had requested and received—at substantial cost—licenses to the patents-in-suit. JA2817-21; JA9091; JA9094; JA9122; JA9124-26; JA9145; JA9149-52. The agreed-upon royalties in these licenses exceeded any prospective litigation costs. JA2817-21; JA9091; JA9094; JA9122; JA9124-26; JA9145; JA9149-52. But the district court excluded that evidence, ensuring that it was never considered by the fact-finder. JA2820-21; JA16-17. Because this admittedly probative nonobviousness evidence was excluded at trial, the jury was precluded—as a matter of law—from making a supportable determination that the asserted claims were obvious. *See Ashland*, 776 F.2d at 306-07; *W.L. Gore*, 721 F.2d at 1555; *Mintz*, 679 F.3d at 1378.

In denying JMOL on invalidity by obviousness, the district court conceded that the fact-finder had been precluded from considering probative secondary-considerations evidence.[13] JA17. But the court reasoned that this failure was acceptable because "the jury heard and considered other evidence" relating to "other secondary considerations." JA17. This Court's precedent is clear, however, that a legal determination of obviousness cannot stand when the fact-finder has considered only some—but not all—of the available secondary-considerations evidence. *Ashland*, 776 F.2d at 306-07; *Cyclobenzaprine*, 676 F.3d at 1077; *W.L. Gore*, 721 F.2d at 1555; *Transocean*, 2012 U.S. App. LEXIS 23486, at *13-14.

---

[13] The district court excluded the licensing evidence on the ground that "the probative value of [the agreements] is outweighed by the prejudicial effect that it would have … within the context of the case." JA16. This was an abuse of discretion. Because of the trial's unusual procedural posture, the jury was presented with only one question: whether the asserted claims were invalid. The only possible prejudicial effect that the licensing evidence could have had, therefore, was to suggest that the claims were valid. And the secondary-considerations case law cited above makes clear that this is precisely the inference that the fact-finder is permitted to draw from such evidence. *Mintz*, 679 F.3d at 1380; *Transocean*, 2012 U.S. App. LEXIS 23486, at *13-14, 25-27. Indeed, the Microsoft license is particularly probative, as Microsoft entered that license after this Court had remanded Microsoft's litigation with Eolas for an invalidity trial on the very Viola art at issue. There is thus an unusually strong nexus between the Microsoft license and the nonobviousness of the patents-in-suit. In any event, the law is clear that—whatever a trial's procedural posture—the fact-finder must consider all of the nonobviousness evidence before an obviousness determination can be made. *Ashland*, 776 F.3d at 306. And when "the ultimate question of obviousness is put to the jury, the jury must be able to review all of the evidence of obviousness." *Transocean*, 2012 U.S. App. LEXIS 23486, at *13-14. The district court conceded that this did not happen here. JA17.

55

Indeed, the Court's recent decisions in *Mintz* and *Transocean* make clear that the factual inquiry regarding "objective evidence of nonobviousness" must be just as complete and rigorous as the factual inquiry regarding "differences between the claimed invention and the prior art." *Mintz*, 679 F.3d at 1375-78; *Transocean*, 2012 U.S. App. LEXIS 23486, at *13-14. The district court's holding that the jury could return an obviousness verdict after considering only some of the probative nonobviousness evidence is thus legally equivalent to holding that the jury could return an obviousness verdict after considering only some of the differences between the invention and the prior art. Of course both propositions are false—all relevant evidence must be considered by the fact-finder. *Mintz*, 679 F.3d at 1375, 1378; *Transocean*, 2012 U.S. App. LEXIS 23486, at *13-14. Given the district court's concession that this did not happen here, JA17, JMOL on obviousness was required. The district court clearly erred in concluding otherwise. JA16-17.

## VIII.  CONCLUSION AND RELIEF REQUESTED

Because Defendants offered only anticipation and obviousness arguments to the jury, and because JMOL is required on both of these arguments, JMOL overturning the jury's invalidity verdict in its entirety is required. Thus, for the reasons discussed above, this Court should reverse the district court's denial of JMOL on invalidity by anticipation and obviousness, reverse the district court's

amended final judgment reflecting that denial of JMOL, enter judgment that the

asserted claims are not invalid, and remand this case for further proceedings.


Date: November 28, 2012                    Respectfully submitted,


                                           /s/ Joel L. Thollander

                                           Mike McKool
                                           *Principal Attorney*
                                           Douglas Cawley
                                           McKOOL SMITH, P.C.
                                           300 Crescent Court, Suite 1500
                                           Dallas, TX 75201
                                           (214) 978-4000

                                           Kevin Burgess
                                           John B. Campbell
                                           Joel L. Thollander
                                           McKOOL SMITH, P.C.
                                           300 W. 6th Street, Suite 1700
                                           Austin, Texas  78701
                                           (512) 692-8700

                                           *Attorneys for Plaintiffs-Appellants*
                                           *Eolas Technologies Inc. and*
                                           *The Regents of the University of*
                                           *California*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **EOLAS TECHNOLOGIES INCORPORATED and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,** | § § § § § | |
| **Plaintiffs,** | § § | |
| vs. | § § | **CASE NO. 6:09-CV-446** |
| **ADOBE SYSTEMS, INC., AMAZON.COM INC., CDW CORPORATION, CITIGROUP INC., THE GO DADDY GROUP, INC., GOOGLE INC., J.C. PENNEY CORPORATION, INC., STAPLES, INC., YAHOO! INC., AND YOUTUBE, LLC.,** | § § § § § § § § | |
| **Defendants.** | § | |

## AMENDED FINAL JUDGMENT

The Invalidity and Inequitable Conduct trial was tried in this action with the undersigned presiding, and the jury has reached a verdict regarding invalidity.

It is **ORDERED** that:

- Claims 1 and 6 of U.S. Patent No. 5,838,906 are found to be invalid.

- Claims 1, 3, 10, 16, 18, 20, 22, 36, 38, 40, and 42 of U.S. Patent No. 7,599,985 are found to be invalid.

Accordingly, it is **ORDERED, ADJUDGED, AND DECREED** that Plaintiffs take nothing from Amazon.com Inc.; Google Inc.; J.C. Penney Corporation, Inc.; Yahoo! Inc.; and YouTube, LLC ("Defendants") and that all pending motions are **DENIED**.

It is further **ORDERED, ADJUDGED, AND DECREED** that Plaintiffs' claims for infringement are dismissed with prejudice based on Defendants' invalidity affirmative defense, and Defendants' counterclaims other than for invalidity are hereby dismissed without prejudice as moot.

**JA000001**

It is further **ORDERED, ADJUDGED, AND DECREED**, that Defendants' costs of court should be taxed against Plaintiffs. The parties are directed to the Standing Order Regarding Bill of Costs on the Court's website.

**So ORDERED and SIGNED this 19th day of July, 2012.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **EOLAS TECHNOLOGIES INCORPORATED and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,** | § § § § § § | |
| **Plaintiffs,** | § § | |
| **vs.** | § § | **CASE NO. 6:09-CV-446** |
| **ADOBE SYSTEMS, INC., AMAZON.COM INC., CDW CORPORATION, CITIGROUP INC., THE GO DADDY GROUP, INC., GOOGLE INC., J.C. PENNEY CORPORATION, INC., STAPLES, INC., YAHOO! INC., AND YOUTUBE, LLC.,** | § § § § § § § § § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Renewed Motion of Plaintiffs the Regents of the University of California and Eolas Technologies Incorporated for Judgment as a Matter of Law Under Rule 50(b) That the Asserted Claims of the Patents-In-Suit Are Not Invalid, or in the Alternative for a New Trial Under Rule 59 (Docket No. 1367). For the reasons stated below, Plaintiffs' motion is **DENIED**.

## BACKGROUND

On October 6, 2009, Eolas Technologies Incorporated ("Eolas") filed this action against multiple defendants[1] alleging infringement of U.S. Patent Nos. 5,838,906 ("the '906 Patent") and

---

[1] The original defendants included Adobe Systems Inc.; Amazon.com, Inc.; Apple Inc.; Argosy Publishing, Inc.; Blockbuster Inc.; CDW Corp.; Citigroup Inc.; eBay Inc.; Frito-Lay, Inc.; The Go Daddy Group, Inc.; Google Inc.; J.C. Penney Corporation, Inc.; JPMorgan Chase & Co.; New Frontier Media, Inc.; Office Depot, Inc.; Perot Systems

7,599,985 ("the '985 Patent"). The '906 Patent, entitled "Distributed Hypermedia Method for Automatically Invoking External Application Providing Interaction and Display of Embedded Objects Within a Hypermedia Document," issued on November 17, 1998, to Michael Doyle, David C. Marin, and Cheong S. Ang. The '985 Patent, entitled "Distributed Hypermedia Method and System for Automatically Invoking External Application Providing Interaction and Display of Embedded Objects Within a Hypermedia Document," issued to the same inventors on October 6, 2009. The '906 and '985 Patents are generally directed to a software system that is operable without user activation to access an object, present it in a browser display window, and then allow a user to manipulate the object.

Prior to the instant case, Eolas sued Microsoft in the Northern District of Illinois for infringement of the '906 Patent. The jury found that Microsoft infringed the patent and that it was not invalid. The Federal Circuit remanded for a new trial regarding certain invalidity defenses. *See Eolas Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1341 (Fed. Cir. 2005). Thereafter, the parties settled in 2007.

Eolas is the exclusive licensee of the patents-in-suit. The Regents of the University of California, the owner of the patents-in-suit, was added as a necessary co-plaintiff on September 22, 2011. On February 6, 2012, the case proceeded to trial on a staged basis—invalidity first, then separate infringement trials. After a four day invalidity-only trial, the jury—by general verdict—found the asserted claims of the patents-in-suit invalid. Eolas challenges the jury's verdict as unsupported by the evidence and alternatively requests a new trial.

---

Corp.; Playboy Enterprises International, Inc.; Rent-A-Center, Inc.; Staples, Inc.; Sun Microsystems Inc.; Texas Instruments Inc.; Yahoo! Inc.; and YouTube, LLC. Only Amazon.com, Inc.; Google Inc.; J.C. Penney Corporation, Inc.; Yahoo! Inc.; and YouTube, LLC (collectively "Defendants") remain in the case.

## APPLICABLE LAW

Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). Thus, a jury verdict must be upheld, and judgment as a matter of law may not be granted, unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* at 700. The jury's verdict must be supported by "substantial evidence" in support of each element of the claims. *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004).

A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). The moving party is entitled to judgment as a matter of law, "only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005).

## ANALYSIS

Eolas challenges the jury's general verdict of invalidity, asserting that there is insufficient evidence of anticipation and insufficient evidence of obviousness. "A general jury verdict of invalidity should be upheld if there was sufficient evidence to support any of the alternative theories of invalidity." *Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1339 (Fed. Cir.

2011). Eolas alternatively requests a new trial for three reasons: (1) the jury was confused and based its verdict on passion and prejudice rather than evidence; (2) the verdict was against the great weight of the evidence; and (3) the exclusion of license evidence from jury consideration was improper.

*Waiver*

As an initial matter, Defendants argue that Eolas failed to preserve the arguments it now makes in its request for judgment as a matter of law. "If a party fails to move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on an issue at the conclusion of all of the evidence, that party waives both its right to file a renewed post-verdict Rule 50(b) motion and also its right to challenge the sufficiency of the evidence on that issue on appeal." *Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229, 238 (5th Cir. 2001) (citing *Logal v. United States*, 195 F.3d 229, 231 (5th Cir. 1999)). However, the Court finds that Eolas properly raised its current arguments in its written 50(a) motion for judgment as a matter of law. *See* Docket No. 1338, at 4–6 (addressing anticipation by Viola); *id.* at 6–7 (addressing obviousness by combinations of Viola, MediaView, Mosaic, and HTML+). As such, Eolas's current 50(b) arguments were preserved.

*Invalidity by Anticipation*

Eolas contends that there was insufficient evidence to support a finding of invalidity by anticipation. A patent claim is invalid as anticipated if the claimed "invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant . . . ." 35 U.S.C. § 102(a) (2006). A claim is also invalid as anticipated if the claimed "invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ." 35 U.S.C. § 102(b)

(2006). Finally, a claim is invalid as anticipated if "before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g) (2006). Anticipation requires the presence in the prior art of each and every limitation of the claimed invention. *Amgen, Inc. v. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1366 (Fed. Cir. 2009).

Defendants' anticipation case focused on the Viola web browser, written by Pei Wei. Viola stands for "visually interactive object-oriented language and application." Tr. Trial Afternoon Session 80:18–20, Feb. 7, 2012. Eolas first contends that Defendants' expert, Dr. Richard Phillips, improperly used a collection of Viola codebases to show anticipation rather than analyzing a single codebase. Eolas also argues that each Viola codebase in evidence does not anticipate for failure to satisfy four claim limitations. The four limitations at issue are: (1) embed text format specifies the location of at least a portion of an object; (2) type information to identify and locate; (3) distributed application; and (4) HTML tags.

*Viola as a Single Reference*

Several versions of the Viola source code were introduced into evidence; each version represents a snapshot of the code at a point in time. The three versions at issue are: (1) a snapshot from May 12, 1993, JDX 292 ("May 12th Code"); (2) a snapshot from May 27, 1993, JDX 293 ("May 27th Code"); and (3) a snapshot from October 16, 1993, JDX 290 ("Alpha Code"). These codebases span approximately five months and have substantial similarities. *See* Tr. Trial Morning Session 120, Feb. 8, 2012 (explaining that the Viola codebases have the same architecture and operation).

Eolas argues that Phillips improperly considered the three distinct Viola codebases as a single prior art reference during his anticipation analysis. To support its argument, Eolas cites the following snippet of Phillips's direct examination:

> Q. . . . . And for purposes of your testimony today, can we agree that the Viola
> system we're talking about is the Viola code as it was developed through, on
> October 16th of 1993?
> A. Yes.
> Q. Okay. So when we talk about Viola today, that's what we're talking about?
> A. Yes, that entire collection.
> Q. And that includes the Viola Alpha code base?
> A. It does include the Viola Alpha code base.
> Q. Okay. From the—from the vantage point of one of ordinary skill in the art,
> does it make sense to consider that collection of Viola code through October
> 16th of 1993 as a single piece of prior art?
> A. Sure. I think it does.

*Id.* at 38. Eolas contends that this testimony, coupled with the fact that Phillips did not explicitly perform an element-by-element anticipation analysis at trial for each of the three Viola codebases, necessitates a judgment that there was insufficient evidence in the record to support a finding of anticipation.

Shortly after making these statements, Phillips explained that it would have been obvious for one of skill in the art to use the different Viola codebases together. *Id.* at 39. This suggests that Phillips meant that multiple references can be used as invalidating prior art in an obviousness analysis. Regardless, Phillips later clarified that each codebase must be considered independently for an invalidity-by-anticipation analysis:

> Q. [For purposes of anticipation, i]t's not proper to pick from the different Viola
> code bases and stick them together, is it?
> A. No.
> Q. They have to be considered one at a time on their own merit?
> A. Yes.

*Id.* at 95–96. Thus, Phillips made it clear that for Viola to anticipate the asserted claims, at least one of the three codebase references must embody all of the claim limitations. Phillips also noted that his expert report analyzed the codebases individually. *See id.* at 101 (noting that the report discussed the May 12th Code and the May 27th Code); *id.* at 96 (stating that he considered five different codebases in his expert report).

Phillips's statements indicate that his testimony generally applied to all three codebases: "Q. Okay. So when we talk about Viola today, that's what we're talking about? A. Yes, that entire collection." *Id.* at 38. Further, he distinguished between the codebases when necessary during his invalidity analysis at trial. *See, e.g.*, *id.* at 106 (agreeing that the May 12th Code and May 27th Code do not use HTML to embed); *id.* at 107 (agreeing that the May 12th Code and May 27th Code do not use MIME TYPE); *id.* at 45 ("Viola Alpha also uses HTTP."). Wei also discussed differences between the codebases. *See* Tr. Trial Afternoon Session 136–39, Feb. 7, 2012 (explaining that the May 12th and May 27th Code were not able to use HTTP) ; *id.* at 164 (explaining that the Alpha Code was able to use HTTP). Thus, a reasonable juror could infer that, to the extent that Phillips testified generally about Viola, the testimony applied to all three codebases in evidence.

In sum, the Court finds that Phillips did not use the multiple codebases in evidence as a single reference for his anticipation invalidity analysis. Phillips's expert report addressed the codebases individually, and the testimony at trial addressed the codebases separately when necessary to highlight differences between them. Further, Phillips clarified for the jury that each codebase must be considered individually for invalidity by anticipation purposes. Thus, Phillips's testimony about Viola related to all three codebases in evidence unless further clarified. Phillips did not improperly combine references during his Viola anticipation analysis.

*Embed Text Format Limitation*

All of the asserted claims include an embed text format limitation. The limitation as stated in Claim 1 of the '985 Patent is representative: "where the embed text format specifies the location of at least a portion of an object external to the file." '985 Patent col. 17:13–15. Eolas argues that the Viola references fail to meet this limitation.

There was sufficient evidence for a reasonable juror to find that the all of the Viola references meet this limitation. Scott Silvey, one of skill in the art and the author of the VPlot application[2], testified that he worked extensively with Wei to build a demonstration of Viola and VPlot for Sun Microsystems engineers in May 1993. He further testified that the VOBJF tag, an embed text format in Viola, points to an "external program that is a Viola object or a Viola script or an external executable application." Tr. Trial Afternoon Session 11, Feb. 7, 2012. Wei explained that the VOBJF tag "[taught] the browser that this location in the page is where you can embed a viewer object." *Id.* at 77. Thus, the VOBJF tag identifies a location in the web page for a viewer object that can display the results or output of the Viola object, script, or executable application identified by the VOBJF tag. Phillips also testified that the VOBJF tag identifies the location of an object for display in the browser: "[F]ollowing [the VOBJF tag] is some information that allows a Viola browser to determine where an executable location can be found. It executes that small program and then discovers that there is a larger program, which is called VPlot. And VPlot then allows the user to interact with data that he sees on . . . the screen." Tr. Trial Morning Session 48, Feb. 8, 2012. The testimony of Phillips, supported by that of Silvey and Wei, reveals that the Viola references used a VOBJF tag (embed text format) that identified the location of external Viola object files, scripts, or applications for display within the browser. A reasonable juror could find this evidence sufficient to show that the all of the Viola references meet the "embed text format specifies the location" limitation.

*Type Information Limitation*

Claims 1 and 6 of the '906 Patent, and claims 1, 3, 10, 16, 18, 20, and 22 of the '985 Patent contain the "type information to identify and locate" limitation. This limitation requires

---

[2] VPlot was an application that displayed graphics in three-dimensional coordinate systems. Tr. Trial Morning Session 48–49, Feb. 8, 2012.

that the object identified by the embed text format have type information associated with it and that the browser use this type information "to identify and locate an executable application." '985 Patent col. 17:17–18.

Phillips testified that the type information limitation is met by the designation of a filename for the target Viola object file. Tr. Trial Morning Session 127, Feb. 8, 2012. After the VOBJF tag, a filename is provided for the Viola object file, which contains instructions for executing or displaying the object. *See* Tr. Trial Afternoon Session 35, Feb. 8, 2012 (Martin explaining that a filename is provided after the VOBJF tag); Tr. Trial Afternoon Session 33, Feb. 7, 2012 (Silvey explaining how the viola object file, Plot.V, is an external executable program that is run embedded in a web page when addressed by the VOBJF tag). Thus, there is evidence to support Phillips's assertion that the designation of a Viola object file conveys the type information necessary to identify and locate an executable application related to the object. The testimony from Phillips, Martin, and Silvey is sufficient for a reasonable juror to find that the type information limitation is met by all of the Viola references through the filename designation in conjunction with a VOBJF tag.

*Distributed Application Limitation*

Claims 36, 38, 40, and 42 of the '985 Patent contain a distributed application limitation: "wherein the executable application is part of a distributed application." '985 Patent col. 21:47–48. The Court construed the term "distributed application" as "an application that is capable of being broken up and performed among two or more computers." Docket No. 914, at 22. Eolas contends that there was no evidence that the Viola references met the distributed application limitation.

Both Plot.v and VPlot were identified as executable applications that interacted with Viola. *See* Tr. Trial Afternoon Session 33, Feb. 7, 2012 (identifying Plot.v as an external Viola

executable); Tr. Trial Morning Session 48, Feb. 8, 2012 (identifying VPlot as an executable application that interacts with Viola). The Viola references, Viola object files (e.g., Plot.v), and VPlot are all based on the X Window System, and Phillips testified that "X Windows is, by definition, a distributed capability." Tr. Trial Morning Session 59, Feb. 8, 2012. Tim Berners-Lee also testified that X Windows "allows you to run a program in one place and have it display in another place." Tr. Trial Morning Session 50, Feb. 7, 2012. Finally, Silvey testified that Viola and the VPlot application were based on X Windows and thus had inherent distributed capabilities. *See* Tr. Trial Afternoon Session 22, Feb. 7, 2012 (explaining that Viola and VPlot had the capability of running on a local computer or remotely over sockets and pipes). The evidence shows that Viola, Plot.v, and VPlot were based on the X Window System, which had inherent distributed capabilities. There was testimony that VPlot was demonstrated to the Sun engineers in May 1993 and at the World Wide Web Wizards Workshop in July 1993. *See id.* at 7–15 (discussing the Sun demonstration); *id.* at 19 (discussing the Wizards Workshop demonstration). Further, Plot.v was included in all three Viola codebases in evidence. Thus, there was sufficient evidence for a reasonable juror to find that all three of the Viola codebases met the distributed application limitation.

*HTML Tags Limitation*

Claims 3, 18, 22, 38, and 42 of the '985 Patent contain an HTML tags limitation. Claim 3 is representative, stating: "The method of claim 2 where the text formats are HTML tags." '985 Patent col. 17: 29–30. Claim 2, in turn, states: "The method of claim 1 where: the information to enable comprises text formats." *Id.* col. 17:27–28. Finally, the relevant portion of claim 1 states: "receiving, at the client workstation from the network server over the network environment, at least one file containing *information to enable* a browser application to display at least a portion of a distributed hypermedia document within a browser-controlled window . . . ." *Id.* col. 17:1–5

(emphasis added). Thus, the HTML tags must "enable a browser application to display at least a portion of a distributed hypermedia document." Eolas contends that the evidence presented at trial does not support this limitation.

Wei testified that all three Viola codebases in evidence were able to parse HTML documents. *See* Tr. Trial Afternoon Session 167, Feb. 7, 2012. Phillips testified that "Viola can understand and execute HTML tags." Tr. Trial Morning Session 57, Feb. 8, 2012. Silvey and Bina also testified that Viola interpreted HTML. *See* Tr. Trial Afternoon Session 52, Feb. 7, 2012 (Silvey stating that Viola parsed HTML pages); Tr. Trial Afternoon Session 180–81, Feb. 6, 2012 (Bina describing how Viola fetched and displayed HTML documents via HTTP). This evidence provides a sufficient basis for a reasonable juror to find that the HTML limitation was met by the all of the Viola references.

*Conclusion on Anticipation*

For these reasons, the evidence at trial was sufficient for a reasonable juror to find that the all three Viola references anticipated the asserted claims of the '906 and '985 Patents.

**Invalidity by Obviousness**

Eolas contends that there was insufficient evidence to support a finding that the asserted claims are obvious. Eolas also argues that an obviousness finding by the jury cannot be upheld because the jury was unable to consider certain objective indicia of nonobviousness—namely, settlement and license agreements pertaining to the patents-in-suit that were excluded as overly prejudicial.

Obviousness is a question of law based on underlying findings of fact. *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009). Obviousness is based on several factual inquiries: "(1) the scope and content of the prior art; (2) the differences between the prior art and the claims at

issue; (3) the level of ordinary skill in the art at the time the invention was made; and (4) objective evidence of nonobviousness, if any." *Id.*

*Sufficiency of the Evidence*

Defendants and Eolas each presented expert testimony regarding obviousness. *See, e.g.*, Tr. Trial Morning Session 128, Feb. 8, 2012 (Phillips summarizing his opinion that the asserted claims are obvious); Tr. Trial Afternoon Session 74, Feb. 8, 2012 (Martin summarizing his opinion that the asserted claims are not obvious). Further, Defendants presented multiple fact witnesses concerning the state of the art during the critical time period.

Bina, a co-developer of the Mosaic browser and cofounder of Netscape Communications, testified regarding Mosaic, Viola, X Windows, and demonstrations at the World Wide Web Wizards Workshop. *See* Tr. Trial Afternoon Session 179–87, Feb. 6, 2012 (regarding Mosaic and Viola); *id.* at 195–96 (regarding X Windows); *id.* at 196–202 (regarding Viola demonstrations at the World Wide Web Wizards Workshop in Boston). Tim Berners-Lee testified regarding the evolution of the World Wide Web and early web browsers. *See* Tr. Trial Morning Session 44–59. Dave Raggett, the inventor of the HTML+ EMBED tag, testified regarding the EMBED tag and how it could work with existing browsers such as Mosaic and Viola. *See id.* at 99–111. Silvey, the coauthor of the Viola VPlot demonstrations, testified regarding those demonstrations and the functionality they entailed. *See id.* at 143–48; Tr. Trial Afternoon Session 7–17, Feb. 7, 2012. Wei, the inventor of Viola, testified regarding the Viola browser. *See* Tr. Trial Afternoon Session 69–97, Feb. 7, 2012. Karl Jacob, a Sun Microsystems engineer, testified about Viola demonstrations. *See id.* at 173–78. Based on the testimony of Phillips and these witnesses, there was evidence to support an obviousness determination in light of Viola, Mosaic, and the HTML+ EMBED tag.

Phillips also testified extensively about the MediaView system that he invented. *See* Tr. Trial Morning Session 29–33, 62–78, Feb. 8, 2012. He testified that the system met all elements of the asserted claims except the HTML tag limitation. *Id.* at 74–75. He stated that it was obvious to combine MediaView with browser technology such as the CERN browser or Mosaic, thus rendering the asserted claims invalid as obvious. *Id.* Further, Dan Sadowski testified regarding a public demonstration of the MediaView 2.1 reference. *See* Tr. Trial Afternoon Session 182–84, Feb. 7, 2012. Accordingly, there was evidence to support an obviousness determination in light of MediaView, Mosaic, and the CERN browser.

These witnesses presented evidence relevant to the obviousness determination, and each was cross-examined by Eolas.[3] The jury heard all of this testimony relevant to whether the asserted claims are obvious, weighed it, and found the asserted claims invalid. The Court finds that the evidence of record is sufficient for a reasonable juror to find that the asserted claims are invalid as obvious in light of Viola or MediaView combined with Mosaic and the HTML+ EMBED tag.

*Excluded Evidence*

At trial, Eolas sought to introduce several settlement and license agreements that stemmed from the instant litigation and the previous *Microsoft* litigation. Before trial, the Court granted Eolas's motion in limine excluding (1) any argument, evidence, testimony or reference to Eolas's damages or infringement claims; and (2) any argument, evidence, testimony, or reference to Eolas's business success or failure. *See* Docket No. 1298. Further, the parties agreed—to the extent possible—not to reference the *Microsoft* litigation during the trial. *See* Tr. Pretrial Motions 25–28, Feb. 6, 2012; Tr. Trial Afternoon Session 10–11, Feb. 6, 2012.

---

[3] Jacobs testified by video, and each party designated questions and answers to be included in the video shown to the jury.

Eolas argued that the settlement and license agreements were relevant as secondary indicia of nonobviousness. *See* Tr. Trial Morning Session 7, Feb. 8, 2012. Defendants argued that allowing the agreements would violate Eolas's motion in limine, which was granted by the Court and which the Defendants had operated under during the presentation of their case. They would violate Eolas's motion in limine, first, because the agreements would constitute evidence about the success or failure of Eolas's licensing business; second, the agreements would necessarily implicate Eolas's infringement claims because many of the agreements regarded parties to the instant dispute; and, finally, permitting the settlement and license agreements would create a sideshow regarding the outcome and import of the *Microsoft* litigation. After hearing the parties' arguments and reviewing the disputed licenses, the Court determined that "the probative value of [the agreements] is outweighed by the prejudicial effect that it would have . . . within the context of the case." Tr. Trial Afternoon Session 15, Feb. 8, 2012.

The Court determined that the licenses were not admissible. Eolas now argues that their exclusion precluded the jury from considering important secondary indicia of nonobviousness, which the Federal Circuit has ruled is a necessary part of the obviousness calculus. *See Mintz v. Dietz & Watson, Inc.*, No. 2010-1341, 2012 U.S. App. LEXIS 10884, at *12–13 (Fed. Cir. May 30, 2012); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000). However, the jury heard and considered evidence relating to secondary considerations of nonobviousness. *See* Tr. Trial Afternoon Session 60–68, Feb. 8, 2012 (Martin testifying about the failure of others); *id.* at 69–73 (Martin testifying about industry praise); *id.* at 63 (Martin testifying about teaching away). Further, the jury instructions listed several secondary considerations that should be considered in making the obviousness determination. *See* Docket No. 1351, at 16–17. Just because secondary indicia of nonobviousness are one element of the obviousness determination does not mean that

all evidence related to secondary considerations is necessarily admissible. Here, the Court determined that the probative value of these recent litigation settlements did not outweigh their potential prejudicial impact on the trial, especially in light of the granting of Eolas's earlier motion in limine. Even though some evidence pertaining to one secondary consideration was barred, the jury heard and considered other evidence relating to all other secondary considerations of nonobviousness. Accordingly, the exclusion of the settlement and license agreements is not sufficient to preclude the obviousness finding by the jury.

*Conclusion on Obviousness*

The evidence at trial was sufficient for a reasonable juror to find that Viola or MediaView, Mosaic, and the HTML+ EMBED tag rendered the asserted claims obvious. Further, the exclusion of recent litigation-based settlement and license agreements was appropriate due to their likely prejudicial effect on the proceedings. Finally, the jury did consider and hear evidence pertaining to other secondary indicia of nonobviousness. For these reasons, the Court finds that the jury's general verdict of invalidity is supported by an evidentiary basis that the asserted claims are obvious.

### New Trial

Eolas alternatively seeks a new trial. Under the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." FED. R. CIV. P. 59(a). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.3d 610, 612–13 (5th Cir. 1985).

Eolas argues that it is entitled to a new trial for three reasons: (1) the jury was confused and based its verdict on passion and prejudice rather than on the relevant evidence; (2) there is no clear and convincing proof of invalidity; or (3) the exclusion of the settlement and license agreements precluded consideration of nonobviousness evidence. The Court has already, in essence, addressed the latter two arguments and finds them unpersuasive. Regarding jury confusion and prejudice, there is no indication that the jury based its verdict on anything other than the evidence presented at trial. As the Court noted when concluding the trial, counsel for both sides conducted themselves in a professional manner throughout the proceedings. The jury was able to weigh the evidence and credibility of the witnesses before arriving at its verdict. A new trial is not warranted.

## CONCLUSION

For these reasons, Renewed Motion of Plaintiffs the Regents of the University of California and Eolas Technologies Incorporated for Judgment as a Matter of Law Under Rule 50(b) that the Asserted Claims of the Patents-In-Suit Are Not Invalid, or in the Alternative for a New Trial Under Rule 59 (Docket No. 1367) is **DENIED**.

**So ORDERED and SIGNED this 19th day of July, 2012.**

_____
**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| EOLAS TECHNOLOGIES INCORPORATED and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CASE NO. 6:09-CV-446 |
| ADOBE SYSTEMS, INC., AMAZON.COM INC., CDW CORPORATION, CITIGROUP INC., THE GO DADDY GROUP, INC., GOOGLE INC., J.C. PENNEY CORPORATION, INC., STAPLES, INC., YAHOO! INC., AND YOUTUBE, LLC., | § § § § § § § | |
| Defendants. | § | |

### VERDICT FORM FOR INVALIDITY TRIAL

1. Did Defendants prove by clear and convincing evidence that any of the following asserted claims of the '985 Patent and '906 Patent are invalid?

Answer "Yes" or "No" for each listed claim.

<u>Patent '985</u>

Claim 1    Yes

Claim 3    Yes

Claim 10    Yes

Claim 16    Yes

Claim 18    Yes

Claim 20    Yes

Claim 22    Yes

Claim 36    _Yes_

Claim 38    _Yes_

Claim 40    _Yes_

Claim 42    _Yes_


**Patent '906**

Claim 1    _Yes_

Claim 6    _Yes_


Signed this ___9th___ day of February 2012


JURY FOREPERSON



U 7309520

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME;

### UNITED STATES DEPARTMENT OF COMMERCE

#### United States Patent and Trademark Office

August 10, 2011

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *5,838,906*
ISSUE DATE: *November 17, 1998*

By Authority of the
**Under Secretary of Commerce for Intellectual Property**
**and Director of the United States Patent and Trademark Office**

N. WILLIAMS
**Certifying Officer**

UC/EOLAS EXHIBIT

# PX0001

6:09-CV-446 LED

EOLASTX-0000338254



US005838906A

# United States Patent [19]

## Doyle et al.

[11] Patent Number: **5,838,906**

[45] Date of Patent: **Nov. 17, 1998**

[54] **DISTRIBUTED HYPERMEDIA METHOD FOR AUTOMATICALLY INVOKING EXTERNAL APPLICATION PROVIDING INTERACTION AND DISPLAY OF EMBEDDED OBJECTS WITHIN A HYPERMEDIA DOCUMENT**

[75] Inventors: **Michael D. Doyle**, Alameda; **David C. Martin**, San Jose; **Cheong S. Ang**, Pacifica, all of Calif.

[73] Assignee: **The Regents of the University of California**, Oakland, Calif.

[21] Appl. No.: **324,443**

[22] Filed: **Oct. 17, 1994**

[51] Int. Cl.⁶ .................... **C06F 9/44; C06F 15/16; C06F 17/30**

[52] U.S. Cl. ................................ 395/200.32; 395/200.28; 395/680; 395/685; 345/326; 345/346; 707/501; 707/513; 707/515; 707/516

[58] Field of Search .............................. 395/157, 200.03, 395/161, 118, 144, 145, 146, 147, 148, 683, 777, 778, 762, 326, 333, 334, 335, 676, 682, 685, 684, 200.32, 200.33, 200.47–200.49; 707/501, 513, 515, 516; 345/326, 343, 346

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | |
|---|---|---|
| 4,815,029 | 3/1989 | Barker et al. ......................... 707/516 |
| 4,847,604 | 7/1989 | Doyle ...................................... 340/706 |
| 4,949,248 | 8/1990 | Caro ...................................... 395/200.03 |
| 5,146,553 | 9/1992 | Noguchi et al. ....................... 707/516 |
| 5,202,828 | 4/1993 | Vertelney et al. ...................... 364/419 |
| 5,204,947 | 4/1993 | Bernstein et al. ..................... 395/157 |
| 5,206,951 | 4/1993 | Khoyi et al. ........................... 395/683 |
| 5,274,821 | 12/1993 | Rouquie ................................ 395/705 |
| 5,307,499 | 4/1994 | Yin ........................................ 395/700 |
| 5,321,806 | 6/1994 | Meinerth et al. ...................... 395/162 |
| 5,321,808 | 6/1994 | Rupp et al. ............................ 395/164 |
| 5,347,632 | 9/1994 | Filepp et al. ...................... 395/200.09 |

(List continued on next page.)

### OTHER PUBLICATIONS

Stephen Le Hunte, "<EEMBED>—Embedded Objects", HTML Reference Library—HTMLIB v2.1, 1995: n.pag. Online. Internet.
"A Little History of the world Wide Web", n.pag. Online. Internet: available http://www.w3.org/History.html.
"NCSA Mosaic Version Information", n.pag. Online. Internet: available http://www.ncsa.uiuc.edu/SDG/Software.
"The second phase of the revolution", WIRED, Oct. 1994, pp. 116–152.

(List continued on next page.)

*Primary Examiner*—Dinh C. Dung
*Attorney, Agent, or Firm*—Townsend and Townsend and Crew LLP

[57] **ABSTRACT**

A system allowing a user of a browser program on a computer connected to an open distributed hypermedia system to access and execute an embedded program object. The program object is embedded into a hypermedia document much like data objects. The user may select the program object from the screen. Once selected the program object executes on the user's (client) computer or may execute on a remote server or additional remote computers in a distributed processing arrangement. After launching the program object, the user is able to interact with the object as the invention provides for ongoing interprocess communication between the application object (program) and the browser program. One application of the embedded program object allows a user to view large and complex multi-dimensional objects from within the browser's window. The user can manipulate a control panel to change the viewpoint used to view the image. The invention allows a program to execute on a remote server or other computers to calculate the viewing transformations and send frame data to the client computer thus providing the user of the client computer with interactive features and allowing the user to have access to greater computing power than may be available to the user's client computer.

**10 Claims, 9 Drawing Sheets**

Microfiche Appendix Included
(4 Microfiche, 375 Pages)



Copy provided by USPTO from the PIRS Image Database on 08/02/2011

**5,838,906**
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,367,635 | 11/1994 | Bauer et al. | 395/200.32 |
| 5,390,314 | 2/1995 | Swanson | 395/500 |
| 5,418,908 | 5/1995 | Keller et al. | 395/200.32 |
| 5,544,320 | 8/1996 | Konrad | 395/200.09 |
| 5,581,686 | 12/1996 | Koppolu et al. | 395/340 |
| 5,606,493 | 2/1997 | Duscher et al. | 395/200.32 |
| 5,652,876 | 7/1997 | Ashe et al. | 707/516 |

### OTHER PUBLICATIONS

Vetter, Ronald "Mosaic and the World–Wide Web", Computer Magazine, v.27, Iss.10, pp. 49–57, Oct. 1994.

Wynne et al. "Lean Management, Group Support Systems, and Hypermedia: a Combination Whose Time Has Come," System Sciences, 1993 Anual Hawaii Int'l Conf., pp. 112–121.

Hansen, Wilfred "Andrew as a Multiparadigm Environment for Visual Languages," Visual Languages, 1993 IEEE Symposium, pp. 256–260.

Moran, Patrick "Tele–Nicer–slicer–Dicer: A New Tool for the Visualization of Large Volumetric Data", NCSA Technical Report (TRO14), Aug. 1993.

Berners–Lee "Hypertext Markup Language (HTML)", HTML Internet Draft, IIIR working Group, Jun. 1993.

University of Southern California's Mercury Project—"USC Mercury Project:Interface", Project Milestones, USC Press Release—obtained from Internet, http://www.usc.edu/dept/raiders/.

Hansen, Wilfred "Enhancing documents with embedded programs: How Ness extends in the Andrew ToolKit", IEEE Computer Language, 1990 International Conference.

Tani, M., et al., "Object–Oriented Video: Interaction with Real–World Objects Through Live Video", May 1992, p. 593–598.

Crowley, T., et al., "MMConf: An Infrastructure for Building Shared Multimedia Applications", CSCW 90 Proceedings, Oct. 1990, p. 329–342.

Davis, H., et al., "Towards An Integrated Information Environment With Open Hypermedia System", ACM ECHT Conference, Dec. 1992, pp. 181–190.

Ferrara, F., "The KIM Query System", Abstract, SIGCHI Bulletin, vol. 6, No. 3, Jul. 1994, pp. 30–39.

Gibbs, S., "Composite Multimedia and Active Objects", OOPSLA '91, pp. 97–112.

Davis, H., et al., "Microcosm: An Open Hypermedia System", Interchi '93, Apr. 1993, p. 526.

Vaziri, A., "Scientific Visualization in High–Speed Network Environments", Computer Networks and ISDN Systems 22, 1991, pp. 111–129.

Cullen, J., et al., "The Use of FTAM to access graphical pictures across wide area networks", Computer Networks and ISDN Systems, 1992, pp. 337–383.

Lashkari, Y.Z., et al., "PLX: A Proposal to Implement a General Broadcasting Facility in a Distributed Environment Running X Windows", Comput. & Graphics, vol. 16, No. 2, pp. 143–149, 1992.

Kirste, T., "Spacepicture—An Interactive Hypermedia Satellite Image Archival System", Comput. & Graphics, vol. 17, No. 3, pp. 251–260, 1993.

Coulson, G., et al., "Extensions to ANSA for Multimedia Computing", Computers Networks and ISDN Systems 25, 1992, pp. 305–323.

Huynh, Duong Le, et al., "PIX: An Object–Oriented Network Graphics Environment", Comput. & Graphics, vol. 17, No. 3, pp. 295–304, 1993.

Berners–Lee, T.J., et al., The World–Wide Web, Computer Networks and ISDN Systems 25, 1992, pp. 454–459.

Shackelford, D.E., et al., "The Architecture and Implementation of a Distributed Hypermedia Storage System", Hypertext '93 Proceedings, Nov. 1993, pp. 1–13.

Labriola, D., "Remote Possibilities", PC Magazine, Jun. 14, 1994, pp. 223–228.

Udell, J., "Visual Basic Custom Controls Meet OLE", Byte Magazine, Mar. 1994, pp. 197–200.

Sarna, D.E., et al., "OLE Gains Without (Much) Pain", Datamation Magazine, Jun. 15, 1994, pp. 31 and 113.

Rizzo, J., "What's OpenDoc?", MacUser magazine, Apr. 1994, pp. 119–123.

Fogarty, K., et al., "Microsoft's OLE can be network Trojan Horse", Network World Magazine, Jun. 27, 1994, vol. 11, No. 26, pp. 1 and 75.

"Cello WWW Browser Release 1.01a", Article obtained from the Internet, ftp.law.cornell.edu/pub/L11/Cello no DDE, Mar. 16, 1994, pp. 2–9.

"OLE 2.0: Death to Monoliths", Byte Magazine, Mar. 1994, p. 122.

Copy provided by USPTO from the PIRS Image Database on 08/02/2011



*FIG. I.* PRIOR ART

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0001.0004



*FIG. 2.* PRIOR ART

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338258

PX0001.0005



*FIG. 3.*



*FIG. 4.*

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0001.0006



FIG. 5.

Copy provided by USPTO from the PIRS Image Database on 08/02/2011



*FIG. 6.*

Copy provided by USPTO from the PIRS Image Database on 08/02/2011



*FIG. 7A.*



*FIG. 7B.*

Copy provided by USPTO from the PIRS Image Database on 08/02/2011



*FIG. 8A.*



*FIG. 8B.*

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0001.0010



FIG. 9.

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0001.0011



*FIG. 10.*

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0001.0012

5,838,906

**1**

## DISTRIBUTED HYPERMEDIA METHOD FOR AUTOMATICALLY INVOKING EXTERNAL APPLICATION PROVIDING INTERACTION AND DISPLAY OF EMBEDDED OBJECTS WITHIN A HYPERMEDIA DOCUMENT

### NOTICE REGARDING COPYRIGHTED MATERIAL

A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure as it appears in the Patent and Trademark Office file or records, but otherwise reserves all copyright rights whatsoever.

### BACKGROUND OF THE INVENTION

This invention relates generally to manipulating data in a computer network, and specifically to retrieving, presenting and manipulating embedded program objects in distributed hypermedia systems.

Computer networks are becoming increasingly popular as a medium for locating and accessing a wide range of data from locations all over the world. The most popular global network is the Internet with millions of computer systems connected to it. The Internet has become popular due to widely adopted standard protocols that allow a vast interconnection of computers and localized computer networks to communicate with each other. Computer systems connected to a network such as the Internet may be of varying types, e.g., mainframes, workstations, personal computers, etc. The computers are manufactured by different companies using proprietary hardware and operating systems and thus have incompatibilities in their instruction sets, busses, software, file formats and other aspects of their architecture and operating systems. Localized computer networks connected to the Internet may be incompatible with other computer systems and localized networks in terms of the physical layer of communication including the specific hardware used to implement the network. Also, different networks use differing, incompatible protocols for transferring information and are not able to communicate with each other without a translation mechanism such as a "gateway".

The Internet provides a uniform and open standard for allowing various computers and networks to communicate with each other. For example, the Internet uses Transfer Control Protocol/Internet Protocol ("TCP/IP") that defines a uniform packet-switched communication standard which is ultimately used in every transfer of information that takes place over the Internet.

Other Internet standards are the HyperText Transmission Protocol ("HTTP") that allows hypertext documents to be exchanged freely among any computers connected to the Internet and HyperText Markup Language ("HTML") that defines the way in which hypertext documents designate links to information. See, e.g., Berners-Lee, T. J., "The world-wide web," Computer Networks and ISDN Systems 25 (1992).

A hypertext document is a document that allows a user to view a text document displayed on a display device connected to the user's computer and to access, retrieve and view other data objects that are linked to hypertext words or phrases in the hypertext document. In a hypertext document, the user may "click on," or select, certain words or phrases in the text that specify a link to other documents, or data

**2**

objects. In this way, the user is able to navigate easily among data objects. The data objects may be local to the user's computer system or remotely located over a network. An early hypertext system is Hypercard, by Apple Computer, Inc. Hypercard is a standalone system where the data objects are local to the user's system.

When a user selects a phrase in a hypertext document that has an associated link to another document, the linked document is retrieved and displayed on the user's display screen. This allows the user to obtain more information in an efficient and easy manner. This provides the user with a simple, intuitive and powerful way to "branch off" from a main document to learn more about topics of interest.

Objects may be text, images, sound files, video data, documents or other types of information that is presentable to a user of a computer system. When a document is primarily text and includes links to other data objects according to the hypertext format, the document is said to be a hypertext document. When graphics, sound, video or other media capable of being manipulated and presented in a computer system is used as the object linked to, the document is said to be a hypermedia document. A hypermedia document is similar to a hypertext document, except that the user is able to click on images, sound icons, video icons, etc., that link to other objects of various media types, such as additional graphics, sound, video, text, or hypermedia or hypertext documents.

FIG. 1 shows examples of hypertext and hypermedia documents and links associating data objects in the documents to other data objects. Hypermedia document **10** includes hypertext **20**, an image icon at **22**, a sound icon at **24** and more hypertext **26**. FIG. 1 shows hypermedia document **10** substantially as it would appear on a user's display screen. The user is able to select, or "click" on icons and text on a display screen by using an input device, such as a mouse, in a manner well-known in the art.

When the user clicks on the phrase "hypermedia," software running on the user's computer obtains the link associated with the phrase, symbolically shown by arrow **30**, to access hypermedia document 14. Hypermedia document 14 is retrieved and displayed on the user's display screen. Thus, the user is presented with more information on the phrase "hypermedia." The mechanism for specifying and locating a linked object such as hypermedia document **14** is an HTML "element" that includes an object address in the format of a Uniform Resource Locator (URL).

Similarly, additional hypertext 26 can be selected by the user to access hypertext document 12 via link 32 as shown in FIG. 1. If the user selects additional hypertext 26, then the text for hypertext document 12 is displayed on the user screen. Note that hypertext document 12, itself, has hypertext at 28. Thus, the user can click on the phrase "hypermedia" while viewing document 12 to access hypermedia document 14 in a manner similar to that discussed above.

Documents, and other data objects, can be referenced by many links from many different source documents. FIG. 1 shows document 14 serving as a target link for both documents 10 and 12. A distributed hypertext or hypermedia document typically has many links within it that specify many different data objects located in computers at different geographical locations connected by a network. Hypermedia document 10 includes image icon 22 with a link to image 16. One method of viewing images is to include an icon, or other indicator, within the text.

Typically, the indicator is a very small image and may be a scaled down version of the full image. The indicator may

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338266

PX0001.0013

5,838,906

| 3 | 4 |

be shown embedded within the text when the text is displayed on the display screen. The user may select the indicator to obtain the full image. When the user clicks on image icon 22 browser software executing on the user's computer retrieves the corresponding full image, e.g., a bit map, and displays it by using external software called a "viewer." This results in the full image, represented by image 16, being displayed on the screen.

An example of a browser program is the National Center for Supercomputing Application's (NCSA) Mosaic software developed by the University of Illinois at Urbana/Champaign, Ill. Another example is "Cello" available on the Internet at http://www.law.cornell.edu/. Many viewers exist that handle various file formats such as ".TIF," ".GIF," formats. When a browser program invokes a viewer program, the viewer is launched as a separate process. The view displays the full image in a separate "window" (in a windowing environment) or on a separate screen. This means that the browser program is no longer active while the viewer is active. By using indicators to act as place holders for full images that are retrieved and displayed only when a user selects the indicator, data traffic over the network is reduced. Also, since the retrieval and display of large images may require several seconds or more of transfer time the user does not have to wait to have images transferred that are of no interest to the user.

Returning to FIG. 1, another type of data object is a sound object shown as sound icon 24 within the hypermedia document. When the user selects sound icon 24, the user's computer accesses sound data shown symbolically by data file 40. The accessed sound data plays through a speaker or other audio device.

As discussed above, hypermedia documents allow a user to access different data objects. The objects may be text, images, sound files, video, additional documents, etc. As used in this specification, a data object is information capable of being retrieved and presented to a user of a computer system. Some data objects include executable code combined with data. An example of such a combination is a "self-extracting" data object that includes code to "unpack" or decompress data that has been compressed to make it smaller before transferring. When a browser retrieves an object such as a self-extracting data object the browser may allow the user to "launch" the self-extracting data object to automatically execute the unpacking instructions to expand the data object to its original size. Such a combination of executable code and data is limited in that the user can do no more than invoke the code to perform a singular function such as performing the self-extraction after which time the object is a standard data object.

Other existing approaches to embedding interactive program objects in documents include the Object Linking and Embedding (OLE) facility in Microsoft Windows, by Microsoft Corp., and OpenDoc, by Apple Computer, Inc. At least one shortcoming of these approaches is that neither is capable of allowing a user to access embedded interactive program objects in distributed hypermedia documents over networks.

FIG. 2 is an example of a computer network. In FIG. 2, computer systems are connected to Internet 100, although in practice Internet 100 may be replaced by any suitable computer network. In FIG. 2, a user 102 operates a small computer 104, such as a personal computer or a work station. The user's computer is equipped with various components, such as user input devices (mouse, trackball, keyboard, etc.), a display device (monitor, liquid crystal

display (LCD), etc.), local storage (hard disk drive, etc.), and other components. Typically, small computer 104 is connected to a larger computer, such as server A at 106. The larger computer may have additional users and computer systems connected to it, such as computer 108 operated by user 110. Any group of computers may form a localized network. A localized network does not necessarily adopt the uniform protocols of the larger interconnecting network (i.e., Internet 100) and is more geographically constrained than the larger network. The localized network may connect to the larger network through a "gateway" or "node" implemented on, for example, a server.

Internet 100 connects other localized networks, such as server B at 120, which interconnects users 122, 124 and 126 and their respective computer systems to Internet 100. Internet 100 is made up of many interconnected computer systems and communication links. Communication links may be by hardwire, fiber optic cable, satellite or other radio wave propagation, etc. Data may move from server A to server B through any number of intermediate servers and communication links or other computers and data processing equipment not shown in FIG. 2 but symbolically represented by Internet 100.

A user at a workstation or personal computer need not connect to the Internet via a larger computer, such as server A or server B. This is shown, for example, by small computer 130 connected directly to Internet 100 as by a telephone modem or other link. Also, a server need not have users connected to it locally, as is shown by server C at 132 of FIG. 2. Many configurations of large and small computers are possible.

Typically, a computer on the Internet is characterized as either a "client" or "server" depending on the role that the computer is playing with respect to requesting information or providing information. Client computers are computers that typically request information from a server computer which provides the information. For this reason, servers are usually larger and faster machines that have access to many data files, programs, etc., in a large storage associated with the server. However, the role of a server may also be adopted by a smaller machine depending on the transaction. That is, user 110 may request information via their computer 108 from server A. At a later time, user A may make a request for information from computer 108. In the first case, where computer 108 issues a request for information from server A, computer 108 is a "client" making a request of information from server A. Server A may have the information in a storage device that is local to Server A or server A may have to make requests of other computer systems to obtain the information. User 110 may also request information via their computer 108 from a server, such as server B located at a remote geographical location on the Internet. However, user 110 may also request information from a computer, such as small computer 124, thus placing small computer 124 in the role of a "server." For purposes of this specification, client and server computers are categorized in terms of their predominant role as either an information requestor or provider. Clients are generally information requestors, while servers are generally information providers.

Referring again to FIG. 1, data objects such as distributed hypermedia documents 10, 12 and 14, image 16 and sound data file 40, may be located at any of the computers shown in FIG. 2. Since these data objects may be linked to a document located on another computer the Internet allows for remote object linking.

For example, hypertext document 10 of FIG. 1 may be located at user 110's client computer 108. When user 110

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

JA000034    EOLASTX-0000338267

PX0001.0014

5,838,906

| 5 | 6 |

makes a request by, for example, clicking on hypertext 20 (i.e., the phrase "hypermedia"), user 110's small client computer 108 processes links within hypertext document 10 to retrieve document 14. In this example, we assume that document 14 is stored at a remote location on server B. Thus, in this example, computer 108 issues a command that includes the address of document 14. This command is routed through server A and Internet 100 and eventually is received by server B. Server B processes the command and locates document 14 on its local storage. Server 14 then transfers a copy of the document back to client 108 via Internet 100 and server A. After client computer 108 receives document 14, it is displayed so that user 110 may view it.

Similarly, image object 16 and sound data file 40 may reside at any of the computers shown in FIG. 2. Assuming image object 16 resides on server C when user 110 clicks on image icon 22, client computer 108 generates a command to retrieve image object 16 to server C. Server C receives the command and transfers a copy of image object 16 to client computer 108. Alternatively, an object, such as sound data file 40, may reside on server A so that it is not necessary to traverse long distances via the Internet in order to retrieve the data object.

The Internet is said to provide an "open distributed hypermedia system." It is an "open" system since Internet 100 implements a standard protocol that each of the connecting computer systems, 106, 130, 120, 132 and 134 must implement (TCP/IP). It is a "hypermedia" system because it is able to handle hypermedia documents as described above via standards such as the HTTP and HTML hypertext transmission and mark up standards, respectively. Further, it is a "distributed" system because data objects that are imbedded within a document may be located on many of the computer systems connected to the Internet. An example of an open distributed hypermedia system is the so-called "world-wide web" implemented on the Internet and discussed in papers such as the Berners-Lee reference given above.

The open distributed hypermedia system provided by the Internet allows users to easily access and retrieve different data objects located in remote geographic locations on the Internet. However, this open distributed hypermedia system as it currently exists has shortcomings in that today's large data objects are limited largely by bandwidth constraints in the various communication links in the Internet and localized networks, and by the limited processing power, or computing constraints, of small computer systems normally provided to most users. Large data objects are difficult to update at frame rates fast enough (e.g., 30 frames per second) to achieve smooth animation. Moreover, the processing power needed to perform the calculations to animate such images in real time does not exist on most workstations, not to mention personal computers. Today's browsers and viewers are not capable of performing the computation necessary to generate and render new views of these large data objects in real time.

For example, the Internet's open distributed hypermedia system allows users to view still images. These images are simple non-interactive two-dimensional images, similar to photographs. Much digital data available today exists in the form of high-resolution three-dimensional image data (e.g., three dimensional images) which is viewed on a computer while allowing the user to perform real time viewing transformations on the data in order for the user to better understand the data.

An example of such type of data is in medical imaging where advanced scanning devices, such as Magnetic Reso-

nance Imaging (MRI) and Computed Tomography (CT), are widely used in the fields of medicine, quality assurance and meteorology to present physicians, technicians and meteorologists with large amounts of data in an efficient way. Because visualization of the data is the best way for a user to grasp the data's meaning, a variety of visualization techniques and real time computer graphics methods have been developed. However, these systems are bandwidth-intensive and compute-intensive and often require multiprocessor arrays and other specialized graphics hardware to carry them out in real time. Also, large amounts of secondary storage for data are required. The expense of these requirements has limited the ability of researchers to readily exchange findings since these larger computers required to store, present and manipulate images are not available to many of the researchers that need to have access to the data.

On the other hand, small client computers in the form of personal computers or workstations such as client computer 108 of FIG. 2 are generally available to a much larger number of researchers. Further, it is common for these smaller computers to be connected to the Internet. Thus, it is desirable to have a system that allows the accessing, display and manipulation of large amounts of data, especially image data, over the Internet to a small, and relatively cheap, client computer.

Due to the relatively low bandwidth of the Internet (as compared to today's large data objects) and the relatively small amount of processing power available at client computers, many valuable tasks performed by computers cannot be performed by users at client computers on the Internet. Also, while the present open distributed hypermedia system on the Internet allows users to locate and retrieve data objects it allows users very little, if any, interaction with these data objects. Users are limited to traditional hypertext and hypermedia forms of selecting linked data objects for retrieval and launching viewers or other forms of external software to have the data objects presented in a comprehensible way.

Thus, it is desirable to have a system that allows a user at a small client computer connected to the Internet to locate, retrieve and manipulate data objects when the data objects are bandwidth-intensive and compute-intensive. Further, it is desirable to allow a user to manipulate data objects in an interactive way to provide the user with a better understanding of information presented and to allow the user to accomplish a wider variety of tasks.

SUMMARY OF THE INVENTION

The present invention provides a method for running embedded program objects in a computer network environment. The method includes the steps of providing at least one client workstation and one network server coupled to the network environment where the network environment is a distributed hypermedia environment; displaying, on the client workstation, a portion of a hypermedia document received over the network from the server, where the hypermedia document includes an embedded controllable application; and interactively controlling the embedded controllable application from the client workstation via communication sent over the distributed hypermedia environment.

The present invention allows a user at a client computer connected to a network to locate, retrieve and manipulate objects in an interactive way. The invention not only allows the user to use a hypermedia format to locate and retrieve program objects, but also allows the user to interact with an

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338268

PX0001.0015

5,838,906

7

application program located at a remote computer. Interprocess communication between the hypermedia browser and the embedded application program is ongoing after the program object has been launched. The user is able to use a vast amount of computing power beyond that which is contained in the user's client computer.

In one application, high resolution three dimensional images are processed in a distributed manner by several computers located remotely from the user's client computer. This amounts to providing parallel distributed processing for tasks such as volume rendering or three dimensional image transformation and display. Also, the user is able to rotate, scale and otherwise reposition the viewpoint with respect to these images without exiting the hypermedia browser software. The control and interaction of viewing the image may be provided within the same window that the browser is using assuming the environment is a "windowing" environment. The viewing transformation and volume rendering calculations may be performed by remote distributed computer systems.

Once an image representing a new viewpoint is computed the frame image is transmitted over the network to the user's client computer where it is displayed at a designated position within a hypermedia document. By transmitting only enough information to update the image, the need for a high bandwidth data connection is reduced. Compression can be used to further reduce the bandwidth requirements for data transmission.

Other applications of the invention are possible. For example, the user can operate a spreadsheet program that is being executed by one or more other computer systems connected via the network to the user's client computer. Once the spreadsheet program has calculated results, the results may be sent over the network to the user's client computer for display to the user. In this way, computer systems located remotely on the network can be used to provide the computing power that may be required for certain tasks and to reduce the data bandwidth by only transmitting results of the computations.

Still other applications of the present invention are possible, as disclosed in the specification, below.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates examples of hypertext and hypermedia documents and links;

FIG. 2 is an example of a network;

FIG. 3 is an illustration of a computer system suitable for use with the present invention;

FIG. 4 is an illustration of basic subsystems in the computer system of FIG. 3;

FIG. 5 is an illustration of an embodiment of the invention using a client computer, server computer and a network;

FIG. 6 shows another embodiment of the present invention using additional computers on the network;

FIG. 7A is a flowchart of some of the functionality within the HTMLparse.c file;

FIG. 7B is a flowchart of some of the functionality within the HTMLformat.c file;

FIG. 8A is a flowchart of some of the functionality within the HTMLwidget.c file;

FIG. 8B is a flowchart of some of the functionality within the HTML.c file;

FIG. 9 is a screen display generated in accordance with the present invention; and

8

FIG. 10 is a diagram of the various processes and data paths in the present invention.

DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT

375 pages of Source code on 4 microfiche Appendices A and B are provided to this specification. The source code should be consulted to provide details of a specific embodiment of the invention in conjunction with the discussion of the routines in this specification. The source code in Appendix A includes NCSA Mosaic version 2.4 source code along with modifications to the source code to implement the present invention. Appendix B includes source code implementing an application program interface. The source code is written in the "C" computer language to run on an X-Window platform.

FIG. 3 is an illustration of a computer system suitable for use with the present invention. FIG. 3 depicts but one example of many possible computer types or configurations capable of being used with the present invention. FIG. 3 shows computer system 150 including display device 153, display screen 155, cabinet 157, keyboard 159 and mouse 161. Mouse 161 and keyboard 159 are "user input devices." Other examples of user input devices are a touch screen, light pen, track ball, data glove, etc.

Mouse 161 may have one or more buttons such as buttons 163 shown in FIG. 3. Cabinet 157 houses familiar computer components such as disk drives, a processor, storage means, etc. As used in this specification "storage means" includes any storage device used in connection with a computer system such as disk drives, magnetic tape, solid state memory, bubble memory, etc. Cabinet 157 may include additional hardware such as input/output (I/O) interface cards for connecting computer system 150 to external devices such as an optical character reader, external storage devices, other computers or additional devices.

FIG. 4 is an illustration of basic subsystems in computer system 150 of FIG. 3. In FIG. 4, subsystems are represented by blocks such as central processor 180, system memory 181 consisting of random access memory (RAM) and/or read-only memory (ROM), display adapter 182, monitor 183 (equivalent to display device 153 of FIG. 3), etc. The subsystems are interconnected via a system bus 184. Additional subsystems such as a printer, keyboard, fixed disk and others are shown. Peripherals and input/output (I/O) devices can be connected to the computer system by, for example serial port 185. For example, serial port 185 can be used to connect the computer system to a modem for connection to a network or serial port 185 can be used to interface with a mouse input device. The interconnection via system bus 184 allows central processor 180 to communicate with each subsystem and to control the execution of instructions from system memory 181 or fixed disk 186, and the exchange of information between subsystems. Other arrangements of subsystems and interconnections are possible.

FIG. 5 is an illustration of an embodiment of the invention using a client computer, server computer and a network.

In FIG. 5, client computer 200 communicates with server computer 204 via network 206. Both client computer 200 and server computer 204 use a network protocol layer to communicate with network 206. In a preferred embodiment, network 206 is the Internet and the network protocol layers are TCP/IP. Other networks and network protocols may be used. For ease of illustration, additional hardware and software layers are not shown in FIG. 5.

Client computer 200 includes processes, such as browser client 208 and application client 210. In a preferred

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

5,838,906

9

embodiment, application client 210 is resident within client computer 200 prior to browser client 208's parsing of a hypermedia document as discussed below. In a preferred embodiment application client 210 resides on the hard disk or RAM of client computer 200 and is loaded (if necessary) and executed when browser client 208 detects a link to application client 210. The preferred embodiment uses the XEvent interprocess communication protocol to exchange information between browser client 208 and application client 210 as described in more detail, below. Another possibility is to install application client 210 as a "terminate and stay resident" (TSR) program in an operating system environment, such as X-Window. Thereby making access to application client 210 much faster.

Browser client 208 is a process that a user of client computer 200 invokes in order to access various data objects, such as hypermedia documents, on network 206. Hypermedia document 212 shown within client computer 200 is an example of a hypermedia document, or object, that a user has requested access to. In this example, hypermedia document 212 has been retrieved from a server connected to network 206 and has been loaded into, e.g., client computer 200's RAM or other storage device.

Once hypermedia document 212 has been loaded into client computer 200, browser client 208 parses hypermedia document 212. In parsing hypermedia document 212, browser client 208 detects links to data objects as discussed above in the Background of the Invention section. In FIG. 5, hypermedia document 212 includes an embedded program link at 214. Embedded program link 214 identifies application client 212 as an application to invoke. In this present example, the application, namely, application client 210, resides on the same computer as the browser client 208 that the user is executing to view the hypermedia document. Embedded program link 214 may include additional information, such as parameters, that tell application client 210 how to proceed. For example, embedded program link 214 may include a specification as to a data object that application client 210 is to retrieve and process.

When browser client 208 encounters embedded program link 214, it invokes application client 210 (optionally, with parameters or other information) and application client 210 executes instructions to perform processing in accordance with the present invention.

An example of the type of processing that application client 210 may perform is multidimensional image visualization. Note that application client 210 is in communication with network 206 via the network protocol layer of client computer 200. This means that application client 210 can make requests over network 206 for data objects, such as multidimensional image objects. For example, application client 210 may request an object, such as object 1 at 216, located in server computer 204. Application client 210 may make the request by any suitable means. Assuming network 206 is the Internet, such a request would typically be made by using HTTP in response to a HTML-style link definition for embedded program link 214.

Assuming application client 210 has made a request for the data object at 216, server process 218 ultimately receives the request. Server process 218 then retrieves data object 216 and transfers it over network 206 back to application client 210. To continue with the example of a multidimensional visualization application, data object 216 may be a three dimensional view of medical data for, e.g., an embryo.

After application client 210 receives the multidimensional data object 216, application client 210 executes instructions

10

to display the multidimensional embryo data on the display screen to a user of the client computer 200. The user is then able to interactively operate controls to recompute different views for the image data. In a preferred embodiment, a control window is displayed within, or adjacent to, a window generated by browser client 208 that contains a display of hypermedia document 212. An example of such display is discussed below in connection with FIG. 9. Thus, the user is able to interactively manipulate a multidimensional image object by means of the present invention. In order to make application client 210 integral with displays created by browser client 208, both the browser client and the application client must be in communication with each other, as shown by the arrow connecting the two within client computer 200. The manner of communication is through an application program interface (API), discussed below.

Browser client 208 is a process, such as NCSA Mosaic, Cello, etc. Application client 210 is embodied in software presently under development called "VIS" and "Panel" created by the Center for Knowledge Management at the University of California, San Francisco, as part of the Doyle Group's distributed hypermedia object embedding approach described in "Integrated Control of Distributed Volume Visualization Through the World-Wide-Web," by C. Ang, D. Martin, M. Doyle; to be published in the Proceedings of Visualization 1994, IEEE Press, Washington, D.C., October 1994.

Versions and descriptions of software embodying the present invention are generally available as hyperlinked data objects from the Visible Embryo Project's World Wide Web document at the URL address "HTTP://visembryo.ucsf.edu/".

Another embodiment of the present invention uses an application server process executing on server computer 204 to assist in processing that may need to be performed by an external program. For example, in FIG. 5, application server 220 resides on server computer 204. Application server 220 works in communication with application client 210 residing on client computer 200. In a preferred embodiment, application server 220 is called VRServer, also a part of Doyle Group's approach. Since server computer 204 is typically a larger computer having more data processing capabilities and larger storage capacity, application server 220 can operate more efficiently, and much faster, than application client 210 in executing complicated and numerous instructions.

In the present example where a multidimensional image object representing medical data for an embryo is being viewed, application server 220 could perform much of the viewing transformation and volume rendering calculations to allow a user to interactively view the embryo data at their client computer display screen. In a preferred embodiment, application client 210 receives signals from a user input device at the user's client computer 200. An example of such input would be to rotate the embryo image from a current position to a new position from the user's point of view. This information is received by application client 210 and processed to generate a command sent over network 206 to application server 220. Once application server 220 receives the information in the form of, e.g., a coordinate transformation for a new viewing position, application server 220 performs the mathematical calculations to compute a new view for the embryo image. Once the new view has been computed, the image data for the new view is sent over network 206 to application client 210 so that application client 210 can update the viewing window currently displaying the embryo image. In a preferred embodiment,

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338270

PX0001.0017

5,838,906

11                                                        12

application server **220** computes a frame buffer of raster display data, e.g., pixel values, and transfers this frame buffer to application client **210**. Techniques, such as data compression and delta encoding, can be used to compress the data before transmitting over network **206** to reduce the bandwidth requirement.

It will be readily seen that application server **220** can advantageously use server computer **204**'s computing resources to perform the viewing transformation much more quickly than could application client **210** executing on client computer **200**. Further, by only transmitting the updated frame buffer containing a new view for the embryo image, the amount of data sent over network **206** is reduced. By using appropriate compression techniques, such as, e.g., MPEG (Motion Picture Experts Group) or JPEG (Joint Photographic Experts Group), efficient use of network **206** is preserved.

FIG. 6 shows yet another embodiment of the present invention. FIG. 6 is similar to FIG. 5, except that additional computers **222** and **224** are illustrated. Each additional computer includes a process labeled "Application (Distributed)." The distributed application performs a portion of the task that an application, such as application server **220** or application client **210**, perform. In the present example, tasks such as volume rendering may be broken up and easily performed among two or more computers. These computers can be remote from each other on network **206**. Thus, several computers, such as server computer **204** and additional computers **222** and **224** can all work together to perform the task of computing a new viewpoint and frame buffer for the embryo for the new orientation of the embryo image in the present example. The coordination of the distributed processing can be performed at client computer **200** by application client **210**, at server computer **204** by application server **220**, or by any of the distributed applications executing on additional computers, such as **222** and **224**. In a preferred embodiment, distributed processing is coordinated by a program called "VIS" represented by application client **210** in FIG. 6.

Other applications of the invention are possible. For example, the user can operate a spreadsheet program that is being executed by one or more other computer systems connected via the network to the user's client computer. Once the spreadsheet program has calculated results, those results may be sent over the network to the user's client computer for display within the hypermedia document on the user's client computer. In this way, computer systems located remotely on the network can be used to provide the computing power that may be required for certain tasks and to reduce the data bandwidth required by only transmitting results of the computations.

Another type of possible application of this invention would involve embedding a program which runs only on the client machine, but which provides the user with more functionality than exists in the hypermedia browser alone. An example of this is an embedded client application which is capable of viewing and interacting with images which have been processed with Dr. Doyle's MetaMAP invention (U.S. Pat. No. 4,847,604). This MetaMAP process uses object-oriented color map processing to allow individual color index ranges within paletted images to have object identities, and is useful for the creation of, for example, interactive picture atlases. It is a more efficient means for defining irregular "hotspots" on images than the ISMAP function of the World Wide Web, which uses polygonal outlines to define objects in images. A MetaMAP-capable client-based image browser application can be embedded,

together with an associated image, within a hypermedia document, allowing objects within the MetaMAP-processed image to have URL addresses associated with them. When a user clicks with a mouse upon an object within the MetaMAP-processed image, the MetaMAP client application relays the relevant URL back to the hypermedia browser application, which then retrieves the HTML file or hypermedia object which corresponds to that URL.

The various processes in the system of the present invention communicate through a custom API called Mosaic/External Application Program Interface MEAPI. The MEAPI set of predefined messages includes those shown in Table I.

TABLE I

| Message Function | Message Name |
|---|---|
| Messages from server to client: | |
| 1. Server Update Done | XtNrefreshNotify |
| 2. Server Ready | XtNpanelStartNotify |
| 3. Server Exiting | XtNpanelExitNotify |
| Messages from client to server: | |
| 4. Area Shown | XtNmapNotify |
| 5. Area Hidden | XtNunmapNotify |
| 6. Area Destroyed | XtNexitNotify |

The messages in Table I are defined in the file protocol__lib.h in Appendix B. The functions of the MEAPI are provided in protocol__lib.c of Appendix B. Thus, by using MEAPI a server process communicates to a client application program to let the client application know when the server has finished updating information, such as an image frame buffer, or pixmap (Message 1); when the server is ready to start processing messages (Message 2) and when the server is exiting or stopping computation related to the server application program.

For client to server communications, MEAPI provides for the client informing the server when the image display window area is visible, when the area is hidden and when the area is destroyed. Such information allows the server to decide whether to allocate computing resources for, e.g., rendering and viewing transformation tasks where the client is running an application program to generate new views of a multi dimensional object. Source code for MEAPI fundamental functions such as handle__client__msg, register client, register__client__msg__callback and send__client__ msg may be found in protocol__lib.c as part of the source code in Appendix B.

Next, a discussion of the software processes that perform parsing of a hypermedia document and launching of an application program is provided in connection with Table II and FIGS. 7A, 7B, 8A and 8B.

Table II, below, shows an example of an HTML tag format used by the present invention to embed a link to an application program within a hypermedia document.

TABLE II

```
<EMBED
    TYPE = "type"
    HREF = "href"
    WIDTH = width
    HEIGHT = height
>
```

As shown in Table II, the EMBED tag includes TYPE, HREF, WIDTH and HEIGHT elements. The TYPE element

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338271

PX0001.0018

5,838,906

13

is a Multipurpose Internet Mail Extensions (MIME) type. Examples of values for the TYPE element are "application/ x-vis" or "video/mpeg". The type "application /x-vis" indicates that an application named "x-vis" is to be used to handle the object at the URL specified by the HREF. Other types are possible such as "application/x-inventor", "application/postscript" etc. In the case where TYPE is "application/x-vis" this means that the object at the URL address is a three dimensional image object since the program "x-vis" is a data visualization tool designed to operate on three dimensional image objects. However, any manner of application program may be specified by the TYPE element so that other types of applications, such as a spreadsheet program, database program, word processor, etc. may be used with the present invention. Accordingly, the object reference by the HREF element would be, respectively, ;a spreadsheet object, database object, word processor document object, etc.

On the other hand, TYPE values such as "video/mpeg", "image/gif", "video/x-sgi-movie", etc. describe the type of data that HREF specifies. This is useful where an external application program, such as a video player, needs to know what format the data is in, or where the browser client needs to determine which application to launch based on the data format. Thus, the TYPE value can specify either an application program or a data type. Other TYPE values are possible. HREF specifies a URL address as discussed above for a data object. Where TYPE is "application/x-vis" the URL address specifies a multi-dimensional image object. Where TYPE is "video/mpeg" the URL address specifies a video object.

WIDTH and HEIGHT elements specify the width and height dimensions, respectively, of a Distributed Hypermedia Object Embedding (DHOE) window to display an external application object such as the three dimensional image object or video object discussed above.

FIG. 7A is a flowchart describing some of the functionality within the HTMLparse.c file of routines. The routines in HTMLparse.c perform the task of parsing a hypermedia document and detecting the EMBED tag. In a preferred embodiment, the enhancements to include the EMBED tag are made to an HTML library included in public domain NCSA Mosaic version 2.4. Note that much of the source code in is pre-existing NCSA Mosaic code. Only those portions of the source code that relate to the new functionality discussed in this specification should be considered as part of the invention. The new functionality is identifiable as being set off from the main body of source code by conditional compilation macros such as "#ifdef . . . #endif" as will be readily apparent to one of skill in the art.

In general, the flowcharts in this specification illustrate one or more software routines executing in a computer system such as computer system 1 of FIG. 1. The routines may be implemented by any means as is known in the art. For example, any number of computer programming languages, such as "C", Pascal, FORTRAN, assembly language, etc., may be used. Further, various programming approaches such as procedural, object oriented or artificial intelligence techniques may be employed.

The steps of the flowcharts may be implemented by one or more software routines, processes, subroutines, modules, etc. It will be apparent that each flowchart is illustrative of merely the broad logical flow of the method of the present invention and that steps may be added to, or taken away from, the flowcharts without departing from the scope of the invention. Further, the order of execution of steps in the flowcharts may be changed without departing from the

14

scope of the invention. Additional considerations in implementing the method described by the flowchart in software may dictate changes in the selection and order of steps. Some considerations are event handling by interrupt driven, polled, or other schemes. A multiprocessing or multitasking environment could allow steps to be executed "concurrently." For ease of discussion the implementation of each flowchart may be referred to as if implemented in a single "routine."

The modifications to NCSA Mosaic version 2.4 software files HTMLparse.c, HTMLformat.c, HTMLwidget.c and HTML.c will next be discussed, in turn.

Returning to FIG. 7, it is assumed that a hypermedia document has been obtained at a user's client computer and that a browser program executing on the client computer displays the document and calls a first routine in the HTMLparse.c file called "HTMLparse". This first routine, HTMLparse, is entered at step 252 where a pointer to the start of the document portion is passed. Steps 254, 256 and 258 represent a loop where the document is parsed or scanned for HTML tags or other symbols. While the file HTMLparse.c includes routines to handle all possible tags and symbols that may be encountered, FIG. 7A, for simplicity, only illustrates the handling of EMBED tags.

Assuming there is more text to parse, execution proceeds to step 256 where routines in HTMLparse.c obtain the next item (e.g., word, tag or symbol) from the document. At step 258 a check is made as to whether the current tag is the EMBED tag. If not, execution returns to step 254 where the next tag in the document is obtained. If, at step 258, it is determined that the tag is the EMBED tag, execution proceeds to step 260 where an enumerated type is assigned for the tag. Each occurrence of a valid EMBED tag specifies an embedded object. HTMLParse calls a routine "get_mark" in HTMLparse.c to put sections of HTML document text into a "markup" text data structure. Routine get_mark, in turn, calls ParseMarkType to assign an enumerated type. The enumerated type is an identifier with a unique integer associated with it that is used in later processing described below.

Once all of the hypermedia text in the text portion to be displayed has been parsed, execution of HTMLparse.c routines terminates at step 262.

FIG. 7B is a flowchart of routines in file HTMLformat.c to process the enumerated type created for the EMBED tag by routines in HTMLparse.c. In the X-Window implementation of a preferred embodiment, the enumerated type is processed as if it is a regular Motif/XT widget. For details on X-Window development see, e.g., "Xlib Programming Manual," "X Toolkit Intrinsics Programming Manual" and "Motif Programming Manual" published by O'Reilly & Associates, Inc. HTMLformat is entered at step 270 where a pointer to the enumerated type to process is passed.

At step 272 the parameters of the structure are initialized in preparation for inserting a DrawingArea widget on an HTML page. This includes providing values for the width and height of a window on the display to contain an image, position of the window, style, URL of the image object, etc. Various codes are also added by routines in HTMLformat.c (such as TriggerMarkChanges) to insert an internal representation of the HTML statement into an object list maintained internally by the browser. In the X-Window application corresponding to the source code of Appendix A, the browser is NCSA Mosaic version 2.4.

FIG. 8A is a flowchart for routine HTMLwidget. HTMLwidget creates display data structures and launches an external application program to handle the data object specified by the URL in the EMBED tag.

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338272

PX0001.0019

5,838,906

15

HTMLwidget is entered at step 280 after HTMLformat has created the internal object representation of the EMBED tag. HTMLwidget is passed the internal object and performs its processing on the object. At step 282 the DrawingArea widget is created according to the type of the internal representation, from HTMLformat, specified in the internal object. Similarly, at step 284 a pixmap area for backing storage is defined.

At step 286 a check is made as to whether the type attribute of the object, i.e., the value for the TYPE element of the EMBED tag, is an application. If so, step 290 is executed to launch a predetermined application. In a preferred embodiment an application is launched according to a user-defined list of application type/application pairs. The list is defined as a user-configurable XResource as described in "Xlib Programming Manual." An alternative embodiment could use the MIME database as the source of the list of application type/application pairs. The routine "vis_start_external_application" in file HTMLformat.c is invoked to match the application type and to identify the application to launch.

The external application is started as a child process of the current running process (Mosaic), and informed about the window ID of the DrawingArea created in HTMLformat. The external application is also passed information about the ID of the pixmap, the data URL and dimensions. Codes for communication such as popping-up/iconifying, start notification, quit notification and refresh notification with external applications and DrawingArea refreshing are also added. Examples of such codes are (1) "setup/start" in vis_register_client and vis_get_panel_window in HTMLwidgets.c; (2) "handle messages from external applications" in vis_handle_panel_msg in HTMLwidgets.c; (4) "terminate external applications" in vis_exit in HTMLwidgets.c which calls vis_send_msg to send a quit message; and (5) "respond to refresh msgs" in vis_redraw in HTMLwidgets.c.

If, at step 286, the type is determined not to be an application object (e.g., a three dimensional image object in the case of application "x-vis") a check is made at step 288 to determine if the type is a video object. If so, step 292 is executed to launch a video player application. Parameters are passed to the video player application to allow the player to display the video object within the DrawingArea within the display of the portion of hypermedia document on the client's computer. Note that many other application objects types are possible as described above.

FIG. 8B is a flowchart for routine HTML. Routine HTML takes care of "shutting down" the objects, data areas, etc. that were set up to launch the external application and display the data object. HTML is entered at step 300 and is called when the display or other processing of the EMBED tag has been completed. At step 302 the display window is removed and the memory areas for the pixmap and internal object structure is made free for other uses. Completion of processing can be by user command or by computer control.

The present invention allows a user to have interactive control over application objects such as three dimensional image objects and video objects. In a preferred embodiment, controls are provided on the external applications' user interface. In the case of a VIS/panel application, a process, "panel" creates a graphical user interface (GUI) thru which the user interacts with the data. The application program, VIS, can be executing locally with the user's computer or remotely on a server, or on one or more different computers, on the network. The application program updates pixmap

16

data and transfers the pixmap data (frame image data) to a buffer to which the browser has access. The browser only needs to respond to the refresh request to copy the contents from the updated pixmap to the DrawingArea. The Panel process sends messages as "Msg" sending performed by routines such as vis_send_msg and vis_handle panel_msg to send events (mousemove, keypress, etc.) to the external application.

FIG. 9 is a screen display of the invention showing an interactive application object (in this case a three dimensional image object) in a window within a browser window. In FIG. 9, the browser is NCSA Mosaic version 2.4. The processes VIS, Panel and VRServer work as discussed above. FIG. 9 shows screen display 356 Mosaic window 350 containing image window 352 and a portion of a panel window 354. Note that image window 352 is within Mosaic window 350 while panel window 354 is external to Mosaic window 350. Another possibility is to have panel window 354 within Mosaic window 350. By using the controls in panel window 354 the user is able to manipulate the image within image window 352 in real time do perform such operations as scaling, rotation, translation, color map selection, etc. In FIG. 9, two Mosaic windows are being used to show two different views of an embryo image. One of the views is rotated by six degrees from the other view so that a stereoscopic effect can be achieved when viewing the images. Communication between Panel and VIS is via "Tooltalk" described in, e.g., "Tooltalk 1.1.1 Reference Manual," from SunSoft.

FIG. 10 is an illustration of the processes VIS, Panel and VRServer discussed above. As shown in FIG. 10, the browser process, Mosaic, communicates with the Panel process via inter-client communication mechanisms such as provided in the X-Window environment. The Panel process communicates with the VIS process through a communications protocol (ToolTalk, in the preferred embodiment) to exchange visualization command messages and image data. The image data is computed by one or more copies of a process called VRServer that may be executing on remote computers on the network. VRServer processes respond to requests such as rendering requests to generate image segments. The image segments are sent to VIS and combined into a pixmap, or frame image, by VIS. The frame image is then transferred to the Mosaic screen via communications between VIS, Panel and Mosaic. A further description of the data transfer may be found in the paper "Integrated Control of Distributed Volume Visualization Through the World-Wide-Web," referenced above.

In the foregoing specification, the invention has been described with reference to a specific exemplary embodiment thereof. It will, however, be evident that various modifications and changes may be made thereunto without departing from the broader spirit and scope of the invention as set forth in the appended claims. For example, various programming languages and techniques can be used to implement the disclosed system. Also, the specific logic presented to accomplish tasks within the present invention may be modified without departing from the scope of the invention. Many such changes or modifications will be readily apparent to one of ordinary skill in the art. The specification and drawings are, accordingly, to be regarded in an illustrative rather than a restrictive sense, the invention being limited only by the provided claims.

What is claimed is:

1. A method for running an application program in a computer network environment, comprising:

providing at least one client workstation and one network server coupled to said network environment, wherein said network environment is a distributed hypermedia environment;

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338273

PX0001.0020

5,838,906

17

executing, at said client workstation, a browser application, that parses a first distributed hypermedia document to identify text formats included in said distributed hypermedia document and for responding to predetermined text formats to initiate processing specified by said text formats; utilizing said browser to display, on said client workstation, at least a portion of a first hypermedia document received over said network from said server, wherein the portion of said first hypermedia document is displayed within a first browser-controlled window on said client workstation, wherein said first distributed hypermedia document includes an embed text format, located at a first location in said first distributed hypermedia document, that specifies the location of at least a portion of an object external to the first distributed hypermedia document, wherein said object has type information associated with it utilized by said browser to identify and locate an executable application external to the first distributed hypermedia document, and wherein said embed text format is parsed by said browser to automatically invoke said executable application to execute on said client workstation in order to display said object and enable interactive processing of said object within a display area created at said first location within the portion of said first distributed hypermedia document being displayed in said first browser-controlled window.

2. The method of claim 1, wherein said executable application is a controllable application and further comprising the step of:

interactively controlling said controllable application on said client workstation via inter-process communications between said browser and said controllable application.

3. The method of claim 2, wherein the communications to interactively control said controllable application continue to be exchanged between the controllable application and the browser even after the controllable application program has been launched.

4. The method of claim 3, wherein additional instructions for controlling said controllable application reside on said network server, wherein said step of interactively controlling said controllable application includes the following substeps:

issuing, from said client workstation, one or more commands to the network server;

executing, on the network server, one or more instructions in response to said commands;

sending information from said network server to said client workstation in response to said executed instructions; and processing said information at the client workstation to interactively control said controllable application.

5. The method of claim 4, wherein said additional instructions for controlling said controllable application reside on said client workstation.

6. A computer program product for use in a system having at least one client workstation and one network server coupled to said network environment, wherein said network environment is a distributed hypermedia environment, the computer program product comprising:

a computer usable medium having computer readable program code physically embodied therein, said computer program product further comprising:

computer readable program code for causing said client workstation to execute a browser application to parse

18

a first distributed hypermedia document to identify text formats included in said distributed hypermedia document and to respond to predetermined text formats to initiate processes specified by said text formats;

computer readable program code for causing said client workstation to utilize said browser to display, on said client workstation, at least a portion of a first hypermedia document received over said network from said server, wherein the portion of said first hypermedia document is displayed within a first browser-controlled window on said client workstation, wherein said first distributed hypermedia document includes an embed text format, located at a first location in said first distributed hypermedia document, that specifies the location of at least a portion of an object external to the first distributed hypermedia document, wherein said object has type information associated with it utilized by said browser to identify and locate an executable application external to the first distributed hypermedia document, and wherein said embed text format is parsed by said browser to automatically invoke said executable application to execute on said client workstation in order to display said object and enable interactive processing of said object within a display area created at said first location within the portion of said first distributed hypermedia document being displayed in said first browser-controlled window.

7. The computer program product of claim 6, wherein said executable application is a controllable application and further comprising:

computer readable program code for causing said client workstation to interactively control said controllable application on said client workstation via inter-process communications between said browser and said controllable application.

8. The computer program product of claim 7, wherein the communications to interactively control said controllable application continue to be exchanged between the controllable application and the browser even after the controllable application program has been launched.

9. The computer program product of claim 8, wherein additional instructions for controlling said controllable application reside on said network server, wherein said step of interactively controlling said controllable application includes:

computer readable program code for causing said client workstation to issue, from the client workstation, one or more commands to the network server;

computer readable program code for causing said network server to execute one or more instructions in response to said commands;

computer readable program code for causing said network sever to send information to said client workstation in response to said executed instructions; and

computer readable program code for causing said client workstation to process said information at the client workstation to interactively control said controllable application.

10. The computer program product of claim 9, wherein said additional instructions for controlling said controllable application reside on said client workstation.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338274

PX0001.0021



US005838906C1

## (12) **EX PARTE REEXAMINATION CERTIFICATE** (5391st)

# United States Patent
Doyle et al.

(10) **Number:** US 5,838,906 C1
(45) **Certificate Issued:** Jun. 6, 2006

(54) **DISTRIBUTED HYPERMEDIA METHOD FOR AUTOMATICALLY INVOKING EXTERNAL APPLICATION PROVIDING INTERACTION AND DISPLAY OF EMBEDDED OBJECTS WITHIN A HYPERMEDIA DOCUMENT**

(75) Inventors: **Michael D. Doyle**, Alameda, CA (US); **David C. Martin**, San Jose, CA (US); **Cheong S. Ang**, Pacifica, CA (US)

(73) Assignee: **University of California**, Alameda, CA (US)

Reexamination Request:
No. 90/006,831, Oct. 30, 2003

Reexamination Certificate for:
Patent No.: **5,838,906**
Issued: **Nov. 17, 1998**
Appl. No.: **08/324,443**
Filed: **Oct. 17, 1994**

(51) Int. Cl.
*G06F 9/54* (2006.01)

(52) **U.S. Cl.** .................... 715/501.1; 709/203; 709/219; 718/106; 715/513; 715/516; 715/526; 715/760; 715/777; 719/310; 345/419; 345/427; 345/619; 345/638; 345/649; 345/653; 345/654; 345/655; 345/656

(58) **Field of Classification Search** .............. 715/501.1
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,056,057 A | * | 10/1991 | Johnson et al. | 710/73 |
| 5,425,141 A | * | 6/1995 | Gedye | 345/797 |
| 5,537,526 A | * | 7/1996 | Anderson et al. | 715/515 |
| 5,812,862 A | * | 9/1998 | Smith et al. | 715/515 |

### OTHER PUBLICATIONS

violaTOGO.tar.Z.zip—compressed file on CD artifact disk contains the later Viola source code, referred to as "DX37" in the CAFC opinion. Zip file contains 1,030 filed in 34 folders, 7.7 megabytes total, May 31, 1993 (Internet publication date).*

Duncan, Ray, "Advanced MSDOS Programming", Microsoft Press, 1986, pp. 390, 391, 486, 487.*

Lin, Jin–Kun, "Virtual Screen: A Framework for Task Management", The X Resource, Issue 1,□□Winter 1992—Proceedings of the 6th Annual X Technical Conference, pp 191–198, 1992.*

Lin, Jin–Kun, "A Multimedia and Multisource Document Editor of an Open Architecture", Dept. of Computer Science, University of N.C. at Chapel Hill, ACM 089791–533–X/92/0010/0057, pp. 57–62, 1992.*

(Continued)

*Primary Examiner*– St. John Courtenay, III

(57) **ABSTRACT**

A system allowing a user of a browser program on a computer connected to an open distributed hypermedia system to access and execute an embedded program object. The program object is embedded into a hypermedia document much like data objects. The user may select the program object from the screen. Once selected the program object executes on the user's (client) computer or may execute on a remote server or additional remote computers in a distributed processing arrangement. After launching the program object, the user is able to interact with the object as the invention provides for ongoing interprocess communication between the application object (program) and the browser program. One application of the embedded program object allows a user to view large and complex multidimensional objects within the browser's window. The user can manipulate a control panel to change the viewpoint used to view the image. The invention allows a program to execute on a remote server or other computers to calculate the viewing transformations and send frame data to the client computer thus providing the user of the client computer with interactive features and allowing the user to have access to greater computing power than may be available at the user's client computer.



Copy provided by USPTO from the PIRS Image Database on 08/02/2011

US 5,838,906 C1

Page 2

## OTHER PUBLICATIONS

Berners–Lee, T., et al., Hypertext Markup Language (HTML), Internet Draft IETF, pp. 1–40, (Jun. 1993).*

Raggett, D., HTML+ (Hypertext Markup Language), (Jul. 23, 1993).*

Raggett, D., Posting to WWW–Talk Public Mailing List, (Posted Jun. 14,1993).*

Adie, C., Network Access to Multimedia Information, 2nd ed., RARE Project OBR(93)015, RARE, pp. 1–53, Feb. 4, 1994.*

Reichard, K., et al., X11R6: the Rumored Changes (Release 6 of the X Window System), Unix Review, vol. 11, No. 5, p. 101(5 pp. 1–4 as printed, May 1993.*

Cox, B., Object Oriented Programming: An Evolutionary Approach, Addison–Wesley, pp. 1–12, 1987.*

Solaris OpenWindows: Introduction to the ToolTalk Service—A White Paper, Sun Microsystems, Inc., pp. 1–16, 1991.*

Tool Inter–Operability: A Hands On Demonstration—A Simple Demonstration of How the ToolTalk Service Works, Sun Microsystems, Inc., pp. 1–24, 1992.*

Designing and Writing a ToolTalk Procedural Protocol—A White Paper, Sun Microsystems, Inc., pp. 1–24, 1992.*

Fresco Frequently Asked Questions, www.i.h.kyoto–u.ac.jp/~shom/doc.org/fresco/FAQ.html, pp. 1–4, Apr. 13, 1995.*

The Andrew View, Carnegia Mellon Univ., www–2.cs.cmu.edu/People/AUIS/ftp/NEWSLETTERS/ASCII/93Jun.ascii, vol. 2, No. pp.1–12 as printed, Jun. 1993.*

The X Window System And broadwayinfo.com/bwwhitesbroadwayhct.htm, Hummingbird Communications Ltd pp. 1–11, 1997.*

Neuendorffer, T., ADEW: A Multimedia Interface Builder for Andrew, Proceedings Multi–Media Communications, Applications, and Technology Workshop, pp. 1–19, Jul. 1991.*

Palay, A. Andrew Toolkit: An Overview, Tech Rept., Carnegie–Mellon University Information Technology Center, pp. 1–15, 198.*

Dettmer, R., X–Windows—the great integrator, IEE Review, vol. 36, No. 6, pp. 219–222, Jun. 1990.*

Toye, G., et al., SHARE : A Methodology and Environment for Collaborative Product Development, Proceedings, Second Workshop on Enabling Technologies: Infrastructure for Collaborative Enterprises, 1993, IEEE, pp. 33–47, Apr. 22, 1993.*

Lin, J., MediaMosaic—A Multimedia Editing Environment, Proc. of the 5th Annual ACM Symposium on User Interface Software and Technology, ACM Press, pp. 135–141, 1992.*

Halasz, F., Reflections on NoteCards: Seven Issues for the Next Generation of Hypermedia Systems, ACM Journal on Computer Documentation, vol. 25, No. 3, pp. 71–87, Aug. 2001, reprinting article published in 1988.*

Feiner, S., et al., An Experimental System for Creating and Presenting Interactive Graphical Documents, ACM Transactions on Graphics, vol. 1, No. 1, pp. 59–77, Jan. 1982.*

Engelbart, D., Knowledge–Domain Interoperability and an Open Hyperdocument System, Proc. of the 1990 ACM Conference on Computer–Supported Cooperative Work, ACM Press, pp. 143–156, 1990.*

Meyrowitz, N., Intermedia: The Architecture and Construction of an Object–Oriented Hypermedia System and Applications Framework, Proc. of the Conf. on Object Oriented Programming Systems, Languages, and Applications, ACM Press, pp. 186–201, 1986.*

Wiil, U., Issues in the Design of EHTS: A Multiuser Hypertext System for Collaboration, Proc. of the 25th Hawaii Int'l. Conf. on Systems Sciences, vol. 2, pp. 629–639, Jan. 1992.*

Celentano, A. et al., A Multiple Presentation Document Mangement System, Proc. of the 10th Annual Int'l. Conf. on Systems Documentation, ACM Press, pp. 63–71, 1992.*

Garg, P., et al., A Hypertext System to Manage Life Cycle Documents, Proc. of the 25th Annual Hawaii Int'l. Conf. on System Sciences, 1988, IEEE, vol. 2, pp. 337–346, Jan. 1988.*

Kahn, P., Webs, Rees, and Stacks: How Hypermedia System Design Effect Hypermedia Content, Designing and Using Human Compter Interfaces and Knowledge Based Systems, Elsevier Science Publishers, pp. 443–449, 1989.*

Streitz, N., et al., Hypertest: Concepts, Systems, and Application, Cambridge Univ. Press, pp. 1–12, 356–359, 367–369, 1990.*

Stotts, P., et al., Hyperdocuments as Automata: Trace–based Browsing Property Verification, UNC CS Technical Report, TR92–038, citeseer.ist.psu.edu/stotts92hyperdocument.html, p. 1, 1992.*

Duncan, Ray, "Advanced MSDOS Programming", Microsoft Press, 1986, pp. 390, 391, 486, 487.*

Lin, Jin–Kun, "Virtual Screen: A Framework for Task Management", The X Resource, Issue 1, Winter 1992—Proceedings of the 6th Annual X Technical Conference, pp 191–198, 1992.*

Lin, Jin–Kun, "A Multimedia and Multisource Document Editor of an Open Architecture", Dept. of Computer Science, University of N.C. at Chapel Hill, ACM 089791–533–X/92/0010/0057, pp. 57–62, 1992.*

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338276

PX0001.0023

US 5,838,906 C1

**1**

**EX PARTE
REEXAMINATION CERTIFICATE
ISSUED UNDER 35 U.S.C. 307**

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1–10** is confirmed.

*    *    *    *    *

Copy provided by USPTO from the PIRS Image Database on 08/02/2011



US005838906C2

## (12) EX PARTE REEXAMINATION CERTIFICATE (6645th)

# United States Patent
Doyle et al.

(10) **Number:** US 5,838,906 C2
(45) **Certificate Issued:** Feb. 3, 2009

(54) **DISTRIBUTED HYPERMEDIA METHOD FOR AUTOMATICALLY INVOKING EXTERNAL APPLICATION PROVIDING INTERACTION AND DISPLAY OF EMBEDDED OBJECTS WITHIN A HYPERMEDIA DOCUMENT**

(75) Inventors: **Michael D. Doyle**, Alameda, CA (US); **David C. Martin**, San Jose, CA (US); **Cheong S. Ang**, Pacifica, CA (US)

(73) Assignee: **University of California**, Alameda, CA (US)

**Reexamination Request:**
No. 90/007,858, Dec. 22, 2005

**Reexamination Certificate for:**
Patent No.: **5,838,906**
Issued: **Nov. 17, 1998**
Appl. No.: **08/324,443**
Filed: **Oct. 17, 1994**

Reexamination Certificate C1 5,838,906 issued Jun. 6, 2006

(51) **Int. Cl.**
$G06F\ 9/46$ (2006.01)
G06F 17/30 (2006.01)
G06F 9/50 (2006.01)

(52) **U.S. Cl.** ...................... 715/205; 345/419; 345/427; 345/619; 345/638; 345/649; 345/653; 345/654; 345/655; 345/656; 709/202; 709/218; 709/219; 715/738; 715/760; 715/777; 715/804; 718/106; 719/310; 719/315; 707/E17.119

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,815,029 | A | 3/1989 | Barker et al. |
| 4,847,604 | A | 7/1989 | Doyle |
| 4,949,248 | A | 8/1990 | Caro |
| 5,056,057 | A | 10/1991 | Johnson et al. |
| 5,146,553 | A | 9/1992 | Noguchi et al. |
| 5,202,828 | A | 4/1993 | Vertelney et al. |
| 5,204,947 | A | 4/1993 | Bernstein et al. |
| 5,206,951 | A | 4/1993 | Khoyi et al. |
| 5,274,821 | A | 12/1993 | Rouquie |
| 5,307,499 | A | 4/1994 | Yin |

(Continued)

OTHER PUBLICATIONS

"How People Use Softcopy Documentation: A Case Study", Dave Hendry et al., Conference of the Centre for Advanced Studies on Collaborative Research (CASCON) 1991, pp. 77–93.*

(Continued)

*Primary Examiner*—Joseph R Pokrzywa

(57) **ABSTRACT**

A system allowing a user of a browser program on a computer connected to an open distributed hypermedia system to access and execute an embedded program object. The program object is embedded into a hypermedia document much like data objects. The user may select the program object from the screen. Once selected the program object executes on the user's (client) computer or may execute on a remote server or additional remote computers in a distributed processing arrangement. After launching the program object, the user is able to interact with the object as the invention provides for ongoing interprocess communication between the application object (program) and the browser program. One application of the embedded program object allows a user to view large and complex multi-dimensional objects from within the browser's window. The user can manipulate a control panel to change the viewpoint used to view the image. The invention allows a program to execute on a remote server or other computers to calculate the viewing transformations and send frame data to the client computer thus providing the user of the client computer with interactive features and allowing the user to have access to greater computing power than may be available at the user's client computer.



Copy provided by USPTO from the PIRS Image Database on 08/02/2011

**US 5,838,906 C2**

Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,321,806 A | 6/1994 | Meinerth et al. |
| 5,321,807 A | 6/1994 | Mumford |
| 5,321,808 A | 6/1994 | Rupp et al. |
| 5,347,632 A | 9/1994 | Filepp et al. |
| 5,367,635 A | 11/1994 | Bauer et al. |
| 5,390,314 A | 2/1995 | Swanson |
| 5,418,908 A | 5/1995 | Keller et al. |
| 5,425,141 A | 6/1995 | Gedye |
| 5,499,369 A | 3/1996 | Atkinson |
| 5,537,526 A | 7/1996 | Anderson et al. |
| 5,544,320 A | 8/1996 | Konrad |
| 5,581,686 A | 12/1996 | Koppolu et al. |
| 5,606,493 A | 2/1997 | Duscher et al. |
| 5,613,058 A | 3/1997 | Koppolu et al. |
| 5,634,019 A | 5/1997 | Koppolu et al. |
| 5,652,876 A | 7/1997 | Ashe et al. |
| 5,754,175 A | 5/1998 | Koppolu et al. |
| 5,801,701 A | 9/1998 | Koppolu et al. |
| 5,812,862 A | 9/1998 | Smith et al. |
| 6,055,514 A | 4/2000 | Wren |

### OTHER PUBLICATIONS

Bill Janssen, "Re: HTML+ support for eqn & Postscript," www–talk email list, 1 page (Jun. 14, 1993).

Dave Raggett, "HTML+ support for eqn & Postscript," www–talk email list, 2 pages (Jun. 14, 1993).

Marc Andreessen, "NCSA Mosaic for X 1.2 available," www–talk email list, 3 pages (Jun. 30, 1993).

Anonymous, "xresources.h," 15 pages (1993). (Downloaded from "Index of /pub/mosaic/Unix/source/old" as part of the file "xmosaic–1.2.tar.z"; Exhibit E has 15 pages, including printouts for: (1) the web page for downloading "xmosaic–1.2.tar.z," (2) the contents of "xmosaic–1.2tar.z," and (3) the file "xresources.h" in "xmosaic–1.2.tar.z").

Marc Andreessen, "NCSA Mosaic for X 2.0 prerelease 4 available," www–talk email list, 4 pages (Sep. 29, 1993).

Anonymous, "Default File Extensions in Mosaic 2.0pre4," 1 page.

Anonymous, "Default MIME Types in Mosaic 2.0pre4," 1 page.

John Bradley, "xv, Interactive Image Display for the X Window System," 72 pages (1992). (Downloaded from "Index of /root/usr.local.src/xv–2.21" as part of the file "xv–2.21.tar.z"; Exhibit I has 77 pages, including printouts for: (1) the web page for downloading "xv–2.21.tar.z," (2) the contents of "xv–2.21.tar.z," and (3) the file "xvdocs.ps.z" in "xv–2.21.tar.z").

John Bradley, "xv, Interactive Image Display for the X Window System," 105 pages (Apr. 26, 1993). (Downloaded from "Index of /pub/net/infosys/NCSA/Web/Mosaic/Unix/view" as part of the file "xv–3.00.tar.z", Exhibit J has 110 pages, including printouts for: (1) the web page for downloading "xv–3.00.tar.z," (2) the contents of "xv–3.00.tar.z," and (3) the file "xvdocs.ps.z" in "xv–3.00.tar.z").

Marc Andreessen, "'xv 3.0' is out . . . ," www–talk email list, 1 page (Apr. 30, 1993).

Timothy Thiesen, "Ghostview(1) Unix Programmer's Manual," 14 pages (Jul. 1993). (Downloaded from "ftp:// mirror.cs.wesc.edu/pub/mirrors/ghost/gnu/ghostview/" as part of the file "ghostview–1.5.tar.gz"; Exhibit L has 21 pages, including printouts for: (1) the FTP site for downloading "ghostview–1.5.tar.gz," (2) the contents of "ghostview–1.5.tar.gz," (3) the file "ghostview.ps" in "ghostview–1.5.tar.gz," and (4) the file "README" in "ghostview–1.5–tar.gz").

Douglas Young, *The X Window System, Programming and Applications with Xt*, Prentice Hall, title page, copyright page, pp. i–x, 1–13, 123–166, 280–332, 520–533 (1990).

Adrian Nye, *Xlib Programming Manual for Version 11*, O'Reilly & Associates, Inc., title page, copyright page, pp. i–xxxiii, 1–46, and index (1988).

Anonymous, "gs.interface," 2 pages (Jul. 1993). (Downloaded from "ftp://mirror.cs.wesc.edu/pub/mirrors/ghost/ gnu/ ghostview/" as part of the file "ghostview–1.5.tar.gz").

Doyle et al., "Processing Cross–sectional Image Data for Reconstruction of Human Developmental Anatomy from Museum Specimens," Newsletter of the Association for Computing Machinery Special Interest Group on Biomedical Computing, vol. 13, No. 1, ACM Press, cover page, table of contents, pp. 9–15 (Feb. 1993).

"A Little History of the world Wide Web", n.pag. Online. Internet: available http://www.w3.org/History.html (retrieved Aug. 18, 2006).

"NCSA Mosaic Version Information", n.pag. Online. Internet: available http://www.ncsa.uiuc.edu/SDG/Software.

"The second phase of the revolution", Wired, Oct. 1994, pp. 116–152.

Vetter, Ronald "Mosaic and the World–Wide Web," Computer Magazine, v.27, Iss. 10, pp. 49–57, Oct. 1994.

Wynne et al. "I can Management, Group Support Systems, and Hypermedia: a Combination Whose Time Has Come," System Sciences, 1993 Annual Hawaii Int'l Conf., pp. 112–121.

Hansen, Wilfred "Andrew as a Multiparadigm Environment for Visual Languages," Visual Languages, 1993 IEEE Symposium, pp. 256–260.

Moran, Patrick "Tele–Nicer–slicer–Dicer: A New Tool for the Visualization of Large Volumetric Data", NCSA Technical Report (TRO14), Aug. 1993.

University of Southern California's Mercury Project— "USC Mercury Project:Interface", Project Milestones, USC Press Release—obtained from Internet, http://www.usc.edu/ dept/raiders/.

Hansen, Wilfred "Enhancing documents with embedded programs: How Ness extends in the Andrew ToolKit", IEEE Computer Language, 1990 International Conference.

Tani, M, et al., "Object–Oriented Video—Interaction with Real–World Objects Through Live Video", May 1992, p. 593–598.

Crowley, T., et al., "MMConf: An Infrastructure for Building Shared Multimedia Applications", CSCW 90 Proceedings, Oct. 1990, p. 329–342.

Davis, H., et al., "Towards An Integrated Information Environment With Open Hypermedia System", ACM ECHT Conference, Dec. 1992, pp. 181–190.

Ferrara, F., "The KIM Query System", Abstract, SIGCHI Bulletin, vol. 6, No. 3, Jul. 1994, pp. 30–39.

Gibbs, S., "Composite Multimedia and Active Objects", OOPSLA '91, pp. 97–112.

Davis, H., et al., "Microcosm: An Open Hypermedia System", Interchi '93, Apr. 1993, p. 526.

Vaziri, A., "Scientific Visualization in High–Speed Network Environments", Computer Networks and ISDN Systems 22, 1991, pp. 111 129.

Cullen, J., et al., "The Use of FTAM to access graphical pictures across wide area networks", Computer Networks and ISDN Systems, 1992, pp. 337–383.

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338279

PX0001.0026

US 5,838,906 C2

Page 3

Lashkari, Y.Z., et al., "PLX: A Proposal to Implement a General Broadcasting Facility in a Distributed Environment Running X Windows", Comput. & Graphics, vol. 16, No. 2, pp. 143–149, 1992.

Kirste, T., "Spacepicture—An Interactive Hypermedia Satellite Image Archival System", Comput. & Graphics, vol. 17, No. 3, pp. 251–260, 1993.

Coulson, G., et al., "Extensions to ANSA for Multimedia Computing", Computers Networks and ISDN Systems 25, 1992, pp. 305–323.

Huynh, Duong Le, et al., "PIX: An Object–Oriented Network Graphics Environment", Comput. & Graphics, vol. 17, No. 3, pp. 295 304, 1993.

Berners–Lee, T.J., et al., The World–Wide Web, Computer Networks and ISDN Systems 25, 1993, pp. 454–459.

Shackelford, D.E., et al., "The Architecture and Implementation of a Distributed Hypermedia Storage System", Hypertext '93 Proceedings, Nov. 1993, pp. 1–13.

Labriola, D., "Remote Possibilities", PC Magazine, Jun. 14, 1994, pp. 223–228.

Udell, J., "Visual Basic Custom Controls Meet OLE", Byte Magazine, Mar. 1994, pp. 197–200.

Sarna, D.E., et al., "OLE Gains Without (Much) Pain", Datamation Magazine, Jun. 15, 1994, pp. 31 and 113.

Rizzo, J., "What's OpenDoc?", MacUser magazine, Apr. 1994, pp. 119–123.

Fogarty, K., et al., "Microsoft's OLE can be Network Trojan Horse", Network World Magazine, Jun. 27, 1994, vol. 11, No. 26, pp. 1 and 75.

"Cello WWW Browser Release 1.01a", Article obtained from the Internet, ftp.law.cornell.edu/pub/L11/Cello no DDE, Mar. 16, 1994, pp. 2 9.

"OLE 2.0: Death to Monoliths", Byte Magazine, Mar. 1994, p. 122.

Duncan, Ray, "Advanced MSDOS Programming," Microsoft Press, 1986 pp. 390, 391, 486, 487.

Lin, Jin–Kun, "Virtual Screen: A Framework for Task Management," The X Resource, Issue 1, Winter 1992 Proceedings of the 6th Annual X Technical Conference, pp. 191–198, 1992.

Lin, Jin–Kun, "A Multimedia and Multisource Document Editor of an Open Architecture," Dept. of Computer Science, University of N.C. at Chapel Hill, ACM 089791–533–X/92/0010/0057, pp. 57–62, 1992.

Berners–Lee T., et al., Hypertext Markup Language (HTML), Internet Draft IETF(Jun. 1993).

Toye, G., et al., SHARE: A Methodology and Environment for Collaborative Product Development, Proceedings, Second Workshop on Enabling Technologies: Infrastructure for Collaborative Enterprises, 1992, IEEE, pp. 33–47, Apr. 22, 1993.

Lin, J. MediaMosaic—A Multimedia Editing Environment, Proc. Of the 5th Annual ACM Symposium on User Interface Software and Technology, ACM pp. 135–141, 1992.

Halasz, F., Reflections on NoteCards: Seven Issues for the Next Generation of Hypermedia Systems, ACM Journal on Computer Documentation, vol. 25, No. 3, pp. 71–87, Aug. 2001, reprinting article published in 1988.

Feiner, S., et al., An Experimental System for Creating and Presenting Interactive Graphical Documents, ACM Transactions on Graphics, vol. 1, No. 1, pp. 59–77, Jan. 1982.

Engelbart, D., Knowledge–Domain Interoperability and an Open Hyperdocument System, Proc. Of the 1990 ACM Conference on Computer Supported Cooperative Work, ACM Press, pp. 143–156, 1990.

Meyrowitz, N., Intermedia: The Architecture and Construction of an Object–Oriented Hypermedia System and Applications Framework, Proc. Of the Conf. on Object Oriented Programming Systems, Languages, and Applications, ACM Press, pp. 186–201, 1986.

Wiil, U., Issues in the Design of EHTS: A Multiuser Hypertext System for Collaboration, Proc. Of the 25th Hawaii Int'l. Conf. on Systems Sciences, vol. 2, pp. 629–639, Jan. 1992.

Celentano, A., et al., A Multiple Presentation Document Management System, Proc. Of the 10th Annual Int'l Conf. on Systems Documentation, ACM Press, pp. 63–71, 1992.

Garg, P. et al., A Hypertext System to Manage Life Cycle Documents, Proc. Of the 25th Annual Hawaii Int'l Conf. on System Sciences, 1988, IEEE, vol. 2, pp. 337 346, Jan. 1988.

Kahn, P., Webs, Rees, and Stacks: How Hypermedia System Design Effect Hypermedia Content, Designing and Using Human–Computer Interfaces and Knowledge Based Systems, Elsevier Science Publishers, pp. 443–449, 1989.

Streitz, N. et al., Hypertext: Concepts, Systems, and Applications, Cambridge Univ. Press, pp. 1–12, 356–359, 367–369, 1990.

Stotts, P., et al., Hyperdocuments as Automata: Trace–based Browsing Property—Verification, UNC CS Technical Report, TR92–038, citeseer.ist.psu.edu/stotts92hyperdocument.html, p. 1, 1992.

Adie, C., Network, Access to Multimedia Information, 2nd ed., RARE Project OBR(93)015, RARE, pp. 1–53, Feb. 4, 1994.

Reichard, K., et al., X11R96: the Rumored Changes (Release 6 of the X Window System), UNIX Review, vol. 11, No. 5, p. 101 (pp. 1–4 as printed) (May 1993).

Cox, B., Object Oriented Programming: An Evolutionary Approach, Addison–Wesley, pp. 1–12, 1987.

Solaris OpenWindows: Introduction to the ToolTalk Service—A White Paper, Sun Microsystems, Inc., pp. 1–16, 1991.

Tool Inter–Operability: A Hands On Demonstration—A Simple Demonstration of How the TookTalk Service Works, Sun Microsystems, Inc., pp. 1–24, 1992.

Designing and Writing a ToolTalk Procedural Protocol—A White Paper, Sun Microsystems, Inc. pp. 1–24, 1992.

Fresco Frequently Asked Questions, www.i.h.kyoto–u.ac.jp/~shom/doc.org/fresco/FAQ.html, pp. 1–14, Apr. 13, 1995.

Palay, A., Andrew Toolkit: An Overview, Tech Rept., Carnegie–Mellon University Information Technology Center, pp. 1–15, 1988.

Dettmer, R., X–Windows—the great integrator, IEE Review, vol. 36, No. 6, pp. 219–222 (Jun. 1990).

The Andrew View, Carnegie Mellon Unic., www–2.cs.cmu.edu/People/AUIS/ftp/NEWSLETTERS/ASCII/93Jun.ascii, vol. 2, no. (pp. 1–12 as printed) (Jun. 1993).

The X Window System and Broadway, www.broadwayinfo.com/bwwhitesbroadwayhct.htm, Humminbird Communications Ltd., pp. 1–11 (1987).

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

**US 5,838,906 C2**

Page 4

Neuendorffer, T., ADEW: A Multimedia Interface Builder for Andrew, Proceedings Multi-Media Communications, Applications, and Technology Workshop, pp. 1–19 (Jul. 1991).

Letter from America Online, Inc., Microsoft Corp., and Macromedia, Inc. (Oct. 14, 2003) and Letter from Adobe Systems Inc. re: Potential Director–Ordered Reexamination of U.S. Patent No. 5,838,906 pursuant to 35 U.S.C. § 303(a) (Oct. 15, 2003) (with cover letter from Sidley, Austin, Brown & Wood LLP) (including attachments).

Anonymous Facsimile re: possible interference (Oct. 16, 2005).

Letter from Stephen Wren (discussing relevance of U.S. Pat. No. 6,055,514 to U.S. Pat. No. 5,838,906) (Feb. 22, 2005).

Letter from Pennie & Edmonds, LLP on behalf of the HTML Consortium, re: Citation of Prior Art Under 35 U.S.C. §301 and 37 C.F.R. 1.501 in Relation to U.S. Patent No. 5,838,906 (Oct. 24, 2003).

Festa, Paul, CNET News.com "Rivalries set Aside in Defense of Internet Explorer" (Sep. 25, 2003) (http://news.com.com/2009–1023_3–5082004.html).

Roberts, Paul, "Microsoft's Patent Loss Rattles Tech Community" (Sep. 3, 2003) (http://www.infoworld.com/article/03/09/03/HInmicrosoft'sloss_1.html).

Fest, Paul, CNET News.com "Eolas Files Motion to Enjoin IE" (Oct. 8, 2003) (http://news.com.com/2100–1028_3–5088349.html?tag=st+pop).

Lynch, Stephen, "Microsoft Rivals Join Patent Fight; M'Soft Rivals Join to Wage Patent Fight" N.Y. Post (Oct. 9, 2003).

O'Reilly Network, Patent List (Jul. 10, 2003).

Ray Ozzie, "Saving the Browser," Weblog entry (2003) (discussing Lotus Notes R3 relevance to the patent).

"Microsoft's OLE can be network Trojan horse," Network World Magazine, vol. 11, No. 26, Jun. 27, 1994.

Object linking and Embedding OLE 2.01 Design Specification (Sep. 27, 1993).

Programming for Windows with Object Linking and Embedding 2.0 (Mar. 1, 1993).

Extensible Compound Document Architecture Client and Server API specification (no date).

Pei Y. Wei, "X Browser" (e–mail to www–talk discussion list) (Dec. 13, 1991).

Pei Y. Wei, "X Browser" (e–mail to www–talk discussion list) (Dec. 13, 1994).

Dale Dougherty, "WWW Developer's Conference" (e–mail to www–talk discussion list) (Jun. 19, 1993).

Pei Wei, "Re: Universal network graphics language" (e–mail to www–talk discussion list) (Jan. 28, 1994).

Pei Wei, "Re: Universal network graphics language" (e–mail to www–talk discussion list) (Jan. 28, 1994).

Pei Wei, "Viola WWW beta release is available" (e–mail to www–talk discussion list) (Feb. 25, 1994).

Pei Wei, "Viola WWW beta release is available" (e–mail to www–talk discussion list) (Feb. 25, 1994).

Pei Wei, "Viola WWW beta release is available" (e–mail to www–talk discussion list) (Feb. 25, 1994).

Pei Wei, "Re: World Wide Web and Viola" (e mail to www–talk discussion list) (May 13, 1992).

Pei Wei, "A Brief Overview of the VIOLA Engine, and its applications" (MSET 0009788–0009801)(no date).

Pei Wei, "A Brief Overview of the VIOLA Engine, and its applications" (InterNIC details for http://www.viola.org) (retrieved from http://www.internicdomainnames.com).

Pei Wei, "A Brief Overview of the VIOLA Engine, and its applications" (TT05417–05433) (1994) (retrieved on Aug. 4, 1998 from http://scam.xcf.berkeley.edu/~wei/viola/violaIntro.html).

Pei Wei, "A Brief Overview of the VIOLA Engine, and its applications" (E0714–021725) (1994) (retrieved from http://scam.xcf.berkeley.edu/~wei/viola/violaIntro.html).

Pei Wei, "A Brief Overview of the VIOLA Engine, and its applications" (TT 05441–05600) (including "Viola in a Nutshell: the Viola World Wide Web Toolkit" from http://scam.xcf.berkeley.edu/~wei/viola/book).

Pei Wei, "A Brief Overview of the VIOLA Engine, and its applications" ((MSET 0000026–0000036) (retrieved from http://scam.xcf.berkeley.edu/~wei/viola/violaIntro.html).

Pei Wei, "Re: FYI . . . press release," (e–mail to www–vrml@wired.com) (Aug. 31, 1994).

Pei Wei, "Re: FYI . . . press release" (e–mail to www–talk discussion list) (Aug. 31, 1994).

Pei Wei, "RE: FYI . . . press release" (e–mail to mddoyle@netcom.com) (Sep. 1, 1994).

Michael Doyle, "Re: More RE: FYI . . . Press release" (e mail to Pei Wei) (Sep. 1, 1994).

Pei Wei, "Re: FYI . . . press release" (e–mail to vrml discussion list) (Sep. 1, 1994).

Michael Doyle, "Scripts vs APIs" (e–mail to vrml discussion list) (Sep. 1, 1994).

Pei Wei "WWW Browsers Extensibility Issues," Stanford Computer Forum WWW Workshop—Sep. 20–21, 1994.

Pei Wei, "Extensibility in WWW Browsers" Stanford Computer Forum WWW Workshop—Sep. 20–21, 1994.

Michael Doyle, "Re: Hot Java is here! And it *rocks*" (e–mail to www–talk discussion list) (Mar. 27, 1995).

Pei Wei, "Re: Eolas Acquires Milestone Internet Software Patent" (e–mail to www–talk discussion list) (Aug. 21, 1995).

Pei Wei, "Re: Eolas Acquires Milestone Internet Software Patent" (e–mail to www–talk discussion list) (Aug. 21, 1995).

Time Berners–Lee, Press Release: "The World Wide Web past, present and future" (Jul. 17, 1996) (retrieved from http://www.bcs.org.uk/news/timbl.htm).

Pei Wei, "Re: Universal network graphics language" (e–mail to www–talk discussion list) (Jan. 28, 1994).

Microsoft Product Support Services Application Note (Text File) GC0165:Rich–Text Format (RTF) Specification (Jun. 1992).

Tim Berners–Lee, "HTML + DTD in ftp://info.cern.ch/pub/www/dev/htmlplus.dtd" (e mail to www–talk discussion list) (Jun. 2, 1993).

Dave Raggett, "HTML + support for eqn & Postscript" (e–mail to www–talk discussion list) (Jun. 14, 1993).

Dave Raggett, "HTML + support for eqn & Postscript" (e–mail to www–talk discussion list) (Jun. 14, 1993).

Christopher J. McRae, "Re: Xmosaic and Xv" (e–mail to www–talk discussion list) (Jun. 26, 1993).

Dave Raggett, "HTML + (Hypertext markup language)" (Jul. 23, 1993).

William Perry, "Re: Interest in HTML Conformance?" (e–mail to www–talk discussion list) (Apr. 17, 1994).

William Perry, "Presentation Tags, etc." (e mail to Tony Jebson) (May 5, 1994).

William Perry, "Re: Where can I find doc on embedding X windows in Lemacs buffers?" (e–mail to help–lucid–emacs) (May 28, 1994).

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

Jeff Sparkes, "Re: Where can I find doc on embedding X windows in Lemacs buffers?" (e–mail to help–ludic–emacs) (May 31, 1994).

Daniel Connolly, "Re: HTML 2.0 specification" e–mail to wmperry@spry.com. (Sep. 2, 1994).

NCSA Software Development Group, "Introducing NCSA Mosaic" (Dec. 1993).

Kraig Brockschmidt, Programming for Windows with Object Linking and Embedding (OLD) 2.0 Draft (no date).

Kraig Brockschmidt, "Inside OLE 2.0" Microsoft Press (Oct. 1993).

ECDA extensible Compound Document Architecture (Jul. 10, 1990).

Microsoft Corporation, "Information At Your Fingertips Backgrounder" (Dec. 1990).

Microsoft Corporation, Object Landing & embedding—Extensible Application Protocols (Apr. 8, 1991).

Microsoft Corporation, "OLE 2.0 Design Summary" (Jul. 5, 1991).

Microsoft Corporation, "OLE 2.0 Architecture and Protocol Proposal" (Jul. 9, 1991).

Microsoft Corporation, "OLE 2.0 Design Specification" (Apr. 15, 1993).

Microsoft Corporation, "Microsoft OLE 2.0 Developers Conference Previews Applications Using Object Technology for Windows" (May 3, 1993).

Microsoft Corporation, "Windows Objects: Object Linking & Embedding 2.0 Developers Conference" (May 3, 1993).

Stuart J. Johnston and Vance McCarthy, "Developers get hands on complex but vital OLE 2.0", Info World, vol. 15, issue 19 (May 10, 1993).

Kraig Brockschmidt, "Programming for Windows with Object Linking and Embedding 2.0" Preliminary Draft (Apr. 19, 1993).

Microsoft Corporation, OLE 2.01 Design Specification.

Microsoft Corporation, "Microsoft OLE Controls–Specification Overview" (Jan. 1994).

Microsoft Corporation, "Microsoft Multimedia View Publishing Toolkit" 1 of 3 volumes: Getting Started, "Authoring Guide" and "Technical Reference" (1993).

Microsoft Corporation, "Microsoft Multimedia View Publishing Toolkit" 2 of 3 volumes: Getting Started, "Authoring Guide" and "Technical Reference" (1993).

Microsoft Corporation, "Microsoft Multimedia View Publishing Toolkit" 3 of 3 volumes: Getting Started, "Authoring Guide" and "Technical Reference" (1993).

Microsoft Corporation, "Microsoft Multimedia View Publishing Toolkit" compact disc, Getting Started, "Authoring Guide" and "Technical Reference" (1993).

E mail From Ang Re: Plan (Oct. 8, 1994).

Bert Bos, "Re: Structured text v. page descriptions" (e–mail to David C. Martin) (Nov. 3, 1994).

Microsoft Windows Win32 Professional Developers Conference Information Packet including a Microsoft Non–Disclosure Agreement (Oct. 18, 1993).

Maritz, P—Microsoft Letter to Microsoft Win32 Professional Developers Conference Attendees (Nov. 8, 1993).

Kraig Brockschmidt, "A Primer on Designing Custom Controls," Microsoft System Journal, Mar.–Apr. 1992.

Microsoft Corporation, "Object Linking and Embedding Backgrounder" (Dec. 1990).

Microsoft Corporation, "Compoound Documents Backgrounder" (Dec. 1990).

Rude Q&A OLE.

Microsoft Corporation, "OLE Controls Architecture" Version 0.6 (Sep. 1, 1993).

Kraig Brockschmidt, "OLE 2.0: implementing Visual Editing (In–Place Activation)" (Nov. 1993).

Kraig Brockschmidt, "Chapter One: OLE Controls Architecture" (Nov. 10, 1993).

Microsoft Corporation, "OLE Controls Architecture" Version 0.7 (Nov. 17, 1993).

Microsoft Corporation, "OLE Controls Architecture" Version 0.2 (May 15, 1993).

Kraig Brockschmidt, "Network DDE in Windows for Workgroups 3.1 Bridges Programs Between PCs", Microsoft Systems Journal, Jan. 1993.

Microsoft Corporation, "Object Linking & Embedding Version 2.0 Programmer's Reference" (Apr. 15, 1993).

Moeller, Michael, et al., "Microsoft Maps New OCX Plan; ActiveX Seen as Web content Platform," PC Week vol. 13, No. 10, p. 1 (Mar. 11, 1996).

MaroVaC, Nenad et al., "Hypernet: A Tool to Choreograph Worldwide Distributed Hypermedia Documents," Comput & Graphics vol. 16, No. 2, pp. 197–202 (1992).

Netscape Communications Corp., Press Release: "Netscape Communications Offers New Network Navigator Free on the Internet" (1998).

Sackman, Gleason, "WWW> Telerobotics via the Web(fwd)" (e–mail to comp.infosystems discussion list) (Sep. 7, 1994).

"The Pattern in the Mosaic: An Interview with Jim Clark and Marc Andreesen," Network Computing, p. 44 (Jan. 15, 1994).

Oliver, Dick, "Netscape Unleashed" (1996).

"Reply by Third Party Requester Under C.F.R. 1.535" (May 5, 2006).

"WWW–Talk Electronic Mailing List Contributors from Jan. 1993 Through Jun. 1993".

"World Wide Web Mailing Lists," retrieved from http://www-w.bilkent.edu.tr/pub/WWW/Mail/Lists.html (May 2, 2006).

Hughes, John, "Entering the World–Wide Web: A Guide to Cyberspace" (Oct. 1993) (http://w3.cib.unibo.it/intro/ww-w–guide/www.guide.html.

Thomas, Eric, "LISTSERV for the Non–Technical User" (Sep. 18, 1993).

Andreessen, Marc, "NCSA Mosaic Technical Summary" (May 8, 1993).

Weber, Jay C., "Protest of Patent # 5,838,906, under 37 CFR 1.291, and Citation of Prior Art for #5,838,906 under 37 CFR 1.502" (including attachments) (Feb. 6, 2004).

Defendant's Trial Exhibit 273: Information Regarding Microsoft OLE 2.01 SDK (CD).

File Tree Printout of Defendant's Trial Exhibit 273: Information Regarding Microsoft OLE 2.01 SDK.

Defendant's Trial Exhibit 258: Information Regarding Microsoft OLE 2.0 Toolkit Program (CD).

File Tree Printout of Defendant's Trial Exhibit 258: Information Regarding Microsoft OLE 2.0 Toolkit Program.

MS–ET 0166172: Information Regarding Microsoft OLE 2.01 SDK (CD).

File Tree Printout of MS–ET 0166172: Information Regarding Microsoft OLE 2.01 SDK.

MS–ET 0189860: First Companion Disk for "Inside OLE 2" by Kraig Brockschmidt (CD).

File Tree Printout of MS–ET 0189860: First Companion Disk for "Inside OLE 2" by Kraig Brockschmidt.

## US 5,838,906 C2

Page 6

MS–ET 0189861: Second Companion Disk for "Inside OLE 2" by Kraig Brockschmidt (CD).

File Tree Printout of MS–ET 0189861: Second Companion Disk for "Inside OLE 2" by Kraig Brockschmidt.

Defendant's Trial Exhibit 326: Information Regarding Multimedia Viewer (CD).

File Tree Printout of Defendant's Trial Exhibit 326: Information Regarding Multimedia Viewer.

Defendants Trial Exhibit 215: Information Regarding Emacs (CD).

File Tree Printout of Defendants Trial Exhibit 215: Information Regarding Emacs.

E 021700: Information Regarding WebRouser (CD).

File Tree Printout of E 021700: Information Regarding WebRouser.

E 027693: Information Regarding Distributed Hypermedia Object Embedding (DHOE) (CD).

File Tree Printout of E 027693: Information Regarding Distributed Hypermedia Object Embedding (DHOE).

*Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626, 2003 U.S. Dist. Lexis 11476 (N.D. Ill. Jul. 2, 2003).

*Eolas Techs., Inc.* v. *Microsoft Corp.,* 270 F.Supp.2d 997 (N.D. Ill., Jul. 1, 2003).

*Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626, 2003 U.S. Dist. Lexis 6322 (N.D. Ill. Apr. 16, 2003).

*Eolas Techs., Inc.* v. *Microsoft Corp.,* 65 U.S.P.Q.2d 1090 (N.D. Ill. Oct. 18, 2002).

*Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626, 2000 U.S. Dist. Lexis 18886 (N.D. Ill. Dec. 28, 2000).

Complaint and Demand for Jury Trial, *Eolas Tech., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Feb. 2, 1999).

Answer, *Eolas Tech., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Mar. 24, 1999).

Microsoft Corporation's Submission Regarding Claim Construction Issues and Scheduling, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Sep. 7, 1999).

First Amended Answer and Counterclaim, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Sep. 7, 1999).

Plaintiff's Reply to Microsoft's First Amended Counterclaim, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Oct. 27, 1999).

Defendant Microsoft Corporation's Initial Brief on Claim Construction Issues, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill Mar. 24, 1999) (Oct. 14, 2000).

Plaintiff Eolas Techs., Inc. Memorandum in Support of Claim Construction (N.D. Ill Oct. 14, 2000).

Defendant Microsoft Corporation's Replay Brief on Claim Construction Issues, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill, Oct. 23, 2000).

Plaintiff Eolas Technologies' Reply Memorandum in Support of Claim Construction, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill Oct. 23, 2000).

Memorandum Opinion and Order, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99 C 626 (N.D. Ill, Dec. 28, 2000).

Plaintiff Eolas Technologies' First Amended Complaint and Demand for Jury Trial, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill, Apr. 6, 2001) (Apr. 9, 2001).

Defendant Microsoft Corporation's Answer to First Amended Complaint and Second Amended Counterclaim, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Apr. 18, 2001).

Plaintiff Eolas Technologies' Reply to Defendant's Second Amended Counterclaim, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill May 2, 2001).

Plaintiff Eolas Technologies' Second Amended Complaint and Demand for Jury Trial, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill, Aug. 31, 2001) (Aug. 31, 2001).

Defendant Microsoft Corporation's Answer to Second Amended Complaint and Third Amended Counterclaim, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Sep. 17, 2001).

Plaintiff's Proposed Jury Instructions Regarding Claim Construction, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Jan. 27, 2003).

Plaintiff's Proposed Preliminary and Final Jury Instructions, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Apr. 25, 2003).

Memorandum of Microsoft Corporation in Support of its Motion to Clarify the Court's In Limine Ruling with Respect to Communications about the Viola WWW Browser involving Michael Doyle, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Jul. 2, 2003).

Plaintiff's Motion to Exclude Extrinsic Evidence of Claimed Pei Wei Invention beyond that Disclosed in the Precise Reference Asserted as Anticipating Prior Art, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Jul. 22, 2003).

Microsoft's Response to Plaintiffs' Motion to Exclude Extrinsic Evidence of Claimed Pei Wei Invention Beyond that Disclosed in the Precise Reference Asserted as Anticipating Prior Art, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Jul. 23, 2003).

Microsoft's Motion to Preclude Plaintiffs from Arguing that the Prior Art Lacks Elements not Found in the Claims of the '906 Patent, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Jul. 28, 2003).

Plaintiffs' Memorandum in Further Support of Their Motion to Exclude Extrinsic Evidence of Claimed Pei Wei Invention, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Jul. 23, 2003).

Microsoft's Offer of Proof Regarding Viola Prior Art, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99 C–626 (N.D. Ill) (Aug. 5, 2003).

Plaintiffs' Memorandum in Opposition to Microsoft's Offer of Proof Regarding the "Viola Prior Art", *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill, Aug. 11, 2003) (Aug. 7, 2003).

Microsoft's Post–Trial Brief on Inequitable Conduct, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Aug. 18, 2003).

Plaintiffs' Post–Trial Brief on Microsoft's Inequitable Conduct Claims, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Aug. 22, 2003).

Microsoft's Response to Plaintiffs' Post–Trial Brief on Inequitable Conduct, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Aug. 26, 2003).

Plaintiffs' Objections to Microsoft's Offer of Proof Regarding Viola Prior Art, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Sep. 3, 2003).

Defendant Microsoft's Motion for Judgment as a Matter of Law and a New Trial, *Eolas Techs., Inc.* v. *Microsoft Corp.,* No. 99–C–626 (N.D. Ill) (Oct. 6, 2003).

*Eolas Techs., Inc.* v. *Microsoft Corp.,* 1:99–CV–00626 (Fed. Cir. Jun. 20, 2005).

Microsoft's Motion for Revision of Claim Construction and Summary Judgment of Non–Infringement, *Eolas Tech., Inc.* v. *Microsoft Corp.,* No. 99 C 626 (N.D. Ill) (Dec. 15, 2005).

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

**US 5,838,906 C2**

Page 7

Declaration of Munir R. Meghjee in Support of Plaintiffs' Memorandum of Law in Opposition to Microsoft Corporation's Motion for Revision of Claim Construction and Summary Judgment of Non–Infringement, *Eolas Techs., Inc.* v. *Microsoft Corp.*, No. 99–C–626 (N.D. Ill) (Jan. 12, 2006).

Plaintiffs' Memorandum of Law in Opposition to Microsoft's Motion for Revision of Claim Construction and Summary Judgment of Non–Infringement, *Eolas Techs., Inc.* v. *Microsoft Corp.*, No. 99–C–626 (N.D. Ill) (Jan. 12, 2006).

Plaintiffs' Local Rule 56.1(b)(3) Response to Microsoft Corporation's Statement of Undisputed Facts in Support of Its Motion for Revision of Claim Construction and Entry of Summary Judgment of Non–Infringement, *Eolas Techs., Inc.* v. *Microsoft Corp.*, No. 99–C–626 (N.D. Ill) (Jan. 12, 2006).

Declaration of Laura L. Donoghue in Support of Microsoft's Reply Memorandum in Support of its Motion for Revision of Claim Construction and Summary Judgement of Noninfringement, *Eolas Techs., Inc.* v. *Microsoft Corp.*, No. 99–C–626 (N.D. Ill) (Jan. 31, 2006).

Plaintiffs' Sur–Reply in Opposition to Microsoft's Motion for Revision of Claim Construction and Summary Judgment of Non–Infringement, *Eolas Techs., Inc.* v. *Microsoft Corp.*, No. 99 C–626 (N.D. Ill) (Feb. 27, 2006).

Defendants' Sur–Rebuttal in Support of its Motion for Revision of Claim Construction and Summary Judgment of Non–Infringement, No. 99–C–626 (N.D. Ill) (Mar. 6, 2006).

Expert Report of Dr. John P.J. Kelly (Dec. 14, 2001).

Rebuttal Expert Report of Edward W. Felten Regarding Validity (Jan. 18, 2002).

Supplemental Expert Report of Dr. John P.J. Kelly (Feb. 1, 2002).

Expert Report of Kraig Brockschmidt (Dec. 12, 2001).

Rebuttal Expert Report of Kraig Brockschmidt.

Expert Report of Robert L. Harmon Regarding Claim Construction.

Rebuttal Expert Report of Robert L. Harmon Pursuant to Rule 26(a)(2)(B). F.R.C.P.

Expert Report of Robert L. Harmon Pursuant to Rule 26(a)(2)(B). F.R.C.P.

Berners–Lee, Tim "HTML, HMML, and HyperTeX" post to WWW–Talk E–mail List (Apr. 21, 1993).

Raggett, Dave, "Standardizing new HTML features" post to WWW–Talk E–mail List (Apr. 27, 1993).

Janssen, Bill, "Re: Standardizing new HTML features" post to WWW–Talk E–mail List (Apr. 27, 1993).

Andreessen, Marc, "Re: Standardizing new HTML features" post to WWW–Talk E–mail List (Apr. 27, 1993).

Janssen, Bill, "Re: Standardizing new HTML features" post to WWW–Talk E–mail List (Apr. 27, 1993).

Janssen, Bill, "Re: Standardizing new HTML features" post to WWW–Talk E–mail List (Apr. 29, 1993).

Janssen, Bill, "Re: Standardizing new HTML features" post to WWW Talk E–mail List (Apr. 29, 1993).

Sanders, Tony, "Re: Standardizing new HTML features" post to WWW–Talk E–mail List (Apr. 29, 1993).

Janssen, Bill, "Re: Standardizing new HTML features" post to WWW–Talk E–mail List (Apr. 29, 1993).

Sanders, Tony, "Re: Standardizing new HTML features" post to WWW–Talk E–mail List (Apr. 29, 1993).

Janssen, Bill, "Re: Standardizing new HTML features" post to WWW–Talk E–mail List (Apr. 29, 1993).

Fine, Thomas A., "More than just HTML (was Re: Poetry and Maths)," post to WWW Talk E mail List (May 25, 1993).

Raggett, Dave, "Re: More than just HTML (was Re: Poetry and Maths)" post to WWW–Talk E–mail List (May 27, 1993).

Abbey, Jonathan, "Re: Keeping HTML Simple & Format negotiation between Browser & Server" post to WWW Talk E–mail List (May 27, 1993).

Raggett, Dave, "Re: Keeping HTML Simple & Format negotiation between Browser & Server" post to WWW–Talk E–mail List (Jun. 1, 1993).

Bernes–Lee, Tim "HTML+DTD in ftp://info.cern.ch/pub/www/dev/htmlplus.dtd" post to WWW–Talk E–mail List (Jun. 2, 1993).

Raggett, Dave, "HTML+ support for eqn & Postcript" post to WWW–Talk E–mail List (Jun. 14, 1993).

Janssen, Bill, "Re: HTML+ support for eqn & Postcript" post to WWW–Talk E–mail List (Jun. 14, 1993).

Altis, Kevin, "Re: HTML+ support for eqn & Postcript" post to WWW–Talk E–mail List (Jun. 18, 1993).

Sanders, Tony, "Re: launching executables through HTML." post to WWW–Talk E–mail List (Jun. 19, 1993).

Andreessen, Marc, "Re: launching executables through HTML" post to WWW–Talk E–mail List (Jun. 20, 1993).

Perry, William M., "New Version of The Emacs Browser For W3 (.04b)" post to WWW–Talk E–mail List (Apr. 13, 1993).

Perry, William M., "New Version of WWW Browser For Emacs" post to WWW–Talk E–mail List (Jun. 18, 1993).

Phillips, George Perry, "Re: launching executables through HTML files" post to WWW–Talk E–mail List (Jun. 20, 1993).

Montulli, Lou, "Re: launching executables through HTML files" post to WWW–Talk E–mail List (Jun. 22, 1993).

Raisch, Rob, "Re: Suggestion for a new URL type" post to WWW–Talk E–mail List (Jun. 26, 1993).

VanHeyningen, Marc, "Re: Suggestion for a new URL type" post to WWW–Talk E–mail List (Jun. 26, 1993).

Andreessen, Marc, "Re: Suggestion for a new URL type" post to WWW–Talk E–mail List (Jun. 26, 1993).

Phillips, George, "Re: browser execution" post to WWW–Talk E–mail List (Jun. 28, 1993).

Andreessen, Marc, "browser execution" post to WWW–Talk E–mail List (Jun. 29, 1993).

Sanders, Tony, "Re: browser execution" post to WWW–Talk E–mail List (Jun. 29, 1993).

McRae, Christopher, "Xmosaic and Xv" post to WWW–Talk E–mail List (Jun. 26, 1993).

Deposition Transcript of Pei Wei (Oct. 27, 1999 and Oct. 28, 1999).

Trial Transcript of Dave Raggett, pp. 1804–1897 (Jul. 23, 2003).

Trial Transcript of Pei Wei, pp. 2244–2469 (Jul. 28–29, 2003).

WWW–Talk Archive 1993 Q2 and 1993 Q3 (Apr. to Oct. 1993) (available at http://ksi.cpsc.ucalgary.ca/archives/WWW–TALK/).

Missing Messages 0982–0999 from WWW–Talk Archive 1993Q2 and 1993Q3 (Apr. to Oct. 1993) (retrieved from http://1997.webhistory.org/www.lists/www–talk.1993q2/ and http://1997.webhistory.org/www.lists/www–talk.1993q3/).

Defendant's Trial Exhibit 37 (includes "viola.TOGO.tar.Z" and other Viola information) [Compact Disc].

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

**US 5,838,906 C2**

Page 8

Printout of readable contents of Defendant's Trial Exhibit 37.

Defendant's Trial Exhibit 34 (Information regarding Viola including Viola 930512.tar.gz.zip) [Compact Disc].

Printout of readable contents of Defendant's Trial Exhibit 34.

PW 1130 (Viola related material similar to Defendant's Trial Exhibit 34 but with a different file structure) [Compact Disc].

MS Supp 1205_001 (Viola related material) [Compact Disc].

MS Supp 1205_002 (Viola related material) [Compact Disc].

MS–ET 0009786 (viola TOGO.tar.Z) [Compact Disc].

MS–ET 9706 (information regarding Viola similar to PW 1130) [Compact Disc].

MS–ET 0153301 (information regarding Viola similar to PW 1130) [Compact Disc].

Defendant's Trial Exhibit 37 File Tree Printout.

PW 1130 File Tree Printout.

Defendant's Trial Exhibit 34 File Tree Printout.

MS Supp 1205_001 File Tree Printout.

MS Supp 1205_002 File Tree Printout.

MS–ET 0009786 File Tree Printout.

MS–ET 9706 File Tree Printout.

MS–ET 0153301 File Tree Printout.

OLE 2.0 PDC Questions and Answers (no date).

Stephen Le Hunte, "<EEMBED>—Embedded Objects", HTML Reference Library—HTMLIB v2.1, 1995; n.pag. Online. Internet.

Andreessen, M., "Re: Let's keep the web together", Dec. 1, 1992 post to WWW Talk Mailing list.

In re Srinivasa Koppolu, et al., Appeal No. 2005–1431, U.S. App. No. 09/442,070 for reissue of Patent 5,801,701 (B.P.A.I. Nov. 14, 2005).

Notice of Lodging of Deposition Testimony Played in Plaintiffs Case in Chief (Jul. 22, 2003) (Koppolu Testimony).

Expert Witness Report of Larry S. Nixon Pursuant to Fed. R. Civ. P. Rule 26(a)(2)(B) (Dec. 14, 2001).

WWW–Talk Archive 1991 printout (retrieved from http://ksi.cpsc.ucalgary.ca/archives/WWW–TALK/www–talk–1991.index.html).

WWW–Talk Archive 1992 printout (retrieved from http://ksi.cpsc.ucalgary.ca/archives/WWW–TALK/www–talk–1992.index.html).

WWW–Talk Archive 1993 Q1 printout (retrieved from http://ksi.cpsc.ucalgary.ca/archives/WWW–TALK/www–talk–1993q1.index.html).

WWW–Talk Archive 1993 Q4 printout (retrieved from http://ksi.cpsc.ucalgary.ca/archives/WWW–TALK/www–talk–1993q4.index.html).

WWW–Talk Archive 1994 Jan. 1 to Jan. 27 printout (retrieved from http://ksi.cpsc.ucalgary.ca/archives/WWW–TALK/www–talk–1994q1.index.html).

Microsoft's Offer of Proof and Motion to Reconsider Regarding Revision of Claim Construction (1:99–cv–00626) (N.D. Ill Apr. 26, 2007).

Declaration of Dr. John P. J. Kelly in Support of Microsoft's Offer of Proof of Non–infringement (1:99–cv–00626) (N.D. Ill Apr. 26, 2007).

Reply Brief of Defendant–Appellant Microsoft Corporation (04–1234) (Fed. Cir. Aug. 16, 2004).

Brief of Defendant–Appellant Microsoft Corporation (04–1234) (Fed. Cir. Jun. 3, 2004).

Transcript of Trial Testimony of John Kelly, pp. 2640–2862 (1:99–cv–00626) (N.D. Ill. Jul. 31, 2003).

Supplemental Expert Report or Larry S. Nixon Pursuant to Fed. R. Civ. P. Rule 26(a)(2)(B) (1:99–cv–00626) (N.D. Ill. May 21, 2007).

Plaintiff's Memorandum of Law in opposition to Microsoft Corporation's Offer of Proof and Motion to Reconsider Regarding Revision of Claim Construction (1:99–cv–00626) (N.D. Ill. May 21, 2007).

Plaintiff's Statement of Undisputed Facts in Support of Their Motion for Summary Judgment on Inequitable Conduct (1:99–cv–00626) (N.D. Ill. May 21, 2007).

Plaintiff's Memorandum of Law in Support of Their Motion for Summary Judgment on Inequitable Conduct and Plaintiffs' Opposition to Defendant's Motion for Leave to Amend its Answer and Counterclaim (1:99–cv–00626) (N.D. Ill. May 21, 2007).

Supplemental Expert Report of Dr. John P.J. Kelly Regarding Invalidity of United States Patent No. 5,838,906 (1:99–cv–00626) (N.D. Ill. May 21, 2007).

Corrected Supplemental Expert Witness Report of Larry S. Nixon Pursuant to Fed. R. Civ. P. Rule 26(a)(2)(B) (1:99–cv–00626) (N.D. Ill. May 22, 2007).

Plaintiffs' Sur–Reply Memorandum of Law in Opposition to Defendant's Motion for Leave to Amend its Answer and Counterclaim (1:99–cv–00626) (N.D. Ill. May 30, 2007).

Plaintiffs' Status Statement for May 31, 2007 Hearing (1:99–cv–00626) (N.D. Ill. May 30, 2007).

Microsoft's Status Report for May 31, 2007 Hearing (1:99–cv–00626) (N.D. Ill. May 29, 2007).

Defendant Microsoft's Motion to Continue Trial Pending Newly–Declared Interference in the PTO Between the '906 Patent and Microsoft's Koppolu Patent (1:99–cv–00626) (N.D. Ill. May 29, 2007).

Defendant Microsoft's Reply Memorandum in Support of its Motion for Leave to Amend its Answer and Counterclaim (1:99–cv–00626) (N.D. Ill. May 25, 2007).

Plaintiff's Memorandum of Law in Opposition to Microsoft Corporation's Motion to Continue Trial (1:99–cv–00626) (N.D. Ill. May 30, 2007).

*Eolas v. Microsoft* Combined Petition of Microsoft Corporation for Rehearing and Rehearing En Banc (Appeal No. 04–1234 in the U.S. Court of Appeals for the Federal Circuit—Mar. 16, 2005).

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0001.0032

US 5,838,906 C2

1

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims 1, 4, 5, 6, 9 and 10 are determined to be patentable as amended.

Claims 2, 3, 7 and 8, dependent on an amended claim, are determined to be patentable.

New claims 11–14 are added and determined to be patentable.

1. A method for running an application program in a computer network environment, comprising:

providing at least one client workstation and one network server coupled to said network environment, wherein said network environment is a distributed hypermedia environment;

executing, at said client workstation, a browser application, that parses a first distributed hypermedia document to identify text formats included in said distributed hypermedia document and for responding to predetermined text formats to initiate processing specified by said text formats; utilizing said browser to display, on said client workstation, at least a portion of a first hypermedia document received over said network from said server, wherein the portion of said first hypermedia document is displayed within a first browser-controlled window on said client workstation, wherein said first distributed hypermedia document includes an embed text format, located at a first location in said first distributed hypermedia document, that specifies the location of at least a portion of an object external to the first distributed hypermedia document, wherein said object has type information associated with it utilized by said browser to identify and locate an executable application external to the first distributed hypermedia document, and wherein said embed text format is parsed by said browser to automatically invoke said executable application to execute on said client workstation in order to display said object and enable [interactive processing of] *an end-user to directly interact with* said object within a display area created at said first location within the portion of said first distributed hypermedia document being displayed in said first brower-controlled window.

4. [The ] *A* method [of claim 3,] *for running an application program in a computer network environment, comprising:*

*providing at least one client workstation and one network server coupled to said network environment, wherein said network environment is a distributed hypermedia environment;*

*executing, at said client workstation, a browser application, that parses a first distributed hypermedia*

2

*document to identify text formats included in said distributed hypermedia document and for responding to predetermined text formats to initiate processing specified by said text format; utilizing said browser to display, on said client workstation, at least a portion of a first hypermedia document received over said network from said server, wherein the portion of said first hypermedia document is displayed within a first browser-controlled window on said client workstation, wherein said first distributed hypermedia document includes an embed text format, located at a first location in said first distributed hypermedia document, that specifies the location of at least a portion of an object external to the first distributed hypermedia document, wherein said object has type information associated with it utilized by said browser to identify and locate an executable application external to the first distributed hypermedia document, and wherein said embed text format is parsed by said browser to automatically invoke said executable application to execute on said client workstation in order to display said object and enable interactive processing of said object within a display area created at said first location within the portion of said first distributed hypermedia document being displayed in said first browser-controlled window;*

*wherein said executable application is a controllable application and further comprising the step of:*

*interactively controlling said controllable application on said client workstation via inter-process communications between said browser and said controllable application;*

*wherein the communications to interactively control said controllable application continue to be exchanged between the controllable application and the browser even after the controllable application program has been launched; and*

*wherein additional instructions for controlling said controllable application reside on said network server, wherein said step of interactively controlling said controllable application includes the following substeps:*

*issuing, from the client workstation, one or more commands to the network server;*

*executing, on the network server, one or more instructions in response to said commands;*

*sending information from said network server to said client workstation in response to said executed instructions; and processing said information at the client workstation to interactively control said controllable application.*

5. [The ] *A* method [of claim 4,] *for running an application program in a computer network environment, comprising:*

*providing at least one client workstation and one network server coupled to said network environment, wherein said network environment is a distributed hypermedia environment;*

*executing, at said client workstation, a browser application, that parses a first distributed hypermedia document to identify text formats included in said distributed hypermedia document and for responding to predetermined text formats to initiate processing specified by said text formats; utilizing said browser to display, on said client workstation, at least a portion of a first hypermedia document received over said network from said server, wherein the portion of said first*

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0001.0033

US 5,838,906 C2

3

hypermedia document is displayed within a first browser-controlled window on said client workstation, wherein said first distributed hypermedia document includes an embed text format, located at a first location in said first distributed hypermedia document, that specifies the location of at least a portion of an object external to the first distributed hypermedia document, wherein said object has type information associated with it utilized by said browser to identify and locate an executable application external to the first distributed hypermedia document, and wherein said embed text format is parsed by said browser to automatically invoke said executable application to execute on said client workstation in order to display said object and enable interactive processing of said object within a display area created at said first location within the portion of said first distributed hypermedia document being displayed in said first browser-controlled window;

wherein said executable application is a controllable application and further comprising the step of:

interactively controlling said controllable application on said client workstation via inter-process communications between said browser and said controllable application;

wherein the communications to interactively control said controllable application continue to be exchanged between the controllable application and the browser even after the controllable application program has been launched;

wherein additional instructions for controlling said controllable application reside on said network server, wherein said step of interactively controlling said controllable application includes the following substeps:

issuing, from the client workstation, one or more commands to the network server;

executing, on the network server, one or more instructions in response to said commands;

sending information from said network server to said client workstation in response to said executed instructions; and processing said information at the client workstation to interactively control said controllable application; and

wherein said additional instructions for controlling said controllable application reside on said client workstation.

6. A computer program product for use in a system having at least one client workstation and one network server coupled to said network environment, wherein said network environment is a distributed hypermedia environment, the computer program product comprising:

a computer usable medium having computer readable program code physically embodied therein, said computer program product further comprising:

computer readable program code for causing said client workstation to execute a browser application to parse a first distributed hypermedia document to identify text formats included in said distributed hypermedia document and to respond to predetermined text formats to initiate processes specified by said text formats;

computer readable program code for causing said client workstation to utilize said browser to display, on said client workstation, at least a portion of a first hypermedia document received over said network from said server, wherein the portion of said first hyper-

4

media document is displayed within a first browser-controlled window on said client workstation, wherein said first distributed hypermedia document includes an embed text format, located at a first location in said first distributed hypermedia document, that specifies the location of at least a portion of an object external to the first distributed hypermedia document, wherein said object has type information associated with it utilized by said browser to identify and locate an executable application external to the first distributed hypermedia document, and wherein said embed text format is parsed by said browser to automatically invoke said executable application to execute on said client workstation in order to display said object and enable [interactive processing of] an end-user to directly interact with said object within a display area created at said first location within the portion of said first distributed hypermedia document being displayed in said first browser-controlled window.

9. [The ] A computer program product [of claim 8,] for use in a system having at least one client workstation and one network server coupled to said network environment, wherein said network environment is a distributed hypermedia environment, the computer program product comprising:

a computer usable medium having computer readable program code physically embodied therein, said computer program product further comprising:

computer readable program code for causing said client workstation to execute a browser application to parse a first distributed hypermedia document to identify text formats included in said distributed hypermedia document and to respond to predetermined text formats to initiate processes specified by said text formats;

computer readable program code for causing said client workstation to utilize said browser to display, on said client workstation, at least a portion of a first hypermedia document received over said network from said server, wherein the portion of said first hypermedia document is displayed within a first browser-controlled window on said client workstation, wherein said first distributed hypermedia document includes an embed text format, located at a first location in said first distributed hypermedia document, that specifies the location of at least a portion of an object external to the first distributed hypermedia document, wherein said object has type information associated with it utilized by said browser to identify and locate an executable application external to the first distributed hypermedia document, and wherein said embed text format is parsed by said browser to automatically invoke said executable application to execute on said client workstation in order to display said object and enable interactive processing of said object within a display area created at said first location within the portion of said first distributed hypermedia document being displayed in said first browser-controlled window;

wherein said executable application is a controllable application and further comprising:

computer readable program code for causing said client workstation to interactively control said controllable application of said client workstation via inter-process communications between said browser and said controllable application;

wherein the communications to interactively control said controllable application continue to be exchanged

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0001.0034

US 5,838,906 C2

| 5 | 6 |

*between the controllable application and the browser even after the controllable application program has been launched; and*

wherein additional instructions for controlling said controllable application reside on said network server, wherein said [step of interactively controlling said controllable application] *computer readable program code for causing said client workstation to interactively control said controllable application on said client workstation* includes:

computer readable program code for causing said client workstation to issue, from the client workstation, one or more commands to the network server;

computer readable program code for causing said network server to execute one or more instructions in response to said commands;

computer readable program code for causing said network [sever] *server* to send information to said client workstation in response to said executed instructions; and

computer readable program code for causing said client workstation to process said information at the client workstation to interactively control said controllable application.

10. [The ] *A* computer program product [of claim 9,] *for use in a system having at least one client workstation and one network server coupled to said network environment, wherein said network environment is a distributed hypermedia environment, the computer program product comprising:*

*a computer usable medium having computer readable program code physically embodied therein, said computer program product further comprising:*

*computer readable program code for causing said client workstation to execute a browser application to parse a first distributed hypermedia document to identify text formats included in said distributed hypermedia document and to respond to predetermined text formats to initiate processes specified by said text formats;*

*computer readable program code for causing said client workstation to utilize said browser to display, on said client workstation, at least a portion of a first hypermedia document received over said network from said server, wherein the portion of said first hypermedia document is displayed within a first browser-controlled window on said client workstation, wherein said first distributed hypermedia document includes an embed text format, located at a first location in said first distributed hypermedia document, that specifies the location of at least a portion of an object external to the first distributed hypermedia document, said object has type information associated with it utilized by said browser to identify and locate an executable application external to the first distributed hypermedia document, and wherein said embed text format is parsed by said browser to automatically invoke said executable application to execute on said client workstation in order to display said object and enable interactive processing of said object within a display area created at said first location within the portion of said first distributed hypermedia document being displayed in said first browser-controlled window;*

*wherein said executable application is a controllable application and further comprising:*

*computer readable program code for causing said client workstation to interactively control said controllable application on said client workstation via inter-process communications between said browser and said controllable application;*

*wherein the communications to interactively control said controllable application continue to be exchanged between the controllable application and the browser even after the controllable application program has been launched;*

*wherein additional instructions for controlling said controllable application reside on said network server, wherein said computer readable program code for causing said client workstation to interactively control said controllable application on said client workstation includes:*

*computer readable program code for causing said client workstation to issue, from the client workstation, one or more commands to the network server;*

*computer readable program code for causing said network server to execute one or more instructions in response to said commands;*

*computer readable program code for causing said network server to send information to said client workstation in response to said executed instructions; and*

*computer readable program code for causing said client workstation to process said information at the client workstation to interactively control said controllable application; and*

wherein said additional instructions for controlling said controllable application reside on said client workstation.

11. The method of claim 3, wherein additional instructions for controlling said controllable application reside on said network server, wherein said step of interactively controlling said controllable application includes the following substeps:

issuing, from the client workstation, one or more commands to the network server;

executing, on the network server, one or more instructions in response to said commands;

sending information from said network server to said client workstation in response to said executed instructions; and processing said information at the client workstation to interactively control said controllable application.

12. The method of claim 11, wherein said additional instructions for controlling said controllable application reside on said client workstation.

13. The computer program product of claim 8, wherein additional instructions for controlling said controllable application reside on said network server, wherein said computer readable program code for causing said client workstation to interactively control said controllable application on said client workstation includes:

computer readable program code for causing said client workstation to issue from the client workstation, one or more commands to the network server;

computer readable program code for causing said network server to execute one or more instructions in response to said commands;

computer readable program code for causing said network server to send information to said client workstation in response to said executed instructions; and

computer readable program code for causing said client workstation to process said information at the client workstation to interactively control said controllable application.

14. The computer program product of claim 13, wherein said additional instructions for controlling said controllable application reside on said client workstation.

\* \* \* \* \*

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338288

PX0001.0035



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE

#### United States Patent and Trademark Office

August 10, 2011

**THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:**

U.S. PATENT:  *7,599,985*
ISSUE DATE:  *October 06, 2009*

By Authority of the
**Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office**



N.  WILLIAMS
**Certifying Officer**



UC/EOLAS EXHIBIT
**PX0002**
6:09-CV-446 LED

EOLASTX-0000338222

PX0002.0001



US007599985B2

(12) **United States Patent**
Doyle et al.

(10) Patent No.: **US 7,599,985 B2**
(45) Date of Patent: **\*Oct. 6, 2009**

(54) **DISTRIBUTED HYPERMEDIA METHOD AND SYSTEM FOR AUTOMATICALLY INVOKING EXTERNAL APPLICATION PROVIDING INTERACTION AND DISPLAY OF EMBEDDED OBJECTS WITHIN A HYPERMEDIA DOCUMENT**

(75) Inventors: **Michael Doyle**, Alameda, CA (US); **David Martin**, San Jose, CA (US); **Cheong Ang**, Pacifica, CA (US)

(73) Assignee: **Regents of the University of California**, Oakland, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1428 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/217,955**

(22) Filed: **Aug. 9, 2002**

(65) **Prior Publication Data**

US 2003/0154261 A1    Aug. 14, 2003

**Related U.S. Application Data**

(63) Continuation of application No. 09/075,359, filed on May 8, 1998, now abandoned, which is a continuation of application No. 08/324,443, filed on Oct. 17, 1994, now Pat. No. 5,838,906.

(51) Int. Cl.
*G06F 9/46* (2006.01)
*G06F 17/30* (2006.01)
*G06F 9/50* (2006.01)

(52) **U.S. Cl.** ..................... **709/202**; 709/218; 709/219; 715/205; 715/738; 715/760; 715/777; 715/804; 719/310; 719/315; 718/106; 345/419; 345/427; 345/619; 345/638; 345/649; 345/653; 345/654; 345/655; 345/656; 707/E17.119

(58) **Field of Classification Search** ......... 709/202–205, 709/217–219; 345/738, 744–749, 760, 804, 345/419, 427, 619, 638, 649, 653–656; 719/328–330, 719/310, 315; 715/501.1, 513, 515–516, 715/205, 738, 760, 777, 804; 718/106; 707/E17.119
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,815,029 A    3/1989    Barker et al.

(Continued)

OTHER PUBLICATIONS

Toye, G., et al. SHARE : A Methodology and Environment for Collaborative Product Development, Proceedings, Second Workshop on Enabling Technologies: Infrastructure for Collaborative Enterprises, 1993, IEEE, pp. 33-47, Apr. 22, 1993.*

(Continued)

*Primary Examiner*—Larry D Donaghue
(74) *Attorney, Agent, or Firm*—Charles E. Krueger

(57) **ABSTRACT**

A system allowing a user of a browser program on a computer connected to an open distributed hypermedia system to access and execute an embedded program object. The program object is embedded into a hypermedia document much like data objects. The user may select the program object from the screen. Once selected the program object executes on the user's (client) computer or may execute on a remote server or additional remote computers in a distributed processing arrangement. After launching the program object, the user is able to interact with the object as the invention provides for ongoing interprocess communication between the application object (program) and the browser program. One application of the embedded program object allows a user to view large and complex multi-dimensional objects from within the browser's window. The user can manipulate a control panel to change the viewpoint used to view the image. The invention allows a program to execute on a remote server or other computers to calculate the viewing transformations and send frame data to the client computer thus providing the user of the client computer with interactive features and allowing the user to have access to greater computing power than may be available at the user's client computer.

**47 Claims, 9 Drawing Sheets**



US 7,599,985 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,847,604 | A | 7/1989 | Doyle |
| 4,949,248 | A | 8/1990 | Caro |
| 5,056,057 | A | 10/1991 | Johnson et al. |
| 5,146,553 | A | 9/1992 | Noguchi et al. |
| 5,202,828 | A | 4/1993 | Vertelney et al. |
| 5,204,947 | A | 4/1993 | Bernstein et al. |
| 5,206,951 | A | 4/1993 | Khoyi et al. |
| 5,274,821 | A | 12/1993 | Rouquie |
| 5,307,499 | A | 4/1994 | Yin |
| 5,321,806 | A | 6/1994 | Meinerth et al. |
| 5,321,807 | A | 6/1994 | Mumford |
| 5,321,808 | A | 6/1994 | Rupp et al. |
| 5,339,392 | A | 8/1994 | Risberg et al. |
| 5,347,632 | A | 9/1994 | Filepp et al. |
| 5,367,635 | A | 11/1994 | Bauer et al. |
| 5,390,314 | A | 2/1995 | Swanson |
| 5,418,908 | A | 5/1995 | Keller et al. |
| 5,425,141 | A | * 6/1995 | Gedye ........................ 345/797 |
| 5,499,369 | A | 3/1996 | Atkinson |
| 5,537,526 | A | * 7/1996 | Anderson et al. ........... 715/515 |
| 5,544,320 | A | 8/1996 | Konrad |
| 5,581,506 | A | 12/1996 | Yamauchi |
| 5,581,686 | A | 12/1996 | Koppolu et al. |
| 5,606,493 | A | 2/1997 | Duscher et al. |
| 5,613,058 | A | 3/1997 | Koppolu et al. |
| 5,634,019 | A | 5/1997 | Koppolu et al. |
| 5,652,876 | A | 7/1997 | Ashe et al. |
| 5,754,175 | A | 5/1998 | Koppolu et al. |
| 5,801,701 | A | 9/1998 | Koppolu et al. |
| 5,812,862 | A | * 9/1998 | Smith et al. ................. 715/515 |
| 5,838,906 | A | 11/1998 | Doyle et al. |
| 6,055,514 | A | 4/2000 | Wren |

## OTHER PUBLICATIONS

Lin, J., MediaMosaic—A Multimedia Editing Environment, Proc. of the 5th Annual ACM Symposium on User Interface Software and Technology, ACM Press, pp. 135-141, 1992.*

Halasz, F., Reflections on NoteCards: Seven Issues for the Next Generation of Hypermedia Systems, ACM Journal on Computer Documentation, vol. 25, No. 3, pp. 71-87, Aug. 2001, reprinting article published in 1988.*

Feiner, S., et al., An Experimental System for Creating and Presenting Interactive Graphical Documents, ACM Transactions on Graphics, vol. 1, No. 1, pp. 59-77, Jan. 1982.*

Garg, P., et al., A Hypertext System to Manage Life Cycle Documents, Proc. of the 25th Annual Hawaii Int'l Conf. on System Sciences, 1988, IEEE, vol. 2, pp. 337-346, Jan. 1988.*

Adie, C., Network Access to Multimedia Information, 2nd ed., RARE Project OBR(93)015, RARE, pp. 1-53, Feb. 4, 1994.*

Reichard, K., et al., X11R6: the Rumored Changes (Release 6 of the X Window System), Unix Review, vol. 11, No. 5, p. 101(5 pp. 1-4 as printed, May 1993.*

Cox, B., Object Oriented Programming: An Evolutionary Approach, Addison-Wesley, pp. 1-12, 1987.*

Solaris OpenWindows: Introduction to the ToolTalk Service—A White Paper, Sun Microsystems, Inc., pp. 1-16, 1991.*

Tool Inter-Operability: A Hands On Demonstration—A Simple Demonstration of How the ToolTalk Service Works, Sun Microsystems, Inc., pp. 1-24, 1992.*

Designing and Writing a ToolTalk Procedural Protocol—A White Paper, Sun Microsystems, Inc., pp. 1-24, 1992.*

Fresco Frequently Asked Questions, www.i.h.kyoto-u.ac.jp/~shom/doc.org/fresco/FAQ.html, pp. 1-4, Apr. 13, 1995.*

The Andrew View, Carnegie Mellon Univ., www-2.cs.cmu.edu/People/AUIS/ftp/NEWSLETTERS/ASCII/93Jun.ascii, vol. 2, No. pp. 1-12 as printed, Jun. 1993.*

The X Window System And Broadway, www.broadwayinfo.com/bwwhitesbroadwayhct.htm, Hummingbird Communications Ltd pp. 1-11, 1997.*

Neuendorffer, T., ADEW: A Multimedia Interface Builder for Andrew, Proceedings Multi-Media Communications, Applications, and Technology Workshop, pp. 1-19, Jul. 1991.*

Palay, A., Andrew Toolkit: An Overview, Tech Rept., Carnegie-Mellon University Information Technology Center, pp. 1-15, 198.*

Dettmer, R., X-Windows—the great integrator, IEE Review, vol. 36, No. 6, pp. 219-222, Jun. 1990.*

Engelbart, D., Knowledge-Domain Interoperability and an Open Hyperdocument System, Proc. of the 1990 ACM Conference on Computer-Supported Cooperative Work, ACM Press, pp. 143-156, 1990.*

Meyrowitz, N., Intermedia: The Architecture and Construction of an Object-Oriented Hypermedia System and Applications Framework, Proc. of the Conf. on Object Oriented Programming Systems, Languages, and Applications, ACM Press, pp. 186- 201, 1986.*

Wiil, U., Issues in the Design of EHTS: A Multiuser Hypertext System for Collaboration, Proc. of the 25th Hawaii Int'l. Conf. on Systems Sciences, vol. 2, pp. 629-639, Jan. 1992.*

Celentano, A., et al., A Multiple Presentation Document Management System, Proc. of the 10th Annual Int'l. Conf. on Systems Documentation, ACM Press, pp. 63-71, 1992.*

Garg, P., et al., A Hypertext System to Manage Life Cycle Documents, Proc. of the 25th Annual Hawaii Int'l. Conf. on System Sciences, 1988, IEEE, vol. 2, pp. 337-346, Jan. 1988.*

Tani, M., et al., "Object-Oriented Video: Interaction with Real-World Objects Through Live Video," May 2002, pp. 593-598.

Crowley, T., et al., "MMCONF: An Infrastructure for Building Shared Multimedia Applications," CSCW 90 Proceedings, Oct. 1990, pp. 329-342.

Davis, H., et al., "Towards an Integrated Information Environment with Open Hypermedia System," ACM ECHT Conference, Dec. 1992, pp. 181-190.

Ferrara, F., "The KIM Query System," Abstract, SIGCHI Bulletin, vol. 6, No. 3, Jul. 1994, pp. 30-39.

Gibbs, S., "Composite Multimedia and Active Objects," OOPSLA '91, pp. 97-112.

Davis, H., et al., "Microcosm: An Open Hypermedia System," Interchi '93, Apr. 1993, p. 526.

Vaziri, A., "Scientific Visualization in High-Speed Network Environments," Computer Networks and ISDN Systems 22, 1991, pp. 111-129.

Cullen, J., et al., "The Use of FTAM to Access Graphical Pictures Across Wide Area Networks," Computer Networks and ISDN Systems, 1992, pp. 337-383.

Lashkari, Y.Z., et al., "PLX: A Proposal to Implement a General Broadcasting Facility in a Distributed Environment Running X Windows," Comput. & Graphics, vol. 16, No. 2, 1992, pp. 143-149.

Coulson, G., et al., "Extensions to ANSA for Multimedia Computing," Computer Networks and ISDN Systems 25, 1992, pp. 305-323.

Kirste, T., "Spacepicture—An Interactive Hypermedia Satellite Image Archival System," Comput. & Graphics, vol. 17, No. 3, 1993, pp. 251-260.

Huynh, Duong Le, et al., "PIX: An Object-Oriented Network Graphics Environment," Comput. & Graphics, vol. 17, No. 3, 1993, pp. 295-304.

Berners-Lee, T.J., et al., "The World-Wide Web," Computer Networks and ISDN Systems, 25, 1992, pp. 454-459.

Shackelford, D.E., et al., "The Architecture and Implementation of a Distributed Hypermedia Storage System," Hypertext '93 Proceedings, Nov. 1993, pp. 1-13.

Labriola, D., "Remote Possibilities," PC Magazine, Jun. 14, 1994, pp. 223-228.

Udell, J., "Visual Basic Custom Controls Meet OLE," Byte Magazine, Mar. 1994, pp. 197-200.

Sarna, D.E., et al., "OLE Gains Without (Much) Pain," Datamation Magazine, Jun. 15, 1994, pp. 31 and 113.

Rizzo, J., "What's OpenDoc?" MacUser Magazine, Apr. 1994, pp. 119-123.

"Cello WWW Browser Release 1.01a," article obtained from the Internet, ftp.law.cornell.edu/pub/L1 I/Cello no DDE, Mar. 16, 1994, pp. 2-9.

"OLE 2.0: Death to Monoliths," Byte Magazine, Mar. 1994, p. 122.

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

Vetter, Ronald, "Mosaic and the World-Wide Web," Computer Magazine, vol. 27, Iss. 10, pp. 49-57.
Wynne et al., "Lean Management, Group Support Systems, and Hypermedia: a Combination Whose Time Has Come," System Sciences, 1993 Annual Hawaii Int'l. Conf., pp. 112-121.
Hansen, Wilfred, "Andrew as a Multiparadigm Environment for Visual Languages," Visual Languages, 1993 IEEE Symposium, pp. 256-260.
Moran, Patrick "Tele-Nicer-Slicer-Dicer: A New Tool for the Visualization of Large Volumetric Data," NCSA Technical Report (TR014), Aug. 1993.
I.e. Hunte, Stephen, "<EEMBED>—Embedded Objects," HTML Reference Library—HTMLib V2.1, 1995: n. pag. Online.Internet.
"A Little History of the World Wide Web," n.pag. Online.Internet: available http://www.w3.org/History.html.
"NCSA Mosaic Version Information," n.pag. Online.Internet: available http://www.ncsa.uiuc.edu/SDG/Software.
"The Second Phase of the Revolution," Wired, Oct. 1994, pp. 116-152.
Berners-Lee, "Hypertext Markup Language (HTML)," HTML Internet Draft, IIIR working group.
University of Southern California's Mercury Project—"USC Mercury Project:Interface: Project Overview," USC press release, obtained from Internet, http://www.usc.edu/dept/raiders.
Hansen, Wilfred, "Enhancing Documents with Embedded Programs: How Ness Extends Insets in the Andrew ToolKit," IEEE Computer Languages, 1990 International Conference.
Fogarty, K., et al., "Microsoft's OLE Can Be Network Trojan Horse," Network World Magazine, Jun. 27, 1994, vol. 11, No. 26, pp. 1 and 75.
Defendant's Trial Exhibit 37 (includes "viola.TOGO.tar.Z" and other Viola information) [Compact Disc].
Printout of readable contents of Defendant's Trial Exhibit 37.
Defendant's Trial Exhibit 34 (information regarding Viola including Viola 930512.tar.gz.zip) [Compact Disc].
Printout of readable contents of Defendant's Trial Exhibit 34.
PW 1130 (Viola related material similar to Defendant's Trial Exhibit 34 but with a different file structure) [Compact Disc].
MS Supp 1205_001 (Viola related material) [Compact Disc].
MS Supp 1205_002 (Viola related material) [Compact Disc].
MS-ET 0009786 (violaTOGO.tar.Z) [Compact Disc].
MS-ET 9706 (information regarding Viola similar to PW 1130) [Compact Disc].
MS-ET 0153301 (information regarding Viola similar to PW 1130) [Compact Disc].
Defendant's Trial Exhibit 37 File Tree Printout.
PW 1130 File Tree Printout.
Defendant's Trial Exhibit 34 File Tree Printout.
MS Supp 1205_001 File Tree Printout.
MS Supp 1205_002 File Tree Printout.
MS-ET 0009786 File Tree Printout.
MS-ET 9706 File Tree Printout.
MS-ET 0153301 File Tree Printout.
Anonymous, "xresources.h," 15 pages (1993). (Downloaded from "Index of /pub/mosaic/Unix/source/old" as part of the file "xmosaic-1.2.tar.z"; Exhibit E has 15 pages, including printouts for: (1) the web page for downloading "xmosaic-1.2.tar.z," (2) the contents of "xmosaic-1.2.tar.z," and (3) the file "xresources.h" in "xmosaic-1.2.tar.z").
Anonymous, "Default File Extensions in Mosaic 2.0pre4," 1 page.
Anonymous, "Default MIME Types in Mosaic 2.0pre4," 1 page.
Anonymous, "gs.interface," 2 pages (Jul. 1993). (Downloaded from "ftp://mirror.cs.wesc.edu/pub/mirrors/ghost/gnu/ghostview/" as part of the file "ghoastview-1.5.tar.gz").
Marc Andreessen, "NCSA Mosaic for X 2.0 prerelease 4 available," www-talk email list, 4 pages (Sep. 29, 1993).
John Bradley, "xv, Interactive Image Display for the X Window System," 72 pages (1992). (Downloaded from "Index of /root/usr local.src/xv-2.21" as part of the file "xv-2.21.tar.z"; Exhibit I has 77 pages, including printouts for: (1) the web page for downloading "xv-2.21.tar.z," (2) the contents of "xv-2.21.tar.z," and (3) the file "xvdocs.ps. z" in "xv-2.21.tar.z").

John Bradley, "xv, Interactive Image Display for the X Window System," 105 pages (Apr. 26, 1993). (Downloaded from "Index of/pub/net/infosys/NCSA/Web/Mosaic/Unix/view" as part of the file "xv-3.00.tar.z"; Exhibit J has 110 pages, including printouts for: (1) the web page for downloading "xv-3.00.tar.z," (2) the contents of "xv-3.00.tar.z," and (3) the file "xvdocs.ps.z" in "xv-3.00.tar.z").
Doyle et al., "Processing Cross-sectional Image Data for Reconstruction of Human Developmental Anatomy from Museum Specimens," Newsletter of the Association for Computing Machinery Special Interest Group on Biomedical Computing, vol. 13, No. 1, ACM Press, coverage page, table of contents, pp. 9-15 (Feb. 1993).
Adrian Nye, Xlib Programming Manual for Version 11, O'Reilly & Associates, Inc., title page, copyright page, pp. i-xxxiii, 1-46, and index (1988).
Timothy Thiesen, "Ghostview(1) Unix Programmer's Manual," 14 pages (Jul. 1993). (Downloaded from "ftp://mirror.cs.wesc.edu/pub/mirrors/ghost/gnu/ghostview/" as part of the file "ghostview-1.5.tar.gz"; Exhibit L has 21 pages, including printouts for: (1) the FTP site for downloading "ghostview-1.5.tar.gz," (2) the contents of "ghostview-1.5.tar.gz," and (3) the file "ghostview.ps" in "ghostview-1.5.tar.gz," and (4) the file "README" in "ghostview-1.5.tar.gz.").
Douglas Young, The X Window System, Programming and Applications with Xt, Prentice Hall, title page, copyright page, pp. i-x, 1-13, 123-166, 280-332, 520-533 (1990).
DTX1031-c.pdf (MS_SUPP1205 002 part 1).
DTX1031-hmml.pdf (MS_SUPP1205 002 part 2).
DTX1031-html.pdf (MS_SUPP1205 002 part 3).
DTX1031-images.pdf (MS_SUPP1205 002 part 4).
DTX1031-make.pdf (MS_SUPP1205 002 part 5).
DTX1031-other.pdf (MS_SUPP1205 002 part 6).
DTX1031-shell.pdf (MS_SUPP1205 002 part 7).
DTX1031-v.pdf (MS_SUPP1205 002 part 8).
DTX1031-wais.pdf (MS_SUPP1205 002 part 9).
DTX1030-c1.pdf (MS_SUPP1205 001 part 1).
DTX1030-c2.pdf (MS_SUPP1205 001 part 2).
DTX1030-hmml.pdf (MS_SUPP1205 001 part 3).
DTX1030-html.pdf (MS_SUPP1205 001 part 4).
DTX1030-images.pdf (MS_SUPP1205 001 part 5).
DTX1030-make.pdf (MS_SUPP1205 001 part 6).
DTX1030-other.pdf (MS_SUPP1205 001 part 7).
DTX1030-ps.pdf (MS_SUPP1205 001 part 8).
DTX1030-sgml.pdf (MS_SUPP1205 001 part 9).
DTX1030-shell.pdf (MS_SUPP1205 001 part 10).
DTX1030-v1.pdf (MS_SUPP1205 001 part 11).
DTX1030-v2.pdf (MS_SUPP1205 001 part 12).
DTX1030-wais.pdf (MS_SUPP1205 001 part 13).
Defendant's Trial Exhibit 273: Information Regarding Microsoft OLE 2.01 SDK (CD).
File Tree Printout of Defendant's Trial Exhibit 273: Information Regarding Microsoft OLE 2.01 SDK.
Defendant's Trial Exhibit 258: Information Regarding Microsoft OLE 2.0 Toolkit Program (CD).
File Tree Printout of Defendant's Trial Exhibit 258: Information Regarding Microsoft OLE 2.0 Toolkit Program.
MS-ET 0166172: Information Regarding Microsoft OLE 2.01 SDK (CD).
File Tree Printout of MS-ET 0166172: Information Regarding Microsoft OLE 2.01 SDK.
MS-ET 0189860: First Companion Disk for "Inside OLE 2" by Kraig Brockschmidt (CD).
File Tree Printout of MS-ET 0189860: First Companion Disk for "Inside OLE 2" by Kraig Brockschmidt.
MS-ET 0189861: Second Companion Disk for "Inside OLE 2" by Kraig Brockschmidt (CD).
File Tree Printout of MS-ET 0189861: Second Companion Disk for "Inside OLE 2" by Kraig Brockschmidt.
Defendant's Trial Exhibit 326: Information Regarding Multimedia Viewer (CD).
File Tree Printout of Defendant's Trial Exhibit 326: Information Regarding Multimedia Viewer.
Defendants Trial Exhibit 215: Information Regarding Emacs (CD).

US 7,599,985 B2

Page 4

File Tree Printout of Defendants Trial Exhibit 215: Information Regarding Emacs.
E 021700: Information Regarding WebRouser (CD).
File Tree Printout of E 021700: Information Regarding WebRouser.
E 027693: Information Regarding Distributed Hypermedia Object Embedding (DHOE) (CD).
File Tree Printout of E 027693: Information Regarding Distributed Hypermedia Object Embedding (DHOE).
DX258-x.pdf.
DX258-images.pdf.
DX258-ps.pdf.
DX258-text.pdf.
DX258-wais.pdf.
DX326-c.pdf.
DX326-images.pdf.
DX326-text.pdf.
DX273-c.pdf.
DX273-images.pdf.
DX273-text.pdf.
E-027693-c.pdf.
E-027693-make.pdf.
E-027693-text.pdf.
E-021700-c.pdf.
E-021700-html.pdf.
E-021700-images.pdf.
E-021700-make.pdf.
E-021700-ps.pdf.
E-021700-shell.pdf.
E-021700-text.pdf.
DX215-text1.pdf.
DX215-text2.pdf.
DX215-c.pdf.
DX215-images.pdf.
DX215-make.pdf.
DX215-ps.pdf.
DX215-shell.pdf.
DX215-text3.pdf.
Declaration of Interference, Doyle v. Koppolu, Patent Interference 105,563 McK (May 24, 2007).
Ex Parte Srinivasa R. Koppolu, C. Douglas Hodges, Barry B. MacKichan, Richard McDaniel, Rao V. Remula, and Antony S. Williams, App. No. 2005-1431 (B.P.A.I. May 24, 2007).
Koppolu Motion 2 (for judgement based on Doyle inequitable conduct), Doyle v. Koppolu, Patent Interference 105,563 McK (Aug. 15, 2007).
Judgment, Doyle v. Koppolu, Patent Interference 105,563 McK (Sep. 25, 2007).
Plaintiffs' Local Rule 56.1(a) Response to Defendant's Statement of Additional Facts regarding Plaintiffs' Motion for Summary Judgment on Inequitable Conduct and Exhibits , Eolas v. Microsoft, Case No. 99 C 0626 (Jul. 19, 2007).
Defendant Microsoft's Local Rule 56.1(a) Response to Plaintiffs' Statement of Additional Facts regarding Microsoft's Motion for Summary Judgment of Obviousness and Exhibits, Eolas v. Microsoft, Case No. 99 C 0626 (Jul. 18, 2007).
Reply in Support of Microsoft's Motion for Summary Judgment of Obviousness and Exhibits, Eolas v. Microsoft, Case No. 99 C 0626 (Jul. 18, 2007).
Plaintiffs' Reply Brief in Support of Their Motion for Summary Judgment on Inequitable Conduct, Eolas v. Microsoft, Case No. 99 C 0626 (Jul. 18, 2007).
Declaration of Edward W. Felten in Support of Plaintiffs' Opposition to Microsoft's Motion for Summary Judgment, Eolas v. Microsoft, Case No. 99 C 0626 (Jul. 9, 2007).
Plaintiffs' Local Rule 56.1(b)(3) Response to Microsoft Corporation's Statement of Undisputed Facts in Support of its Motion for Summary Judgment on Inequitable Conduct and Exhibits, Eolas v. Microsoft, Case No. 99 C 0626 (Jul. 9, 2007).
Defendant Microsoft's Local Rule 56.1(b)(3) Response to Plaintiffs' Statement of Undisputed Facts, and Microsoft's Statement of Additional Material Facts, in Opposition to Plaintiffs' Motion for Summary Judgment on Inequitable Conduct and Exhibits, Eolas v. Microsoft, Case No. 99 C 0626 (Jul. 9, 2007).

Plaintiffs' Opposition to Microsoft's Motion for Summary Judgment of Obviousness, Eolas v. Microsoft, Case No. 99 C 0626 (Jul. 9, 2007).
Defendant Microsoft's Opposition to Plaintiffs' Motion for Summary Judgment on Inequitable Conduct, Eolas v. Microsoft, Case No. 99 C 0626 (Jul. 9, 2007).
Microsoft's Local Rule 56.1 Statement of Undisputed Facts in Support of its Motion for Summary Judgment of Obviousness and Exhibits, Eolas v. Microsoft, Case No. 99 C 0626 (Jun. 29, 2007).
Memorandum in Support of Microsoft's Motion for Summary Judgment of Obviousness, Eolas v. Microsoft, Case No. 99 C 0626 (Jun. 29, 2007).
Microsoft's Offer of Proof and Motion to Reconsider Regarding Revision of Claim Construction (1:99-cv-00626) (N.D. Ill Apr. 26, 2007).
Declaration of Dr. John P.J. Kelly in Support of Microsoft's Offer of Proof of Non-infringement (199-cv-00626) (N.D. Ill Apr. 26, 2007).
Reply Brief of Defendant-Appellant Microsoft Corporation (04-1234) (Fed. Cir. Aug. 16, 2004).
Brief of Defendant-Appellant Microsoft Corporation (04-1234) (Fed. Cir. Jun. 3, 2004).
Transcript of Trial Testimony of John Kelly, pp. 2640-2862 (1:99-cv-00626) (N.D. Ill. Jul. 31, 2003).
Supplemental Expert Witness Report or Larry S. Nixon Pursuant to Fed. R. Civ. P. Rule 26(a)(2)(B) (1:99-cv-00626) (N.D. Ill. May 21, 2007).
Plaintiffs' Memorandum of Law in opposition to Microsoft Corporation's Offer of Proof and Motion to Reconsider Regarding Revision of Claim Construction (1:99-cv-00626) (N.D. Ill. May 21, 2007).
Plaintiffs' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment on Inequitable Conduct (1:99-cv-00626) (N.D. Ill. May 21, 2007).
Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment on Inequitable Conduct and Plaintiffs' Opposition to Defendant's Motion for Leave to Amend its Answer and Counterclaim (1:99-cv-00626) (N.D. Ill. May 21, 2007).
Supplemental Expert Report of Dr. John P.J. Kelly Regarding Invalidity of United States Patent No. 5,838,906 (1:99-cv-00626) (N.D. Ill. May 21, 2007).
Corrected Supplemental Expert Witness Report of Larry S. Nixon Pursuant to Fed. R. Civ. P. Rule 26(a)(2)(B) (1:99-cv-00626) (N.D. Ill May 22, 2007).
Plaintiffs' Sur-Reply Memorandum of Law in Opposition to Defendant's Motion for Leave to Amend its Answer and Counterclaim (1:99-cv-00626) (N.D. Ill. May 30, 2007).
Plaintiffs' Status Statement for May 31, 2007 Hearing (1:99-cv-00626) (N.D. Ill. May 30, 2007).
Microsoft's Status Report for May 31, 2007 Hearing (1:99-cv-00626) (N.D. Ill. May 30, 2007).
Defendant Microsoft's Motion to Continue Trial Pending Newly-Declared Interference in the PTO Between the '906 Patent and Microsoft's Koppolu Patent (1:99-cv-00626) (N.D. Ill. May 29, 2007).
Defendant Microsoft's Reply Memorandum in Support of its Motion for Leave to Amend its Answer and Counterclaim (1:99-cv-00626) (N.D. Ill. May 25 2007).
Plaintiffs' Memorandum of Law in Opposition to Microsoft Corporation's Motion to Continue Trial (1:99-cv-00626) (N.D. Ill. May 30, 2007).
Eolas v. Microsoft Combined Petition of Microsoft Corporation for Rehearing and Rehearing En Banc (Appeal No. 04-1234 in the U.S. Court of Appeals for the Federal Circuit  Mar. 16, 2005).
In re Srinivasa Koppolu, et al., Appeal No. 2005-1431, U.S. Appl. No. 09/442,070 for reissue of Patent 5,801,701 (B.P.A.I. Nov. 14, 2005).
Notice of Lodging of Deposition Testimony Played in Plaintiffs Case in Chief (Jul. 22, 2003) (Koppolu Testimony).
Expert Witness Report of Larry S. Nixon Pursuant to Fed. R. Civ. P. Rule 26(a)(2)(B) (Dec. 14, 2007).
Office Action issued by the U.S. Patent Office for Reexamination Control U.S. Appl. No. 90/007,858 dated Jul. 30, 2007, 40 pages.
WWW-Talk Archive 1991 printout (retrieved from http://ksi.cpsc.ucalgary.ca/archives/WWW-TALK/www-talk-1991.index.html).

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

**US 7,599,985 B2**

Page 5

WWW-Talk Archive 1992 printout (retrieved from http://ksi.cpsc.ucalgary.ca/archives/WWW-TALK/www-talk-1992.index.html).

WWW-Talk Archive 1993 Q1 printout (retrieved from http://ksi.cpsc.ucalgary.ca/archives/WWW-TALK/www-talk-1993q1.index.html).

WWW-Talk Archive 1993 Q4 printout (retrieved from http://ksi.cpsc.ucalgary.ca/archives/WWW-TALK/www-talk-1993q4.index.html).

WWW-Talk Archive 1994 Jan. 1 to Jan. 27 printout (retrieved from http://ksi.cpsc.ucalgary.ca/archives/WWW-TALK/www-talk-1994q1.index.html).

OLE 2.0 PDC Questions and Answers (no date).

Stephen Le Hunte, "<EEMBED>—Embedded Objects", HTML Reference Library—HTMLIB v2.1, 1995: n.pag. Online. Internet.

Andreessen, M., Dec. 1, 1992 post to WWW Talk Mailing list.

Pokrzywa, Joseph R., "ExParte Reexamination Interview Summary", for U.S. Appl. No. 90/007,858, dated Sep. 6, 2007, 4 pages.

Pokrzywa, Joseph R., "Office Action in ExParte Reexamination Reexamination", for U.S. Appl. No. 90/007,858, dated Apr. 18, 2008, 36 pages.

Pokrzywa, Joseph R., "ExParte Reexamination Interview Summary", for U.S. Appl. No. 90/007,858, dated Jun. 3, 2008, 4 pages.

Pokrzywa, Joseph R., "Notice of Intent to Issue ExParte Reexamination Certificate", for U.S. Appl. No. 90/007,858, dated Sep. 10, 2008, 9 pages.

Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626, 2003 U.S. Dist. LEXIS 11476 (N.D. III. Jul. 2, 2003).

Eolas Techs., Inc. v. Microsoft Corp., 270 F.Supp.2d 997 (N.D. III., Jul. 1, 2003).

Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626, 2003 U.S. Dist. LEXIS 6322 (N.D. III. Apr. 16, 2003).

Eolas Techs., Inc. v. Microsoft Corp., 65 U.S.P.Q.2d 1090 (N.D. III. Oct. 18, 2002).

Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626, 2000 U.S. Dist. LEXIS 18886 (N.D. III. Dec. 28, 2000).

Complaint and Demand for Jury Trial, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Feb. 2, 1999).

Answer, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Mar. 24, 1999).

Microsoft Corporation's Submission Regarding Claim Construction Issues and Scheduling, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Sep. 7, 1999).

First Amended Answer and Counterclaim, Eolas Tech., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Sep. 7, 1999).

Plaintiff's Reply to Microsoft's First Amended Counterclaim, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Oct. 27, 1999).

Defendant Microsoft Corporation's Initial Brief on Claim Construction Issues, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III Mar. 24, 1999) (Oct. 14, 2000).

Plaintiff Eolas Techs., Inc. Memorandum in Support of Claim Construction (N.D. III Oct. 14, 2000).

Defendant Microsoft Corporation's Reply Brief on Claim Construction Issues, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III, Oct. 23, 2000).

Plaintiff Eolas Technologies' Reply Memorandum in Support of Claim Construction, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III Oct. 23, 2000).

Memorandum Opinion and Order, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III, Dec. 28, 2000).

Plaintiff Eolas Technologies' First Amended Complaint and Demand for Jury Trial, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III, Apr. 6, 2001) (Apr. 9, 2001).

Defendant Microsoft Corporation's Answer to First Amended Complaint and Second Amended Counterclaim, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Apr. 18, 2001).

Plaintiff Eolas Technologies' Reply to Defendant's Second Amended Counterclaim, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III May 2, 2001).

Plaintiff Eolas Technologies' Second Amended Complaint and Demand for Jury Trial, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III, Aug. 31, 2001) (Aug. 31, 2001).

Defendant Microsoft Corporation's Answer to Second Amended Complaint and Third Amended Counterclaim, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Sep. 17, 2001).

Plaintiffs' Proposed Jury Instructions Regarding Claim Construction, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Jan. 27, 2003).

Plaintiffs' Proposed Preliminary and Final Jury Instructions, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Apr. 25, 2003).

Memorandum of Microsoft Corporation in Support of its Motion to Clarify the Court's In Limine Ruling with Respect to Communications about the Viola WWW Browser involving Michael Doyle, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Jul. 2, 2003).

Plaintiff's Motion to Exclude Extrinsic Evidence of Claimed Pei Wei Invention beyond that Disclosed in the Precise Reference Asserted as Anticipating Prior Art, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Jul. 22, 2003).

Microsoft's Response to Plaintiff's Motion to Exclude Extrinsic Evidence of Claimed Pei Wei Invention Beyond that Disclosed in the Precise Reference Asserted as Anticipating Prior Art, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Jul. 23, 2003).

Microsoft's Motion to Preclude Plaintiffs from Arguing that the Prior Art Lacks Elements not Found in the Claims of the '906 Patent, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Jul. 28, 2003).

Plaintiffs' Memorandum in Further Support of Their Motion to Exclude Extrinsic Evidence of Claimed Pei Wei Invention, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Jul. 29, 2003).

Microsoft's Offer of Proof Regarding Viola Prior Art, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Aug. 5, 2003).

Plaintiffs' Memorandum in Opposition to Microsoft's Offer of Proof Regarding the "Viola Prior Art", Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III, Aug. 11, 2003) (Aug. 7, 2003).

Microsoft's Post-Trial Brief on Inequitable Conduct, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Aug. 18, 2003).

Plaintiffs' Post-Trial Brief on Microsoft's Inequitable Conduct Claims, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Aug. 22, 2003).

Microsoft's Response to Plaintiffs' Post-Trial Brief on Inequitable Conduct, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Aug. 26, 2003).

Plaintiffs' Objections to Microsoft's Offer of Proof Regarding Viola Prior Art, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Sept. 3, 2003).

Defendant Microsoft's Motion for Judgment as a Matter of Law and a New Trial, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Oct. 6, 2003).

Eolas Techs., Inc. v. Microsoft Corp., 1:99-CV-00626 (Fed. Cir. Jun. 20, 2005).

Microsoft's Motion for Revision of Claim Construction and Summary Judgment of Non-Infringement, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Dec. 15, 2005).

Declaration of Munir R. Meghjee in Support of Plaintiffs' Memorandum of Law in Opposition to Microsoft Corporation's Motion for Revision of Claim Construction and Summary Judgment of Non-Infringement, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Jan. 12, 2006).

Plaintiffs' Memorandum of Law in Opposition to Microsoft's Motion for Revision of Claim Construction and Summary Judgment of Non-Infringement, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Jan. 12, 2006).

Plaintiffs' Local Rule 56.1(b)(3) Response to Microsoft Corporation's Statement of Undisputed Facts in Support of Its Motion for Revision of Claim Construction and Entry of Summary Judgment of Non-Infringement, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Jan. 12, 2006).

Declaration of Laura L. Donoghue in Support of Microsoft's Reply Memorandum in Support of its Motion for Revision of Claim Construction and Summary Judgment of Noninfringement, Eolas Techs., Inc. v. Microsoft Corp., No. 99-C-626 (N.D. III) (Jan. 31, 2006).

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

US 7,599,985 B2

Page 6

Plaintiffs' Sur-Reply in Opposition to Microsoft's Motion for Revision of Claim Construction and Summary Judgment of Non-Infringement, *Eolas Techs., Inc. v. Microsoft Corp.*, No. 99-C-626 (N.D. III) (Feb. 27, 2006).
Defendants' Sur-Rebuttal in Support of its Motion for Revision of Claim Construction and Summary Judgment of Non-Infringement, No. 99-C-626 (N.D. III) (Mar. 6, 2006).
Expert Report of Dr. John P.J. Kelly (Dec. 14, 2001).
Rebuttal Expert Report of Edward W. Felten Regarding Validity (Jan. 18, 2002).
Supplemental Expert Report of Dr. John P.J. Kelly (Feb. 1, 2002).
Expert Report of Kraig Brockschmidt (Dec. 12, 2001).
Rebuttal Report of Kraig Brockschmidt.
Expert Report of Robert L. Harmon Regarding Claim Construction.
Rebuttal Expert Report of Robert L. Harmon Pursuant to Rule 26(a)(2)(B). F.R.C.P.
Expert Report of Robert L. Harmon Pursuant to Rule 26(a)(2)(B). F.R.C.P.
Berners-Lee, Tim "HTML, HMML, and HyperTeX" post to WWW-Talk E-mail List (Apr. 21, 1993).
Raggett, Dave, "Standardizing new HTML features" post to WWW-Talk E-mail List (Apr. 27, 1993).
Janssen, Bill, "Re: Standardizing new HTML features" post to WWW-Talk E-mail List (Apr. 27, 1993).
Andreessen, Marc, "Re: Standardizing new HTML features" post to WWW-Talk E-mail List (Apr. 27, 1993).
Janssen, Bill, "Re: Standardizing new HTML features" post to WWW-Talk E-mail List (Apr. 29, 1993).
Sanders, Tony, "Re: Standardizing new HTML features" post to WWW-Talk E-mail List (Apr. 29, 1993).
Sanders, Tony, "Re: Standardizing new HTML features" post to WWW-Talk E-mail List (Apr. 29, 1993).
Fine, Thomas A., "More than just HTML (was Re: Poetry and Maths)" post to WWW-Talk E-mail List (May 25, 1993).
Raggett, Dave, "Re: More than just HTML (was Re: Poetry and Maths)" post to WWW-Talk E-mail List (May 27, 1993).
Abbey, Jonathan, "Re: Keeping HTML Simple & Format negotiation between Browser & Server" post to WWW-Talk E-mail List (May 27, 1993).
Raggett, Dave, "Re: Keeping HTML Simple & Format negotiation between Browser & Server" post to WWW-Talk E-mail List (Jun. 1, 1993).
Berners-Lee, Tim, "HTML+DTD in ftp://info.cern.ch/pub/www/dev/htmlplus.dtd" post to WWW-Talk E-mail List (Jun. 2, 1993).
Raggett, Dave, "HTML+ support for eqn & Postcript" post to WWW-Talk E-mail List (Jun. 14, 1993).
Janssen, Bill, "Re: HTML+ support for eqn & Postcript" post to WWW-Talk E-mail List (Jun. 14, 1993).
Altis, Kevin, "Re: HTML+ support for eqn & Postcript" post to WWW-Talk E-mail List (Jun. 18, 1993).
Sanders, Tony, "Re: launching executables through HTML" post to WWW-Talk E-mail List (Jun. 19, 1993).
Andreessen, Marc, "Re: launching executables through HTML" post to WWW-Talk E-mail List (Jun. 20, 1993).
Perry, William M., "New Version of The Emacs Browser For W3 (.04b)" post to WWW-Talk E-mail List (Apr. 13, 1993).
Perry, William M., "New Version of WWW Browser For Emacs" post to WWW-Talk E-mail List (Jun. 18, 1993).
Phillips, George Perry, "Re: launching executables through HTML files" post to WWW-Talk E-mail List (Jun. 20, 1993).
Montulli, Lou, "Re: launching executables through HTML files" post to WWW-Talk E-mail List (Jun. 20, 1993).
Raisch, Rob, "Re: Suggestion for a new URL type" post to WWW-Talk E-mail List (Jun. 26, 1993).
VanHeyningen, Marc, "Re: Suggestion for a new URL type" post to WWW-Talk E-mail List (Jun. 26, 1993).
Andreessen, Marc, "Re: Suggestion for a new URL type" post to WWW-Talk E-mail List (Jun. 26, 1993).
Phillips, George, "Re: browser execution" post to WWW-Talk E-mail List (Jun. 28, 1993).
Andreessen, Marc, "browser execution" post to WWW-Talk E-mail List (Jun. 29, 1993).

Sanders, Tony, "Re: browser execution" post to WWW-Talk E-mail List (Jun. 29, 1993).
McRae, Christopher, "Xmosaic and Xv" post to WWW-Talk E-mail List (Jun. 26, 1993).
Deposition Transcript of Pei Wei (Oct. 27, 1999 and Oct. 28, 1999).
Trial Transcript of Dave Raggett, pp. 1804-1897 (Jul. 23, 2003).
Trial Transcript of Pei Wei, pp. 2244-2469 (Jul. 28-29, 2003).
"A Little History of the world Wide Web", n.pag. Online. Internet: available http://www.w3.org/History.html (retrieved Aug. 18, 2006).
"NCSA Mosaic Version Information", n.pag. Online. Internet: available http://www.ncsa.uiuc.edu/SDG/Software.
"The second phase of the revolution", Wired, Oct. 1994, pp. 116-152.
Vetter, Ronald "Mosaic and the World-Wide Web," Computer Magazine, v.27, Iss.10, pp. 49-57, Oct. 1994.
Wynne et al. "Lean Management, Group Support Systems, and Hypermedia: a Combination Whose Time Has Come," System Sciences, 1993 Annual Hawaii Int'l Conf., pp. 112-121.
Hansen, Wilfred "Andrew as a Multiparadigm Environment for Visual Languages," Visual Languages, 1993 IEEE Symposium, pp. 256-260.
Moran, Patrick "Tele-Nicer-slicer-Dicer: A New Tool for the Visualization of Large Volumetric Data", NCSA Technical Report (TRO14), Aug. 1993.
University of Southern California's Mercury Project—USC Mercury Project:Interface", Project Milestones, USC Press Release—obtained from Internet, http://www.usc.edu/dept/raiders/.
Hansen, Wilfred "Enhancing documents with embedded programs: How Ness extends in the Andrew ToolKit", IEEE Computer Language, 1990 International Conference.
Tani, M., et al., "Object-Oriented Video: Interaction with Real-World Objects Through Live Video", May 1992, p. 593-598.
Crowley, T., et al., "MMConf: An Infrastructure for Building Shared Multimedia Applications", CSCW 90 Proceedings, Oct. 1990, p. 329-342.
Davis, H., et al., "Towards An Integrated Information Environment With Open Hypermedia System", ACM ECHT Conference, Dec. 1992, pp. 181-190.
Ferrara, F., "The KIM Query System", Abstract, SIGCHI Bulletin, vol. 6, No. 3 Jul. 1994, pp. 30-39.
Gibbs, S., "Composite Multimedia and Active Objects", OOPSLA '91, pp. 97-112.
Davis, H., et al., "Microcosm: An Open Hypermedia System", Interchi '93, Apr. 1993, p. 526.
Vaziri, A., "Scientific Visualization in High-Speed Network Environments", Computer Networks and ISDN Systems 22, 1991, pp. 111-129.
Cullen, J., et al., "The Use of FTAM to access graphical pictures across wide area networks", Computer Networks and ISDN Systems, 1992, pp. 337-383.
Lashkari, Y.Z., et al., "PLX: A Proposal to Implement a General Broadcasting Facility in a Distributed Environment Running X Windows", Comput. & Graphics, vol. 16, No. 2, pp. 143-149, 1992.
Kirste, T., "Spacepicture—An Interactive Hypermedia Satellite Image Archival System", Comput. & Graphics, vol. 17, No. 3, pp. 251-260, 1993.
Coulson, G., et al., "Extensions to ANSA for Multimedia Computing", Computers Networks and ISDN Systems 25, 1992, pp. 305-323.
Huynh, Duong Le, et al., "PIX: An Object-Oriented Network Graphics Environment", Comput. & Graphics, vol. 17, No. 3, pp. 295-304, 1993.
Berners-Lee, T.J., et al., The World-Wide Web, Computer Networks and ISDN Systems 25, 1992, pp. 454-459.
Shackelford, D.E., et al., "The Architecture and Implementation of a Distributed Hypermedia Storage System", Hypertext '93 Proceedings, Nov. 1993, pp. 1-13.
Labriola, D., "Remote Possibilities", PC Magazine, Jun. 14, 1994, pp. 223-228.
Udell, J., "Visual Basic Custom Controls Meet OLE", Byte Magazine, Mar. 1994, pp. 197-200.
Sarna, D.E., et al., "OLE Gains Without (Much) Pain", Datamation Magazine, Jun. 15, 1994, pp. 31 and 113.

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

US 7,599,985 B2

Page 7

Rizzo, J., "What's OpenDoc?", MacUser magazine, Apr. 1994, pp. 119-123.

Fogarty, K., et al., "Microsoft's OLE can be Network Trojan Horse", Network World Magazine, Jun. 27, 1994, vol. 11, No. 26, pp. 1 and 75.

"Cello WWW Browser Release 1.01a", Article obtained from the Internet, ftp.law.cornell.edu/pub/L11/Cello no DDE, Mar. 16, 1994, pp. 2-9.

"OLE 2.0: Death to Monoliths", Byte Magazine, Mar. 1994, p. 122.

Duncan, Ray, "Advanced MSDOS Programming," Microsoft Press, 1986 pp. 390, 391, 486, 487.

Lin, Jin-Kun, "Virtual Screen: A Framework for Task Management," The X Resource, Issue 1, Winter 1992- Proceedings of the 6th Annual X Technical Conference, pp. 191-198, 1992.

Lin, Jin-Kun, "A Multimedia and Multisource Document Editor of an Open Architecture," Dept. of Computer Science, University of N.C. at Chapel Hill, ACM 089791-533-X/92/0010/0057, pp. 57-62, 1992.

Berners-Lee T., et al., Hypertext Markup Language (HTML), Internet Draft IETF (Jun. 1993).

Toye, G., et al., SHARE: A Methodology and Environment for Collaborative Product Development, Proceedings, Second Workshop on Enabling Technologies: Infrastructure for Collaborative Enterprises, 1992, IEEE, pp. 33-47, Apr. 22, 1993.

Lin, J. MediaMosaic—A Multimedia Editing Environment, Proc. Of the 5th Annual ACM Symposium on User Interface Software and Technology, ACM Press, pp. 135-141, 1992.

Engelbart, D., Knowledge-Domain Interoperability and an Open Hyperdocument System, Proc. Of the 1990 ACM Conference on Computer Supported Cooperative Work, ACM Press, pp. 143-156, 1990.

Meyrowitz, N., Intermedia: The Architecture and Construction of an Object-Oriented Hypermedia System and Applications Framework, Proc. Of the Conf. on Object Oriented Programming Systems, Languages, and Applications, ACM Press, pp. 186-201, 1986.

Will, U., Issues in the Design of EHTS: A Multiuser Hypertext System for Collaboration, Proc. Of the 25th Hawaii Int'l. Conf. on Systems Sciences, vol. 2, pp. 629-639, Jan. 1992.

Celentano, A., et al., A Multiple Presentation Document Management System, Proc. Of the 10th Annual Int'l Conf. on Systems Documentation, ACM Press, pp. 63-71, 1992.

Garg, P. et al., A Hypertext System to Manage Life Cycle Documents, Proc. Of the 25th Annual Hawaii Int'l Conf. on System Sciences, 1988, IEEE, vol. 2, pp. 337-346, Jan. 1988.

Kahn, P., Webs, Rees, and Stacks: How Hypermedia System Design Effect Hypermedia Content, Designing and Using Human-Computer Interfaces and Knowledge Based Systems, Elsevier Science Publishers, pp. 443-449, 1989.

Streitz, N. et al., Hypertext: Concepts, Systems, and Applications, Cambridge Univ. Press, pp. 1-12, 356-359, 367-369, 1990.

Stotts, P., et al., Hyperdocuments as Automata: Trace-based Browsing Property Verification, UNC CS Technical Report, TR92-038, citeseer.ist.psu.edu/stotts92hyperdocument.html, p. 1, 1992.

Reichard, K., et al., X11R96: the Rumored Changes (Release 6 of the X Window System), UNIX Review, vol. 11, No. 5, p. 101 (pp. 1-4 as printed) (May 1993).

Tool Inter-Operability: A Hands On Demonstration—A Simple Demonstration of How the TookTalk Service Works, Sun Microsystems, Inc., pp. 1-24, 1992.

Palay, A., Andrew Toolkit: An Overview, Tech Rept., Carnegie-Mellon University Information Technology Center, pp. 1-15, 1988.

Dettmer, R., X-Windows—the great integrator, IEE Review, vol. 36, No. 6, pp. 219-222 (Jun. 1990).

The Andrew View, Carnegie Mellon Univ., www-2.cs.cmu.edu/ People/AUIS/ftp/NEWSLETTERS/ASCII/93Jun.ascii, vol. 2, No. (pp. 1-12 as printed) (Jun. 1993).

The X Window System and Broadway, www.broadwayinfo.com/ bwwhitesbroadwayhct.htm, Humminbird Communications Ltd., pp. 1-11 (1987).

Neuendorffer, T., ADEW: A Multimedia Interface Builder for Andrew, Proceedings Multi-Media Communications, Applications, and Technology Workshop, pp. 1-19 (Jul. 1991).

Letter from America Online, Inc., Microsoft Corp., and Macromedia, Inc (Oct. 14, 2003) and Letter from Adobe Systems Inc. re: Potential Director-Ordered Reexamination of U.S. Patent No. 5,838,906 pursuant to 35 U.S.C. § 303(a) (Oct. 15, 2003) (with cover letter from Sidley, Austin, Brown & Wood LLP) (including attachments).

Anonymous Facsimile re: possible interference (Oct. 16, 2005).

Letter from Stephen Wren (discussing relevance of U.S. Pat. No. 6,055,514 to U.S. Pat. No. 5,838,906) (Feb. 22, 2005).

Letter from Pennie & Edmonds, LLP on behalf of the WWW Consortium, re: Citation of Prior Art Under 35 U.S.C. §301 and 37 C.F.R. 1.501 in Relation to U.S. Patent No. 5,838,906 (Oct. 24, 2003).

Festa, Paul, CNET News.com "Rivalries set Aside in Defense of Internet Explorer" (Sep. 25, 2003) (http://news.com.com/2009-1023_3-5082004.html).

Roberts, Paul, "Microsoft's Patent Loss Rattles Tech Community" (Sep. 3, 2003) (http://www.infoworld.com/article/03/09/03/ Hsmicrosoft'sloss_1.html).

Festa, Paul, CNET News.com "Eolas Files Motion to Enjoin IE" (Oct. 8, 2003) (http://news.com.com/2100-1028_3-5088349.html?tag=st+pop).

Lynch, Stephen, "Microsoft Rivals Join Patent Fight; M'Soft Rivals Join to Wage Patent Fight" N.Y.Post (Oct. 9, 2003).

O'Reilly Network, Patent List (Jul. 10, 2003).

Ray Ozzie, "Saving the Browser," Weblog entry (2003) (discussing Lotus Notes R3 relevance to the patent).

"Microsoft's OLE can be network Trojan horse," Network World Magazine, vol. 11, No. 26, Jul. 27, 1994.

Object linking and Embedding OLE 2.01 Design Specification (Sep. 27, 1993).

Programming for Windows with Object Linking and Embedding 2.0 (Mar. 1, 1993).

Extensible Compound Document Architecture Client and Server API specification (no date).

Pei Y. Wei, "X Browser" (e-mail to www-talk discussion list) (Dec. 13, 1991).

Pei Y. Wei, "X Browser" (e-mail to www-talk discussion list) (Dec. 13, 1991).

Dale Dougherty, "WWW Developer's Conference" (e-mail to www-talk discussion list) (Jun. 19, 1993).

Pei Wei, "Re: Universal network graphics language" (e-mail to www-talk discussion list) (Jan. 28, 1994).

Pei Wei, "Viola WWW beta release is available" (e-mail to www-talk discussion list) (Feb. 25, 1994).

Pei Wei, "Re: World Wide Web and Viola" (e-mail to www-talk discussion list) (May 13, 1992).

Pei Wei, "A Brief Overview of the VIOLA Engine, and its applications" (MSEI 0009788-0009801)(no date).

Pei Wei, "A Brief Overview of the VIOLA Engine, and its applications" (InterNIC details for http://www.viola.org) (retrieved from http://www.internicdomainnames.com).

Pei Wei, "A Brief Overview of the VIOLA Engine, and its applications" (TT05417-05433) (1994) (retrieved on Aug. 4, 1998 from http://scam.xcf/berkeley.edu/~wei/viola/violaIntro.html).

Pei Wei, "A Brief Overview of the VIOLA Engine, and its applications" (E0714—021725) (1994) (retrieved from http://scam.xcf. berkeley.edu/~wei/viola/violaIntro.html).

Pei Wei, "A Brief Overview of the VIOLA Engine, and its applications" (TT 05441-13 05600) (1994) (including "Viola in a Nutshell: the Viola World Wide Web Toolkit" from http://scam.xcf/berkeley. edu/~wei/viola/book).

Pei Wei, "A Brief Overview of the VIOLA Engine, and its applications" ((MSET 0000026—0000036) (retrieved from http://scam.xcf. berkeley.edu/~wei/viola/violaIntro.html).

Pei Wei, "Re: FYI . . . press release," (e-mail to www-vrml@wired. com) (Aug. 31, 1994).

Pei Wei, "Re: FYI . . . press release," (e-mail to www-talk discussion list) (Aug. 31, 1994).

Pei Wei, "Re: FYI . . . press release," (e-mail to mddoyle@netcom. com) (Sep. 1, 1994).

Michael Doyle, "Re: More RE: FYI . . . Press release" (e-mail to Pei Wei) (Sep. 1, 1994).

Pei Wei, "Re: FYI . . . press release," (e-mail to vrml discussion list) (Sep. 1, 1994).

Michael Doyle, "Scripts vs APIs" (e-mail to vrml discussion list) (Sep. 1, 1994).

Pei Wei "WWW Browsers Extensibility Issues," Stanford Computer Forum WWW Workshop-Sep. 20-21, 1994.

Pei Wei, "Extensibility in WWW Browsers" Stanford Computer Forum WWW Workshop-Sep. 20-21, 1994.

Michael Doyle, "Re: Hot Java is here! And it *rocks*" (e-mail to www-talk discussion list) (Mar. 27, 1995).

Pei Wei, "Re: EOLAS Acquires Milestone Internet Software Patent" (e-mail to www-talk discussion list) (Aug. 21, 1995).

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

US 7,599,985 B2
Page 8

Pei Wei, "Re: EOLAS Acquires Milestone Internet Software Patent" (e-mail to www-talk discussion list) (Aug. 21, 1995).

Tim Berners-Lee, Press Release: "The World Wide Web—past, present and future" (Jul. 17, 1996) (retrieved from http://www.bcs.org.uk/news/timbl.htm).

Pei Wei, "Re: Universal network graphics language" (e-mail to www-talk discussion list) (Jan. 28, 1994).

Microsoft Product Support Services Application Note (Text File) GC0165:Rich-Text Format (RTF) Specification (Jun. 1992).

Tim Berners-Lee, "HTML + DTD in ftp://info.cern.ch/pub/www/dev/htmlplus.dtd" (e-mail to www-talk discussion list) (Jun. 2, 1993).

Dave Raggett, "HTML + support for eqn & Postscript" (e-mail to www-talk discussion list) (Jun. 14, 1993).

Dave Raggett, "HTML + support for eqn & Postscript" (e-mail to www-talk discussion list) (Jun. 14, 1993).

Christopher J. McRae, "Re: Xmosaic and Xv" (e-mail to www-talk discussion list) (Jun. 26, 1993).

Dave Raggett, "HTML + (Hypertext markup language)" (Jul. 23, 1993).

William Perry, "Re: Interest in HTML Conformance?" (e-mail to www-talk discussion list) (Apr. 17, 1994).

William Perry, "Presentation Tags, etc." (e-mail to Tony Jebson) (May 5, 1994).

William Perry, "Re: Where can I find doc on embedding X windows in Lemacs buffers?" (e-mail to help-lucid-emacs) (May 28, 1994).

Jeff Sparkes, "Re: Where can I find doc on embedding X windows in Lemacs buffers?" (e-mail to help-lucid-emacs) (May 31, 1994).

Daniel Connolly, "Re: HTML 2.0 specification" (e-mail to wmperry@spry.com (Sep. 2, 1994).

NCSA Software Development Group, "Introducing NCSA Mosaic" (Sep. 1993).

Kraig Brockschmidt, Programming for Windows with Object Linking and Embedding (OLD) 2.0 Draft (no date).

Kraig Brockschmidt, "Inside OLE 2.0" Microsoft Press (Oct. 1993).

ECDA extensible Compound Document Architecture (Jul. 10, 1990).

Microsoft Corporation, "Information At Your Fingertips Backgrounder" (Dec. 1990).

Microsoft Corporation, Object Landing & embedding—Extensible Application Protocols (Apr. 8, 1991).

Microsoft Corporation, "OLE 2.0 Design Summary" (Jul. 5, 1991).

Microsoft Corporation, "OLE 2.0 Architecture and Protocol Proposal" (Jul. 9, 1991).

Microsoft Corporation, "OLE 2.0 Design Specification" (Apr. 15, 1993).

Microsoft Corporation, "Microsoft OLE 2.0 Developers Conference Previews Applications Using Object Technology for Windows" (May 3, 1993).

Microsoft Corporation, "Windows Objects: Object Linking & Embedding 2.0 Developers Conference" (May 3, 1993).

Stuart J. Johnston and Vance McCarthy, "Developers get hands on complex but vital OLE 2.0", Info World, vol. 15, issue 19 (May 10, 1993).

Kraig Brockschmidt, "Programming for Windows with Object Linking and Embedding 2.0" Preliminary Draft (Apr. 19, 1993).

Microsoft Corporation, OLE 2.01 Design Specification.

Microsoft Corporation, "Microsoft OLE Controls-Specification Overview" (Jan. 1994).

Microsoft Corporation, "Microsoft Multimedia View Publishing Toolkit" 1 of 3 volumes: Getting Started, "Authoring Guide" and "Technical Reference" (1993).

Microsoft Corporation, "Microsoft Multimedia View Publishing Toolkit" 2 of 3 volumes: Getting Started, "Authoring Guide" and "Technical Reference" (1993).

Microsoft Corporation, "Microsoft Multimedia View Publishing Toolkit" 3 of 3 volumes: Getting Started, "Authoring Guide" and "Technical Reference" (1993).

Microsoft Corporation, "Microsoft Multimedia View Publishing Toolkit" compact disc, Getting Started, "Authoring Guide" and "Technical Reference" (1993).

E-mail From Ang Re: Plan (Oct. 8, 1994).

Bert Bos, "Re: Structured text v. page descriptions" (e-mail to David C. Martin) (Nov. 3, 1994).

Microsoft Windows Win32 Professional Developers Conference Information Packet including a Microsoft Non-Disclosure Agreement (Oct. 18, 1993).

Maritz, P.—Microsoft Letter to Microsoft Win32 Professional Developers Conference Attendees (Nov. 8, 1993).

Kraig Brockschmidt, "A Primer on Designing Custom Controls," Microsoft System Journal, Mar.-Apr. 1992.

Microsoft Corporation, "Object Linking and Embedding Backgrounder" (Dec. 1990).

Microsoft Corporation, "Compound Documents Backgrounder" (Dec. 1990).

Rude Q&A OLE.

Microsoft Corporation, "OLE Controls Architecture" Version 0.6 (Sep. 1, 1993).

Kraig Brockschmidt, "OLE 2.0: implementing Visual Editing (In-Place Activation)" (Nov. 1993).

Kraig Brockschmidt, "Chapter One: OLE Controls Architecture" (Nov. 10, 1993).

Microsoft Corporation, "OLE Controls Architecture" Version 0.7 (Nov. 17, 1993).

Microsoft Corporation, "OLE Controls Architecture" Version 0.2 (May 15, 1993).

Kraig Brockschmidt, "Network DDE in Windows for Workgroups 3.1 Bridges Programs Between PCs", Microsoft Systems Journal, Jan. 1993.

Microsoft Corporation, "Object Linking & Embedding Version 2.0 Programmer's Reference" (Apr. 15, 1993).

Moeller, Michael, et al., "Microsoft Maps New OCX: Plan; ActiveX Seen as Web content Platform," PC Week vol. 13, No. 10, p. 1 (Mar. 11, 1996).

Marovac, Nenad et al., "Hypernet: A Tool to Choreograph Worldwide Distributed Hypermedia Documents," Comput & Graphics vol. 16, No. 2, pp. 197-202 (1992).

Netscape Communications Corp., Press Release: "Netscape Communications Offers New Network Navigator Free on the Internet" (1998).

Sackman, Gleason, "WWW>Telerobotics via the Web(fwd)" (e-mail to comp.infosystems discussion list) (Sep. 7, 1994).

"The Pattern in the Mosaic: An Interview with Jim Clark and Marc Andreesen," Network Computing, p. 44 (Jan. 15, 1994).

Oliver, Dick, "Netscape Unleashed" (1996).

"Reply by Third Party Requester Under C.F.R. 1.535" (May 5, 2006).

"WWW-Talk Electronic Mailing List Contributors from Jan. 1993 Through Jun. 1993".

"World-Wide Web Mailing Lists", retrieved from http://www.bilkent.edu.tr/pub/WWW/Mail/Lists.html (May 2, 2006).

Hughes, Kevin, "Entering the World-Wide Web: A Guide to Cyberspace" (Oct. 1993) (http://w3.cib.unibo.it/intro/www-guide/www.guide.html.

Thomas, Eric, "LISTSERV for the Non-Technical User" (Sep. 18, 1994).

Andreessen, Marc, "NCSA Mosaic Technical Summary" (May 8, 1993).

Weber, Jay C., "Protest of Patent #5,838,906 under 37 CFR 1.291, and Citation of Prior Art for # 5,838,906, under 37 CFR 1.502" (including attachments) (Feb. 6, 2004).

Earlier Viola Source Code; enclosed CD; viola930512.tar.gz.zip.

Later Viola Source Code; enclosed CD; violaTOGO.tar.gz.zip.

Ragett, D., HTML+(Hypertext Markup Language), (Jul. 23, 1993).

Ragget, D., Posting of Dave Raggett, dsr@hplb.hpl.hp.com to www-talk@nxoc01.cern.ch (W-WW-Talk public mailing list).

WWW-Talk Archive 1993 Q2 and 1993 Q3 (Apr. to Oct. 1993) (available at http://ksi.cpsc.ucalgary.ca/archives/WWW-TALK/).

Missing Messages 0982-0999 from WWW-Talk Archive 1993Q2 and 1993Q3 (Apr. to Oct. 1993) (retrieved from http://1997.webhistory.org/www.lists/www-talk.1993q2/ and http://1997.webhistory.org/www.lists/www-talk.1993q3/).

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 08/02/2011



FIG. 1. PRIOR ART

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0002.0010



FIG. 2. PRIOR ART

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

JA000066    EOLASTX-0000338232

PX0002.0011



FIG. 3.



FIG. 4.

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0002.0012



*FIG. 5.*

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338234

PX0002.0013

FIG. 6.

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0002.0014

Case: 12-1632     Document: 34     Page: 136     Filed: 11/28/2012



*FIG. 7A.*



*FIG. 7B.*

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0002.0015



FIG. 8A.



FIG. 8B.

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0002.0016



*FIG. 9.*

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0002.0017



FIG. 10.

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

US 7,599,985 B2

1

# DISTRIBUTED HYPERMEDIA METHOD AND SYSTEM FOR AUTOMATICALLY INVOKING EXTERNAL APPLICATION PROVIDING INTERACTION AND DISPLAY OF EMBEDDED OBJECTS WITHIN A HYPERMEDIA DOCUMENT

## RELATED APPLICATIONS

This application is a continuation and claims the benefit of U.S. application Ser. No. 09/075,359, filed May 8, 1998 now abandoned, which is a continuation of U.S. application Ser. No. 08/324,443, filed Oct. 17, 1994 now U.S. Pat. No. 5,838, 906, the disclosures of which are hereby incorporated by reference.

## BACKGROUND OF THE INVENTION

This invention relates generally to manipulating data in a computer network, and specifically to retrieving, presenting and manipulating embedded program objects in distributed hypermedia systems.

Computer networks are becoming increasingly popular as a medium for locating and accessing a wide range of data from locations all over the world. The most popular global network is the Internet with millions of computer systems connected to it. The Internet has become popular due to widely adopted standard protocols that allow a vast interconnection of computers and localized computer networks to communicate with each other. Computer systems connected to a network such as the Internet may be of varying types, e.g., mainframes, workstations, personal computers, etc. The computers are manufactured by different companies using proprietary hardware and operating systems and thus have incompatibilities in their instruction sets, busses, software, file formats and other aspects of their architecture and operating systems. Localized computer networks connected to the Internet may be incompatible with other computer systems and localized networks in terms of the physical layer of communication including the specific hardware used to implement the network. Also, different networks use differing, incompatible protocols for transferring information and are not able to communicate with each other without a translation mechanism such as a "gateway".

The Internet provides a uniform and open standard for allowing various computers and networks to communicate with each other. For example, the Internet uses Transfer Control Protocol/Internet Protocol ("TCP/IP") that defines a uniform packet-switched communication standard which is ultimately used in every transfer of information that takes place over the Internet.

Other Internet standards are the HyperText Transmission Protocol ("HTTP") that allows hypertext documents to be exchanged freely among any computers connected to the Internet and HyperText Markup Language ("HTML") that defines the way in which hypertext documents designate links to information. See, e.g., Berners-Lee, T. J., "The world-wide web," Computer Networks and ISDN Systems 25 (1992).

A hypertext document is a document that allows a user to view a text document displayed on a display device connected to the user's computer and to access, retrieve and view other data objects that are linked to hypertext words or phrases in the hypertext document. In a hypertext document, the user may "click on," or select, certain words or phrases in the text that specify a link to other documents, or data objects. In this way, the user is able to navigate easily among data objects. The data objects may be local to the user's computer system

2

or remotely located over a network. An early hypertext system is Hypercard, by Apple Computer, Inc. Hypercard is a standalone system where the data objects are local to the user's system.

When a user selects a phrase in a hypertext document that has an associated link to another document, the linked document is retrieved and displayed on the user's display screen. This allows the user to obtain more information in an efficient and easy manner. This provides the user with a simple, intuitive and powerful way to "branch off" from a main document to learn more about topics of interest.

Objects may be text, images, sound files, video data, documents or other types of information that is presentable to a user of a computer system. When a document is primarily text and includes links to other data objects according to the hypertext format, the document is said to be a hypertext document. When graphics, sound, video or other media capable of being manipulated and presented in a computer system is used as the object linked to, the document is said to be a hypermedia document. A hypermedia document is similar to a hypertext document, except that the user is able to click on images, sound icons, video icons, etc., that link to other objects of various media types, such as additional graphics, sound, video, text, or hypermedia or hypertext documents.

FIG. 1 shows examples of hypertext and hypermedia documents and links associating data objects in the documents to other data objects. Hypermedia document includes hypertext 20, an image icon at 22, a sound icon at 24 and more hypertext 26. FIG. 1 shows hypermedia document 10 substantially as it would appear on a user's display screen. The user is able to select, or "click" on icons and text on a display screen by using an input device, such as a mouse, in a manner well-known in the art.

When the user clicks on the phrase "hypermedia," software running on the user's computer obtains the link associated with the phrase, symbolically shown by arrow 30, to access hypermedia document 14. Hypermedia document 14 is retrieved and displayed on the user's display screen. Thus, the user is presented with more information on the phrase "hypermedia." The mechanism for specifying and locating a linked object such as hypermedia document 14 is an HTML "element" that includes an object address in the format of a Uniform Resource Locator (URL).

Similarly, additional hypertext 26 can be selected by the user to access hypertext document 12 via link 32 as shown in FIG. 1. If the user selects additional hypertext 26, then the text for hypertext document 12 is displayed on the user screen. Note that hypertext document 12, itself, has hypertext at 28. Thus, the user can click on the phrase "hypermedia" while viewing document 12 to access hypermedia document 14 in a manner similar to that discussed above.

Documents, and other data objects, can be referenced by many links from many different source documents. FIG. 1 shows document 14 serving as a target link for both documents 10 and 12. A distributed hypertext or hypermedia document typically has many links within it that specify many different data objects located in computers at different geographical locations connected by a network. Hypermedia document 10 includes image icon 22 with a link to image 16. One method of viewing images is to include an icon, or other indicator, within the text.

Typically, the indicator is a very small image and may be a scaled down version of the full image. The indicator may be shown embedded within the text when the text is displayed on the display screen. The user may select the indicator to obtain the full image. When the user clicks on image icon 22 browser

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338240

PX0002.0019

US 7,599,985 B2

3

software executing on the user's computer system retrieves the corresponding full image, e.g., a bit map, and displays it by using external software called a "viewer." This results in the full image, represented by image 16, being displayed on the screen.

An example of a browser program is the National Center for Supercomputing Application's (NCSA) Mosaic software developed by the University of Illinois at Urbana/Champaign, Ill. Another example is "Cello" available on the Internet at http://www.law.cornell.edu/. Many viewers exist that handle various file formats such as ".TIF," ".GIF," formats. When a browser program invokes a viewer program, the viewer is launched as a separate process. The view displays the full image in a separate "window" (in a windowing environment) or on a separate screen. This means that the browser program is no longer active while the viewer is active. By using indicators to act as place holders for full images that are retrieved and displayed only when a user selects the indicator, data traffic over the network is reduced. Also, since the retrieval and display of large images may require several seconds or more of transfer time the user does not have to wait to have images transferred that are of no interest to the user.

Returning to FIG. 1, another type of data object is a sound object shown as sound icon 24 within the hypermedia document. When the user selects sound icon 24, the user's computer accesses sound data shown symbolically by data file 40. The accessed sound data plays through a speaker or other audio device.

As discussed above, hypermedia documents allow a user to access different data objects. The objects may be text, images, sound files, video, additional documents, etc. As used in this specification, a data object is information capable of being retrieved and presented to a user of a computer system. Some data objects include executable code combined with data. An example of such a combination is a "self-extracting" data object that includes code to "unpack" or decompress data that has been compressed to make it smaller before transferring. When a browser retrieves an object such as a self-extracting data object the browser may allow the user to "launch" the self-extracting data object to automatically execute the unpacking instructions to expand the data object to its original size. Such a combination of executable code and data is limited in that the user can do no more than invoke the code to perform a singular function such as performing the self-extraction after which time the object is a standard data object.

Other existing approaches to embedding interactive program objects in documents include the Object Linking and Embedding (OLE) facility in Microsoft Windows, by Microsoft Corp., and OpenDoc, by Apple Computer, Inc. At least one shortcoming of these approaches is that neither is capable of allowing a user to access embedded interactive program objects in distributed hypermedia documents over networks.

FIG. 2 is an example of a computer network. In FIG. 2, computer systems are connected to Internet 100, although in practice Internet 100 may be replaced by any suitable computer network. In FIG. 2, a user 102 operates a small computer 104, such as a personal computer or a work station. The user's computer is equipped with various components, such as user input devices (mouse, trackball, keyboard, etc.), a display device (monitor, liquid crystal display (LCD), etc.), local storage (hard disk drive, etc.), and other components. Typically, small computer 104 is connected to a larger computer, such as server A at 106. The larger computer may have additional users and computer systems connected to it, such as computer 108 operated by user 110. Any group of computers may form a localized network. A localized network does not

4

necessarily adopt the uniform protocols of the larger interconnecting network (i.e., Internet 100) and is more geographically constrained than the larger network. The localized network may connect to the larger network through a "gateway" or "node" implemented on, for example, a server.

Internet 100 connects other localized networks, such as server B at 120, which interconnects users 122, 124 and 126 and their respective computer systems to Internet 100. Internet 100 is made up of many interconnected computer systems and communication links. Communication links may be by hardwire, fiber optic cable, satellite or other radio wave propagation, etc. Data may move from server A to server B through any number of intermediate servers and communication links or other computers and data processing equipment not shown in FIG. 2 but symbolically represented by Internet 100.

A user at a workstation or personal computer need not connect to the Internet via a larger computer, such as server A or server B. This is shown, for example, by small computer 130 connected directly to Internet 100 by a telephone modem or other link. Also, a server need not have users connected to it locally, as is shown by server C at 132 of FIG. 2. Many configurations of large and small computers are possible.

Typically, a computer on the Internet is characterized as either a "client" or "server" depending on the role that the computer is playing with respect to requesting information or providing information. Client computers are computers that typically request information from a server computer which provides the information. For this reason, servers are usually larger and faster machines that have access to many data files, programs, etc., in a large storage associated with the server. However, the role of a server may also be adopted by a smaller machine depending on the transaction. That is, user 110 may request information via their computer 108 from server A. At a later time, server A may make a request for information from computer 108. In the first case, where computer 108 issues a request for information from server A, computer 108 is a "client" making a request of information from server A. Server A may have the information in a storage device that is local to Server A or server A may have to make requests of other computer systems to obtain the information. User 110 may also request information via their computer 108 from a server, such as server B located at a remote geographical location on the Internet. However, user 110 may also request information from a computer, such as small computer 124, thus placing small computer 124 in the role of a "server." For purposes of this specification, client and server computers are categorized in terms of their predominant role as either an information requester or provider. Clients are generally information requesters, while servers are generally information providers.

Referring again to FIG. 1, data objects such as distributed hypermedia documents 10, 12 and 14, image 16 and sound data file 40, may be located at any of the computers shown in FIG. 2. Since these data objects may be linked to a document located on another computer the Internet allows for remote object linking.

For example, hypertext document 10 of FIG. 1 may be located at user 110's computer 108. When user 110 makes a request by, for example, clicking on hypertext 20 (i.e., the phrase "hypermedia"), user 110's small client computer 108 processes links within hypertext document 10 to retrieve document 14. In this example, we assume that document 14 is stored at a remote location on server B. Thus, in this example, computer 108 issues a command that includes the address of document 14. This command is routed through

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338241

PX0002.0020

US 7,599,985 B2

5

server A and Internet **100** and eventually is received by server B. Server B processes the command and locates document **14** on its local storage. Server **14** then transfers a copy of the document back to client **108** via Internet **100** and server A. After client computer **108** receives document **14**, it is displayed so that user **110** may view it.

Similarly, image object **16** and sound data file **40** may reside at any of the computers shown in FIG. **2**. Assuming image object **16** resides on server C when user **110** clicks on image icon **22**, client computer **108** generates a command to retrieve image object **16** to server C. Server C receives the command and transfers a copy of image object **16** to client computer **108**. Alternatively, an object, such as sound data file **40**, may reside on server A so that it is not necessary to traverse long distances via the Internet in order to retrieve the data object.

The Internet is said to provide an "open distributed hypermedia system." It is an "open" system since Internet **100** implements a standard protocol that each of the connecting computer systems, **106**, **130**, **120**, **132** and **134** must implement (TCP/IP). It is a "hypermedia" system because it is able to handle hypermedia documents as described above via standards such as the HTTP and HTML hypertext transmission and mark up standards, respectively. Further, it is a "distributed" system because data objects that are embedded within a document may be located on many of the computer systems connected to the Internet. An example of an open distributed hypermedia system is the so-called "world-wide web" implemented on the Internet and discussed in papers such as the Berners-Lee reference given above.

The open distributed hypermedia system provided by the Internet allows users to easily access and retrieve different data objects located in remote geographic locations on the Internet. However, this open distributed hypermedia system as it currently exists has shortcomings in that today's large data objects are limited largely by bandwidth constraints in the various communication links in the Internet and localized networks, and by the limited processing power, or computing constraints, of small computer systems normally provided to most users. Large data objects are difficult to update at frame rates fast enough (e.g., 30 frames per second) to achieve smooth animation. Moreover, the processing power needed to perform the calculations to animate such images in real time does not exist on most workstations, not to mention personal computers. Today's browsers and viewers are not capable of performing the computation necessary to generate and render new views of these large data objects in real time.

For example, the Internet's open distributed hypermedia system allows users to view still images. These images are simple non-interactive two-dimensional images, similar to photographs. Much digital data available today exists in the form of high-resolution multi-dimensional image data (e.g., three dimensional images) which is viewed on a computer while allowing the user to perform real time viewing transformations on the data in order for the user to better understand the data.

An example of such type of data is in medical imaging where advanced scanning devices, such as Magnetic Resonance Imaging (MRI) and Computed Tomography (CT), are widely used in the fields of medicine, quality assurance and meteorology to present physicians, technicians and meteorologists with large amounts of data in an efficient way. Because visualization of the data is the best way for a user to grasp the data's meaning, a variety of visualization techniques and real time computer graphics methods have been developed. However, these systems are bandwidth-intensive and compute-intensive and often require multiprocessor

6

arrays and other specialized graphics hardware to carry them out in real time. Also, large amounts of secondary storage for data are required. The expense of these requirements has limited the ability of researchers to readily exchange findings since these larger computers required to store, present and manipulate images are not available to many of the researchers that need to have access to the data.

On the other hand, small client computers in the form of personal computers or workstations such as client computer **108** of FIG. **2** are generally available to a much larger number of researchers. Further, it is common for these smaller computers to be connected to the Internet. Thus, it is desirable to have a system that allows the accessing, display and manipulation of large amounts of data, especially image data, over the Internet to a small, and relatively cheap, client computer.

Due to the relatively low bandwidth of the Internet (as compared to today's large data objects) and the relatively small amount of processing power available at client computers, many valuable tasks performed by computers cannot be performed by users at client computers on the Internet. Also, while the present open distributed hypermedia system on the Internet allows users to locate and retrieve data objects it allows users very little, if any, interaction with these data objects. Users are limited to traditional hypertext and hypermedia forms of selecting linked data objects for retrieval and launching viewers or other forms of external software to have the data objects presented in a comprehensible way.

Thus, it is desirable to have a system that allows a user at a small client computer connected to the Internet to locate, retrieve and manipulate data objects when the data objects are bandwidth-intensive and compute-intensive. Further, it is desirable to allow a user to manipulate data objects in an interactive way to provide the user with a better understanding of information presented and to allow the user to accomplish a wider variety of tasks.

BRIEF SUMMARY OF THE INVENTION

The present invention provides a method for running embedded program objects in a computer network environment. The method includes the steps of providing at least one client workstation and one network server coupled to the network environment where the network environment is a distributed hypermedia environment; displaying, on the client workstation, a portion of a hypermedia document received over the network from the server, where the hypermedia document includes an embedded controllable application; and interactively controlling the embedded controllable application from the client workstation via communication sent over the distributed hypermedia environment.

The present invention allows a user at a client computer connected to a network to locate, retrieve and manipulate objects in an interactive way. The invention not only allows the user to use a hypermedia format to locate and retrieve program objects, but also allows the user to interact with an application program located at a remote computer. Interprocess communication between the hypermedia browser and the embedded application program is ongoing after the program object has been launched. The user is able to use a vast amount of computing power beyond that which is contained in the user's client computer.

In one application, high resolution three dimensional images are processed in a distributed manner by several computers located remotely from the user's client computer. This amounts to providing parallel distributed processing for tasks such as volume rendering or three dimensional image transformation and display. Also, the user is able to rotate, scale

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338242

PX0002.0021

US 7,599,985 B2

7                                                              8

and otherwise reposition the viewpoint with respect to these images without exiting the hypermedia browser software. The control and interaction of viewing the image may be provided within the same window that the browser is using assuming the environment is a "windowing" environment. The viewing transformation and volume rendering calculations may be performed by remote distributed computer systems.

Once an image representing a new viewpoint is computed the frame image is transmitted over the network to the user's client computer where it is displayed at a designated position within a hypermedia document. By transmitting only enough information to update the image, the need for a high bandwidth data connection is reduced. Compression can be used to further reduce the bandwidth requirements for data transmission.

Other applications of the invention are possible. For example, the user can operate a spreadsheet program that is being executed by one or more other computer systems connected via the network to the user's client computer. Once the spreadsheet program has calculated results, the results may be sent over the network to the user's client computer for display to the user. In this way, computer systems located remotely on the network can be used to provide the computing power that may be required for certain tasks and to reduce the data bandwidth by only transmitting results of the computations.

Still other applications of the present invention are possible, as disclosed in the specification, below.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates examples of hypertext and hypermedia documents and links;

FIG. 2 is an example of a computer network;

FIG. 3 is an illustration of a computer system suitable for use with the present invention;

FIG. 4 is an illustration of basic subsystems in the computer system of FIG. 3;

FIG. 5 is an illustration of an embodiment of the invention using a client computer, server computer and a network;

FIG. 6 shows another embodiment of the present invention using additional computers on the network;

FIG. 7A is a flowchart of some of the functionality within the HTMLparse.c file;

FIG. 7B is a flowchart of some of the functionality within the HTMLformat.c file;

FIG. 8A is a flowchart of some of the functionality within the HTMLwidget.c file;

FIG. 8B is a flowchart of some of the functionality within the HTML.c file;

FIG. 9 is a screen display generated in accordance with the present invention; and

FIG. 10 is a diagram of the various processes and data paths in the present invention.

DETAILED DESCRIPTION OF THE INVENTION

375 pages of Source code on 4 microfiche Appendices A and B are provided to this specification. The source code should be consulted to provide details of a specific embodiment of the invention in conjunction with the discussion of the routines in this specification. The source code in Appendix A includes NCSA Mosaic version 2.4 source code along with modifications to the source code to implement the present invention. Appendix B includes source code implementing an application program interface. The source code is written in the "C" computer language to run on an X-Window platform.

FIG. 3 is an illustration of a computer system suitable for use with the present invention. FIG. 3 depicts but one example of many possible computer types or configurations capable of being used with the present invention. FIG. 3 shows computer system 150 including display device 153, display screen 155, cabinet 157, keyboard 159 and mouse 161.

Mouse 161 and keyboard 159 are "user input devices." Other examples of user input devices are a touch screen, light pen, track ball, data glove, etc. Mouse 161 may have one or more buttons such as buttons 163 shown in FIG. 3. Cabinet 157 houses familiar computer components such as disk drives, a processor, storage means, etc. As used in this specification "storage means" includes any storage device used in connection with a computer system such as disk drives, magnetic tape, solid state memory, bubble memory, etc. Cabinet 157 may include additional hardware such as input/output (I/O) interface cards for connecting computer system 150 to external devices such as an optical character reader, external storage devices, other computers or additional devices.

FIG. 4 is an illustration of basic subsystems in computer system 150 of FIG. 3. In FIG. 4, subsystems are represented by blocks such as central processor 180, system memory 181 consisting of random access memory (RAM) and/or read-only memory (ROM), display adapter 182, monitor 183 (equivalent to display device 153 of FIG. 3), etc. The subsystems are interconnected via a system bus 184. Additional subsystems such as a printer, keyboard, fixed disk and others are shown. Peripherals and input/output (I/O) devices can be connected to the computer system by, for example serial port 185. For example, serial port 185 can be used to connect the computer system to a modem for connection to a network or serial port 185 can be used to interface with a mouse input device. The interconnection via system bus 184 allows central processor 180 to communicate with each subsystem and to control the execution of instructions from system memory 181 or fixed disk 186, and the exchange of information between subsystems. Other arrangements of subsystems and interconnections are possible.

FIG. 5 is an illustration of an embodiment of the invention using a client computer, server computer and a network.

In FIG. 5, client computer 200 communicates with server computer 204 via network 206. Both client computer 200 and server computer 204 use a network protocol layer to communicate with network 206. In a preferred embodiment, network 206 is the Internet and the network protocol layers are TCP/IP. Other networks and network protocols may be used. For ease of illustration, additional hardware and software layers are not shown in FIG. 5.

Client computer 200 includes processes, such as browser client 208 and application client 210. In a preferred embodiment, application client 210 is resident within client computer 200 prior to browser client 208's parsing of a hypermedia document as discussed below. In a preferred embodiment application client 210 resides on the hard disk or RAM of client computer 200 and is loaded (if necessary) and executed when browser client 208 detects a link to application client 210. The preferred embodiment uses the XEvent interprocess communication protocol to exchange information between browser client 208 and application client 210 as described in more detail, below. Another possibility is to install application client 210 as a "terminate and stay resident" (TSR) program in an operating system environment, such as X-Window. Thereby making access to application client 210 much faster.

Browser client 208 is a process that a user of client computer 200 invokes in order to access various data objects, such as hypermedia documents, on network 206. Hypermedia

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338243

PX0002.0022

US 7,599,985 B2

9
10

document 212 shown within client computer 200 is an example of a hypermedia document, or object, that a user has requested access to. In this example, hypermedia document 212 has been retrieved from a server connected to network 206 and has been loaded into, e.g., client computer 200's RAM or other storage device.

Once hypermedia document 212 has been loaded into client computer 200, browser client 208 parses hypermedia document 212. In parsing hypermedia document 212, browser client 208 detects links to data objects as discussed above in the Background of the Invention section. In FIG. 5, hypermedia document 212 includes an embedded program link at 214. Embedded program link 214 identifies application client 212 as an application to invoke. In this present example, the application, namely, application client 210, resides on the same computer as the browser client 208 that the user is executing to view the hypermedia document. Embedded program link 214 may include additional information, such as parameters, that tell application client 210 how to proceed. For example, embedded program link 214 may include a specification as to a data object that application client 210 is to retrieve and process.

When browser client 208 encounters embedded program link 214, it invokes application client 210 (optionally, with parameters or other information) and application client 210 executes instructions to perform processing in accordance with the present invention.

An example of the type of processing that application client 210 may perform is multidimensional image visualization. Note that application client 210 is in communication with network 206 via the network protocol layer of client computer 200. This means that application client 210 can make requests over network 206 for data objects, such as multidimensional image objects. For example, application client 210 may request an object, such as object 1 at 216, located in server computer 204. Application client 210 may make the request by any suitable means. Assuming network 206 is the Internet, such a request would typically be made by using HTTP in response to a HTML-style link definition for embedded program link 214.

Assuming application client 210 has made a request for the data object at 216, server process 218 ultimately receives the request. Server process 218 then retrieves data object 216 and transfers it over network 206 back to application client 210. To continue with the example of a multidimensional visualization application, data object 216 may be a three dimensional view of medical data for, e.g., an embryo.

After application client 210 receives the multidimensional data object 216, application client 210 executes instructions to display the multidimensional embryo data on the display screen to a user of the client computer 200. The user is then able to interactively operate controls to recompute different views for the image data. In a preferred embodiment, a control window is displayed within, or adjacent to, a window generated by browser client 208 that contains a display of hypermedia document 212. An example of such display is discussed below in connection with FIG. 9. Thus, the user is able to interactively manipulate a multidimensional image object by means of the present invention. In order to make application client 210 integral with displays created by browser client 208, both the browser client and the application client must be in communication with each other, as shown by the arrow connecting the two within client computer 200. The manner of communication is through an application program interface (API), discussed below.

Browser client 208 is a process, such as NCSA Mosaic, Cello, etc. Application client 210 is embodied in software

presently under development called "VIS" and "Panel" created by the Center for Knowledge Management at the University of California, San Francisco, as part of the Doyle Group's distributed hypermedia object embedding approach described in "Integrated Control of Distributed Volume Visualization Through the World-Wide-Web," by C. Ang, D. Martin, M. Doyle; to be published in the Proceedings of Visualization 1994, IEEE Press, Washington, D.C., October 1994.

Versions and descriptions of software embodying the present invention are generally available as hyperlinked data objects from the Visible Embryo Project's World Wide Web document at the URL address "HTTP://visembryo.ucsf.edu/".

Another embodiment of the present invention uses an application server process executing on server computer 204 to assist in processing that may need to be performed by an external program. For example, in FIG. 5, application server 220 resides on server computer 204. Application server 220 works in communication with application client 210 residing on client computer 200. In a preferred embodiment, application server 220 is called VRServer, also a part of Doyle Group's approach. Since server computer 204 is typically a larger computer having more data processing capabilities and larger storage capacity, application server 220 can operate more efficiently, and much faster, than application client 210 in executing complicated and numerous instructions.

In the present example where a multidimensional image object representing medical data for an embryo is being viewed, application server 220 could perform much of the viewing transformation and volume rendering calculations to allow a user to interactively view the embryo data at their client computer display screen. In a preferred embodiment, application client 210 receives signals from a user input device at the user's client computer 200. An example of such input would be to rotate the embryo image from a current position to a new position from the user's point of view. This information is received by application client 210 and processed to generate a command sent over network 206 to application server 220. Once application server 220 receives the information in the form of, e.g., a coordinate transformation for a new viewing position, application server 220 performs the mathematical calculations to compute a new view for the embryo image. Once the new view has been computed, the image data for the new view is sent over network 206 to application client 210 so that application client 210 can update the viewing window currently displaying the embryo image. In a preferred embodiment, application server 220 computes a frame buffer of raster display data, e.g., pixel values, and transfers this frame buffer to application client 210. Techniques, such as data compression and delta encoding, can be used to compress the data before transmitting over network 206 to reduce the bandwidth requirement.

It will be readily seen that application server 220 can advantageously use server computer 204's computing resources to perform the viewing transformation much more quickly than could application client 210 executing on client computer 200. Further, by only transmitting the updated frame buffer containing a new view for the embryo image, the amount of data sent over network 206 is reduced. By using appropriate compression techniques, such as, e.g., MPEG (Motion Picture Experts Group) or JPEG (Joint Photographic Experts Group), efficient use of network 206 is preserved.

FIG. 6 shows yet another embodiment of the present invention. FIG. 6 is similar to FIG. 5, except that additional computers 222 and 224 are illustrated. Each additional computer includes a process labeled "Application (Distributed)." The distributed application performs a portion of the task that an

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338244

PX0002.0023

US 7,599,985 B2

11

application, such as application server **220** or application client **210**, perform. In the present example, tasks such as volume rendering may be broken up and easily performed among two or more computers. These computers can be remote from each other on network **206**. Thus, several computers, such as server computer **204** and additional computers **222** and **224** can all work together to perform the task of computing a new viewpoint and frame buffer for the embryo for the new orientation of the embryo image in the present example. The coordination of the distributed processing can be performed at client computer **200** by application client **210**, at server computer **204** by application server **220**, or by any of the distributed applications executing on additional computers, such as **222** and **224**. In a preferred embodiment, distributed processing is coordinated by a program called "VIS" represented by application client **210** in FIG. **6**.

Other applications of the invention are possible. For example, the user can operate a spreadsheet program that is being executed by one or more other computer systems connected via the network to the user's client computer. Once the spreadsheet program has calculated results, those results may be sent over the network to the user's client computer for display within the hypermedia document on the user's client computer. In this way, computer systems located remotely on the network can be used to provide the computing power that may be required for certain tasks and to reduce the data bandwidth required by only transmitting results of the computations.

Another type of possible application of this invention would involve embedding a program which runs only on the client machine, but which provides the user with more functionality than exists in the hypermedia browser alone. An example of this is an embedded client application which is capable of viewing and interacting with images which have been processed with Dr. Doyle's MetaMAP invention (U.S. Pat. No. 4,847,604). This MetaMAP process uses object-oriented color map processing to allow individual color index ranges within paletted images to have object identities, and is useful for the creation of, for example, interactive picture atlases. It is a more efficient means for defining irregular "hotspots" on images than the ISMAP function of the World Wide Web, which uses polygonal outlines to define objects in images. A MetaMAP-capable client-based image browser application can be embedded, together with an associated image, within a hypermedia document, allowing objects within the MetaMAP-processed image to have URL addresses associated with them. When a user clicks with a mouse upon an object within the MetaMAP-processed image, the MetaMAP client application relays the relevant URL back to the hypermedia browser application, which then retrieves the HTML file or hypermedia object which corresponds to that URL.

The various processes in the system of the present invention communicate through a custom API called Mosaic/External Application Program Interface MEAPI. The MEAPI set of predefined messages includes those shown in Table I.

TABLE I

| Message Function Message Name |
| --- |
| Messages from server to client: |
| 1. Server Update Done XtNrefreshNotify |
| 2. Server Ready XtNpanelStartNotify |
| 3. Server Exiting XtNpanelExitNotify |

12

TABLE I-continued

| Message Function Message Name |
| --- |
| Messages from client to server: |
| 4. Area Shown XtNmapNotify |
| 5. Area Hidden XtNunmapNotify |
| 6. Area Destroyed XtNexitNotify |

The messages in Table I are defined in the file protocol. sub.--lib.h in Appendix B. The functions of the MEAPI are provided in protocol. sub.--lib.c of Appendix B. Thus, by using MEAPI a server process communicates to a client application program to let the client application know when the server has finished updating information, such as an image frame buffer, or pixmap (Message 1); when the server is ready to start processing messages (Message 2) and when the server is exiting or stopping computation related to the server application program.

For client to server communications, MEAPI provides for the client informing the server when the image display window area is visible, when the area is hidden and when the area is destroyed. Such information allows the server to decide whether to allocate computing resources for, e.g., rendering and viewing transformation tasks where the server is running an application program to generate new views of a multi dimensional object. Source code for MEAPI fundamental functions such as handle.sub.--client.sub. --msg, register. sub.--client, register.sub.--client.sub.--msg.sub.--callback and send.sub. --client. sub.--msg may be found in protocol. sub.--lib.c as part of the source code in Appendix B. Next, a discussion of the software processes that perform parsing of a hypermedia document and launching of an application program is provided in connection with Table II and FIGS. 7A, 8A and 8B. Table II, below, shows an example of an HTML tag format used by the present invention to embed a link to an application program within a hypermedia document.

For client to server communications, MEAPI provides for the client informing the server when the image display window area is visible, when the area is hidden and when the area is destroyed. Such information allows the server to decide whether to allocate computing resources for, e.g., rendering and viewing transformation tasks where the server is running an application program to generate new views of a multi dimensional object. Source code for MEAPI fundamental functions such as handle.sub.--client.sub. --msg, register. sub.--client, register.sub.--client.sub.--msg.sub.--callback and send.sub. client. sub.--msg may be found in protocol. sub.--lib.c as part of the source code in Appendix B.

Next, a discussion of the software processes that perform parsing of a hypermedia document and launching of an application program is provided in connection with Table II and FIGS. 7A, 7B, 8A and 8B.

Table II, below, shows an example of an HTML tag format used by the present invention to embed a link to an application program within a hypermedia document.

TABLE II

| &lt EMBED |
| --- |
| TYPE = "type" |
| HREF = "href" |
| WIDTH = width |
| HEIGHT = height |
| &gt |

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338245

PX0002.0024

US 7,599,985 B2

13

As shown in Table II, the EMBED tag includes TYPE, HREF, WIDTH and HEIGHT elements. The TYPE element is a Multipurpose Internet Mail Extensions (MIME) type. Examples of values for the TYPE element are "application/x-vis" or "video/mpeg". The type "application/x-vis" indicates that an application named "x-vis" is to be used to handle the object at the URL specified by the HREF. Other types are possible such as "application/x-inventor", "application/postscript" etc. In the case where TYPE is "application/x-vis" this means that the object at the URL address is a three dimensional image object since the program "x-vis" is a data visualization tool designed to operate on three dimensional image objects. However, any manner of application program may be specified by the TYPE element so that other types of applications, such as a spreadsheet program, database program, word processor, etc. may be used with the present invention. Accordingly, the object reference by the HREF element would be, respectively, a spreadsheet object, database object, word processor document object, etc.

On the other hand, TYPE values such as "video/mpeg", "image/gif", "video/x-sgi-movie", etc. describe the type of data that HREF specifies. This is useful where an external application program, such as a video player, needs to know what format the data is in, or where the browser client needs to determine which application to launch based on the data format. Thus, the TYPE value can specify either an application program or a data type. Other TYPE values are possible. HREF specifies a URL address as discussed above for a data object. Where TYPE is "application/x-vis" the URL address specifies a multi-dimensional image object. Where TYPE is "video/mpeg" the URL address specifies a video object.

WIDTH and HEIGHT elements specify the width and height dimensions, respectively, of a Distributed Hypermedia Object Embedding (DHOE) window to display an external application object such as the three dimensional image object or video object discussed above.

FIG. 7A is a flowchart describing some of the functionality within the HTMLparse.c file of routines. The routines in HTMLparse.c perform the task of parsing a hypermedia document and detecting the EMBED tag. In a preferred embodiment, the enhancements to include the EMBED tag are made to an HTML library included in public domain NCSA Mosaic version 2.4. Note that much of the source code in is pre-existing NCSA Mosaic code. Only those portions of the source code that relate to the new functionality discussed in this specification should be considered as part of the invention. The new functionality is identifiable as being set off from the main body of source code by conditional compilation macros such as "#ifdef . . . #endif" as will be readily apparent to one of skill in the art.

In general, the flowcharts in this specification illustrate one or more software routines executing in a computer system such as computer system 1 of FIG. 1. The routines may be implemented by any means as is known in the art. For example, any number of computer programming languages, such as "C", Pascal, FORTRAN, assembly language, etc., may be used. Further, various programming approaches such as procedural, object oriented or artificial intelligence techniques may be employed.

The steps of the flowcharts may be implemented by one or more software routines, processes, subroutines, modules, etc. It will be apparent that each flowchart is illustrative of merely the broad logical flow of the method of the present invention and that steps may be added to, or taken away from, the flowcharts without departing from the scope of the invention. Further, the order of execution of steps in the flowcharts may be changed without departing from the scope of the invention.

14

Additional considerations in implementing the method described by the flowchart in software may dictate changes in the selection and order of steps. Some considerations are event handling by interrupt driven, polled, or other schemes. A multiprocessing or multitasking environment could allow steps to be executed "concurrently." For ease of discussion the implementation of each flowchart may be referred to as if implemented in a single "routine."

The modifications to NCSA Mosaic version 2.4 software files HTMLparse.c, HTMLformat.c, HTMLwidget.c and HTML.c will next be discussed, in turn.

Returning to FIG. 7, it is assumed that a hypermedia document has been obtained at a user's client computer and that a browser program executing on the client computer displays the document and calls a first routine in the HTMLparse.c file called "HTMLparse". This first routine, HTMLparse, is entered at step 252 where a pointer to the start of the document portion is passed. Steps 254, 256 and 258 represent a loop where the document is parsed or scanned for HTML tags or other symbols. While the file HTMLparse.c includes routines to handle all possible tags and symbols that may be encountered, FIG. 7A, for simplicity, only illustrates the handling of EMBED tags.

Assuming there is more text to parse, execution proceeds to step 256 where routines in HTMLparse.c obtain the next item (e.g., word, tag or symbol) from the document. At step 258 a check is made as to whether the current tag is the EMBED tag. If not, execution returns to step 254 where the next tag in the document is obtained. If, at step 258, it is determined that the tag is the EMBED tag, execution proceeds to step 260 where an enumerated type is assigned for the tag. Each occurrence of a valid EMBED tag requires an embedded object. HTMLparse calls a routine "get.sub.--mark" in HTMLparse.c to put sections of HTML document text into a "markup" text data structure. Routine get.sub.--mark, in turn, calls ParseMarkType to assign an enumerated type. The enumerated type is an identifier with a unique integer associated with it that is used in later processing described below.

Once all of the hypermedia text in the text portion to be displayed has been parsed, execution of HTMLparse.c routines terminates at step 262.

FIG. 7B is a flowchart of routines in file HTMLformat.c to process the enumerated type created for the EMBED tag by routines in HTMLparse.c. In the X-Window implementation of a preferred embodiment, the enumerated type is processed as if it is a regular Motif/XT widget. For details on X-Window development see, e.g., "Xlib Programming Manual," "X Toolkit Intrinsics Programming Manual" and "Motif Programming Manual" published by O'Reilly &amp; Associates, Inc. HTMLformat is entered at step 270 where a pointer to the enumerated type to process is passed.

At step 272 the parameters of the structure are initialized in preparation for inserting a DrawingArea widget on an HTML page. This includes providing values for the width and height of a window on the display to contain an image, position of the window, style, URL of the image object, etc. Various codes are also added by routines in HTMLformat.c (such as TriggerMarkChanges) to insert an internal representation of the HTML statement into an object list maintained internally by the browser. In the X-Window application corresponding to the source code of Appendix A, the browser is NCSA Mosaic version 2.4.

FIG. 8A is a flowchart for routine HTMLwidget. HTMLwidget creates display data structures and launches an external application program to handle the data object specified by the URL in the EMBED tag.

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

PX0002.0025

US 7,599,985 B2

15

HTML widget is entered at step 280 after HTML format has created the internal object representation of the EMBED tag. HTML widget is passed the internal object and performs its processing on the object. At step 282 the DrawingArea widget is created according to the type of the internal representation, from HTML format, specified in the internal object. Similarly, at step 284 a pixmap area for backing storage is defined.

At step 286 a check is made as to whether the type attribute of the object, i.e., the value for the TYPE element of the EMBED tag, is an application. If so, step 290 is executed to launch a predetermined application. In a preferred embodiment an application is launched according to a user-defined list of application type/application pairs. The list is defined as a user-configurable XResource as described in "Xlib Programming Manual." An alternative embodiment could use the MIME database as the source of the list of application type/application pairs. The routine "vis.sub.--start.sub.--external.sub.--application" in file HTML format.c is invoked to match the application type and to identify the application to launch.

The external application is started as a child process of the current running process (Mosaic), and informed about the window ID of the DrawingArea created in HTML format. The external application is also passed information about the ID of the pixmap, the data URL and dimensions. Codes for communication such as popping-up/iconifying, start notification, quit notification and refresh notification with external applications and DrawingArea refreshing are also added. Examples of such codes are (1) "setup/start" in vis.sub.--register.sub.--client and vis. sub.--get panel.sub.--window in HTML widgets.c; (2) "handle messages from external applications" in vis.sub.--handle panel.sub.--msg in HTML widgets.c; (3) "send messages to external applications" in vis.sub.--send.sub.--msg in HTML widgets.c; (4) "terminate external applications" in vis.sub.--exit in HTML widgets.c which calls vis.sub.--send.sub.--msg to send a quit message; and (5) "respond to refresh msgs" in vis.sub.--redraw in HTML widgets.c.

If, at step 286, the type is determined not to be an application object (e.g., a three dimensional image object in the case of application "x-vis") a check is made at step 288 to determine if the type is a video object. If so, step 292 is executed to launch a video player application. Parameters are passed to the video player application to allow the player to display the video object within the DrawingArea within the display of the portion of hypermedia document on the client's computer. Note that many other application objects types are possible as described above.

FIG. 8B is a flowchart for routine HTML. Routine HTML takes care of "shutting down" the display, data areas, etc. that were set up to launch the external application and display the data object. HTML is entered at step 300 and is called when the display or other processing of the EMBED tag has been completed. At step 302 the display window is removed and the memory areas for the pixmap and internal object structure is made free for other uses. Completion of processing can be by user command or by computer control.

The present invention allows a user to have interactive control over application objects such as three dimensional image objects and video objects. In a preferred embodiment, controls are provided on the external applications' user interface. In the case of a VIS/panel application, a process, "panel" creates a graphical user interface (GUI) thru which the user interacts with the data. The application program, VIS, can be executing locally with the user's computer or remotely on a server, or on one or more different computers, on the network. The application program updates pixmap data and transfers the pixmap data (frame image data) to a buffer to which the

16

browser has access. The browser only needs to respond to the refresh request to copy the contents from the updated pixmap to the DrawingArea. The Panel process sends messages as "Msg" sending performed by routines such as vis.sub.--send. sub.--msg and vis.sub.--handle panel.sub.--msg to send events (mousemove, keypress, etc.) to the external application.

FIG. 9 is a screen display of the invention showing an interactive application object (in this case a three dimensional image object) in a window within a browser window. In FIG. 9, the browser is NCSA Mosaic version 2.4. The processes VIS, Panel and VRServer work as discussed above. FIG. 9 shows screen display 356 Mosaic window 350 containing image window 352 and a portion of a panel window 354. Note that image window 352 is within Mosaic window 350 while panel window 354 is external to Mosaic window 350. Another possibility is to have panel window 354 within Mosaic window 350. By using the controls in panel window 354 the user is able to manipulate the image within image window 352 in real time do perform such operations as scaling, rotation, translation, color map selection, etc. In FIG. 9, two Mosaic windows are being used to show two different views of an embryo image. One of the views is rotated by six degrees from the other view so that a stereoscopic effect can be achieved when viewing the images. Communication between Panel and VIS is via "Tooltalk" described in, e.g., "Tooltalk 1.1.1 Reference Manual," from SunSoft.

FIG. 10 is an illustration of the processes VIS, Panel and VRServer discussed above. As shown in FIG. 10, the browser process, Mosaic, communicates with the Panel process via inter-client communication mechanisms such as provided in the X-Window environment. The Panel process communicates with the VIS process through a communications protocol (ToolTalk, in the preferred embodiment) to exchange visualization command messages and image data. The image data is computed by one or more copies of a process called VRServer that may be executing on remote computers on the network. VRServer processes respond to requests such as rendering requests to generate image segments. The image segments are sent to VIS and combined into a pixmap, or frame image, by VIS. The frame image is then transferred to the Mosaic screen via communications between VIS, Panel and Mosaic. A further description of the data transfer may be found in the paper "Integrated Control of Distributed Volume Visualization Through the World-Wide-Web," referenced above.

In the foregoing specification, the invention has been described with reference to a specific exemplary embodiment thereof. It will, however, be evident that various modifications and changes may be made thereunto without departing from the broader spirit and scope of the invention as set forth in the appended claims. For example, various programming languages and techniques can be used to implement the disclosed invention. Also, the specific logic presented to accomplish tasks within the present invention may be modified without departing from the scope of the invention. Many such changes or modifications will be readily apparent to one of ordinary skill in the art. The specification and drawings are, accordingly, to be regarded in an illustrative rather than a restrictive sense, the invention being limited only by the provided claims.

What is claimed is:

1. A method for running an application program in a distributed hypermedia network environment, wherein the network environment comprises at least one client workstation and one network server coupled to the network environment, the method comprising:

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

EOLASTX-0000338247

PX0002.0026

US 7,599,985 B2

17

receiving, at the client workstation from the network server over the network environment, at least one file containing information to enable a browser application to display at least a portion of a distributed hypermedia document within a browser-controlled window;

executing the browser application on the client workstation, with the browser application:

responding to text formats to initiate processing specified by the text formats;

displaying at least a portion of the document within the browser-controlled window;

identifying an embed text format which corresponds to a first location in the document, where the embed text format specifies the location of at least a portion of an object external to the file, where the object has type information associated with it;

utilizing the type information to identify and locate an executable application external to the file; and

automatically invoking the executable application, in response to the identifying of the embed text format, to execute on the client workstation in order to display the object and enable an end-user to directly interact with the object while the object is being displayed within a display area created at the first location within the portion of the hypermedia document being displayed in the browser-controlled window.

2. The method of claim 1 where:

the information to enable comprises text formats.

3. The method of claim 2 where the text formats are HTML tags.

4. The method of claim 1 where the information contained in the file received comprises at least one embed text format.

5. The method of claim 1 where the step of identifying an embed text format comprises:

parsing the received file to identify text formats included in the received file.

6. The method of claim 5 where the parsing is by a parser in the browser.

7. The method of claim 1 where the processing specified by the text formats is specified directly.

8. The method of claim 1 where the correspondence is implied by the order of the text format in a set of all of the text formats.

9. The method of claim 1 where the embed text format specifies the location of at least a portion of an object directly.

10. The method of claim 1 where having type information associated is by including type information in the embed text format.

11. The method of claim 1 where automatically invoking does not require interactive action by the user.

12. The method of claim 1, wherein said executable application is a controllable application and further comprising the step of:

interactively controlling said controllable application on said client workstation via inter-process communications between said browser and said controllable application.

13. The method of claim 12, wherein the communications to interactively control said controllable application continue to be exchanged between the controllable application and the browser even after the controllable application program has been launched.

14. The method of claim 13, wherein additional instructions for controlling said controllable application reside on said network server, wherein said step of interactively controlling said controllable application includes the following substeps:

18

issuing, from the client workstation, one or more commands to the network server;

executing, on the network server, one or more instructions in response to said commands;

sending information from said network server to said client workstation in response to said executed instructions; and processing said information at the client workstation to interactively control said controllable application.

15. The method of claim 14, wherein said additional instructions for controlling said controllable application reside on said client workstation.

16. One or more computer readable media encoded with software comprising computer executable instructions, for use in a distributed hypermedia network environment, wherein the network environment comprises at least one client workstation and one network server coupled to the network environment, and when the software is executed operable to:

receive, at the client workstation from the network server over the network environment, at least one file containing information to enable a browser application to display at least a portion of a distributed hypermedia document within a browser-controlled window;

cause the client workstation to utilize the browser to:

respond to text formats to initiate processing specified by the text formats;

display at least a portion of the document within the browser-controlled window;

identify an embed text format corresponding to a first location in the document, the embed text format specifying the location of at least a portion of an object external to the file, with the object having type information associated with it;

utilize the type information to identify and locate an executable application external to the file; and

automatically invoke the executable application, in response to the identifying of the embed text format, to execute on the client workstation in order to display the object and enable an end-user to directly interact with the object while the object is being displayed within a display area created at the first location within the portion of the hypermedia document being displayed in the browser-controlled window.

17. The computer readable media of claim 16 where:

the information to enable comprises text formats.

18. The computer readable media of claim 17 where:

the text formats are HTML tags.

19. The computer readable media of claim 16 where:

the information contained in the file received comprises at least one embed text format.

20. A method of serving digital information in a computer network environment having a network server coupled to the network environment, and where the network environment is a distributed hypermedia environment, the method comprising:

communicating via the network server with at least one client workstation over said network in order to cause said client workstation to:

receive, over said network environment from said server, at least one file containing information to enable a browser application to display at least a portion of a distributed hypermedia document within a browser-controlled window;

execute, at said client workstation, a browser application, with the browser application:

responding to text formats to initiate processing specified by the text formats;

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

JA000082     EOLASTX-0000338248

PX0002.0027

US 7,599,985 B2

**19**

displaying, on said client workstation, at least a portion of the document within the browser-controlled window;

identifying an embed text format which corresponds to a first location in the document, where the embed text format specifies the location of at least a portion of an object external to the file, where the object has type information associated with it;

utilizing the type information to identify and locate an executable application external to the file; and

automatically invoking the executable application, in response to the identifying of the embed text format, to execute on the client workstation in order to display the object and enable an end-user to directly interact with the object while the object is being displayed within a display area created at the first location within the portion of the hypermedia document being displayed in the browser-controlled window.

21. The method of claim 20 where:
the information to enable comprises text formats.

22. The method of claim 21 where:
the text formats are HTML tags.

23. The method of claim 20 where:
the information contained in the file received comprises at least one embed text format.

24. A method for running an executable application in a computer network environment, wherein said network environment has at least one client workstation and one network server coupled to a network environment, the method comprising:

enabling an end-user to directly interact with an object by utilizing said executable application to interactively process said object while the object is being displayed within a display area created at a first location within a portion of a hypermedia document being displayed in a browser-controlled window, wherein said network environment is a distributed hypermedia environment, wherein said client workstation receives, over said network environment from said server, at least one file containing information to enable said browser application to display, on said client workstation, at least said portion of said distributed hypermedia document within said browser-controlled window, wherein said executable application is external to said file, wherein said client workstation executes the browser application, with the browser application responding to text formats to initiate processing specified by the text formats, wherein at least said portion of the document is displayed within the browser-controlled window, wherein an embed text format which corresponds to said first location in the document is identified by the browser, wherein the embed text format specifies the location of at least a portion of said object external to the file, wherein the object has type information associated with it, wherein the type information is utilized by the browser to identify and locate said executable application, and wherein the executable application is automatically invoked by the browser, in response to the identifying of the embed text format.

25. The method of claim 24 where:
the information to enable comprises text formats.

26. The method of claim 25 where:
the text formats are HTML tags.

27. The method of claim 24 where:
the information contained in the file received comprises at least one embed text format.

**20**

28. One or more computer readable media encoded with software comprising an executable application for use in a system having at least one client workstation and one network server coupled to a network environment, operable to:

cause the client workstation to display an object and enable an end-user to directly interact with said object while the object is being displayed within a display area created at a first location within a portion of a hypermedia document being displayed in a browser-controlled window, wherein said network environment is a distributed hypermedia environment, wherein said client workstation receives, over said network environment from said server, at least one file containing information to enable said browser application to display, on said client workstation, at least said portion of said distributed hypermedia document within said browser-controlled window, wherein said executable application is external to said file, wherein said client workstation executes said browser application, with the browser application responding to text formats to initiate processing specified by the text formats, wherein at least said portion of the document is displayed within the browser-controlled window, wherein an embed text format which corresponds to said first location in the document is identified by the browser, wherein the embed text format specifies the location of at least a portion of said object external to the file, wherein the object has type information associated with it, wherein the type information is utilized by the browser to identify and locate said executable application, and wherein the executable application is automatically invoked by the browser, in response to the identifying of the embed text format.

29. The method of claim 28 where:
the information to enable comprises text formats.

30. The method of claim 29 where:
the text formats are HTML tags.

31. The method of claim 28 where:
the information contained in the file received comprises at least one embed text format.

32. A method for serving digital information in a computer network environment, said method comprising:

communicating via a network server with at least one client workstation over said computer network environment in order to cause said client workstation to:

receive at said client workstation, over said computer network environment from said server, at least one file containing information to enable a browser application to display, on said client workstation, at least a portion of a distributed hypermedia document within a browser-controlled window;

utilize an executable application external to said file to enable an end-user to directly interact with an object while the object is being displayed within a display area created at a first location within the portion of the distributed hypermedia document being displayed in the browser-controlled window, wherein said network server coupled to said computer network environment, wherein said computer network environment has at least said client workstation and said network server coupled to the computer network environment, wherein said computer network environment is a distributed hypermedia environment, wherein said client workstation executes the browser application, with the browser application responding to text formats to initiate processing specified by the text formats, wherein at least said portion of the document is displayed within the browser-controlled window, wherein an embed text format which corre-

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

US 7,599,985 B2

21

sponds to said first location in the document is identified by the browser, wherein the embed text format specifies the location of at least a portion of said object external to the file, wherein the object has type information associated with it, wherein the type information is utilized by the browser to identify and locate said executable application, and wherein the executable application is automatically invoked by the browser, in response to the identifying of the embed text format.

33. The method of claim 32 where:
the information to enable comprises text formats.

34. The method of claim 33 where:
the text formats are HTML tags.

35. The method of claim 32 where:
the information contained in the file received comprises at least one embed text format.

36. A method for running an application program in a distributed hypermedia network environment, wherein the distributed hypermedia network environment comprises at least one client workstation and one remote network server coupled to the distributed hypermedia network environment, the method comprising:

receiving, at the client workstation from the network server over the distributed hypermedia network environment, at least one file containing information to enable a browser application to display at least a portion of a distributed hypermedia document within a browser-controlled window;

executing the browser application on the client workstation, with the browser application:

responding to text formats to initiate processing specified by the text formats;

displaying at least a portion of the document within the browser-controlled window;

identifying an embed text format which corresponds to a first location in the document, where the embed text format specifies the location of at least a portion of an object;

identifying and locating an executable application associated with the object; and

automatically invoking the executable application, in response to the identifying of the embed text format, in order to enable an end-user to directly interact with the object, while the object is being displayed within a display area created at the first location within the portion of the hypermedia document being displayed in the browser-controlled window, wherein the executable application is part of a distributed application, and wherein at least a portion of the distributed application is for execution on a remote network server coupled to the distributed hypermedia network environment.

37. The method of claim 36 where:
the information to enable comprises text formats.

38. The method of claim 37 where:
the text formats are HTML tags.

39. The method of claim 36 where:
the information contained in the file received comprises at least one embed text format.

40. A method of serving digital information in a computer network environment having a network server coupled to said computer network environment, and where the network environment is a distributed hypermedia network environment, the method comprising:

communicating with the network server with at least one remote client workstation over said computer network environment in order to cause said client workstation to:

22

receive, over said computer network environment from the network server, at least one file containing information to enable a browser application to display at least a portion of a distributed hypermedia document within a browser-controlled window;

execute, at said client workstation, a browser application, with the browser application:

responding to text formats to initiate processing specified by the text formats;

displaying, on said client workstation, at least a portion of the document within the browser-controlled window;

identifying an embed text format which corresponds to a first location in the document, where the embed text format specifies the location of at least a portion of an object;

identifying and locating an executable application associated with the object; and

automatically invoking the executable application, in response to the identifying of the embed text format, in order to enable an end-user to directly interact with the object while the object is being displayed within a display area created at the first location within the portion of the hypermedia document being displayed in the browser-controlled window, wherein the executable application is part of a distributed application, and wherein at least a portion of the distributed application is for execution on the network server.

41. The method of claim 40 where:
the information to enable comprises text formats.

42. The method of claim 41 where:
the text formats are HTML tags.

43. The method of claim 40 where:
the information contained in the file received comprises at least one embed text format.

44. A method for serving digital information in a computer network environment, said method comprising:

communicating via a network server with at least a remote client workstation over the computer network environment in order to receive commands from the client workstation, with the network server coupled to said computer network environment, wherein said computer network environment has at least said client workstation and said network server coupled to the computer network environment, wherein the computer network environment is a distributed hypermedia environment, wherein the client workstation receives, over the computer network environment from the server, at least one file containing information to enable a browser application to display, on the client workstation, at least a portion of a distributed hypermedia document within a browser-controlled window, wherein the client workstation executes the browser application, with the browser application responding to text formats to initiate processing specified by the text formats, wherein at least said portion of the document is displayed within the browser-controlled window, wherein an embed text format which corresponds to a first location in the document is identified by the browser, wherein the embed text format specifies the location of at least a portion of an object, wherein an executable application associated with the object is identified and located by the browser, wherein the executable application is automatically invoked by the browser, in response to the identifying of the embed text format, to enable an end-user to directly interact with the object while the object is being displayed within a display area created at the first location

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

JA000084    EOLASTX-0000338250

PX0002.0029

US 7,599,985 B2

23

within the portion of the hypermedia document being displayed in the browser-controlled window, wherein the executable application is part of a distributed application, and wherein at least a portion of the distributed application is for execution on the network server;

executing one or more instructions in response to the commands;

sending information to the client workstation in response to the executed instructions, to allow processing of the information at the client workstation to enable said end-user to directly interact with said object.

24

45. The method of claim 44 where:

the information to enable comprises text formats.

46. The method of claim 45 where:

the text formats are HTML tags.

47. The method of claim 44 where:

the information contained in the file received comprises at least one embed text format.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

JA000085

EOLASTX-0000338251

PX0002.0030

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 7,599,985 B2 | Page 1 of 1 |
| APPLICATION NO. | : 10/217955 | |
| DATED | : October 6, 2009 | |
| INVENTOR(S) | : Michael Doyle, David Martin and Cheong Ang | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Col. 20, in claim 29, line 1 "method" should be changed to --computer readable media--.

Col. 20, in claim 30, line 1 "method" should be changed to --computer readable media--.

Col. 20, in claim 31, line 1 "method" should be changed to --computer readable media--.

Signed and Sealed this
Fifth Day of April, 2011

David J. Kappos
*Director of the United States Patent and Trademark Office*

JA000086      EOLASTX-0000338252

PX0002.0031

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,599,985 B2                                      Page 1 of 1
APPLICATION NO.     : 10/217955
DATED               : October 6, 2009
INVENTOR(S)         : Michael Doyle, David Martin and  Cheong Ang

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Col. 20, line 33 (claim 29, line 1) "method" should be changed to --computer readable media--.
Col. 20, line 35 (claim 30, line 1) "method" should be changed to --computer readable media--.
Col. 20, line 37 (claim 31, line 1) "method" should be changed to --computer readable media--.

This certificate supersedes the Certificate of Correction issued April 5, 2011.

Signed and Sealed this
Third Day of May, 2011

David J. Kappos

David J. Kappos
*Director of the United States Patent and Trademark Office*

Copy provided by USPTO from the PIRS Image Database on 08/02/2011

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing BRIEF OF PLAINTIFFS-APPELLANTS

EOLAS TECHNOLOGIES INC. AND THE REGENTS OF THE UNIVERSITY

OF CALIFORNIA was served through the Court's ECF system and electronic mail

on November 28, 2012 to counsel of record as follows:

Edward Reines (edward.reines@weil.com)
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
Jennifer Doan (jdoan@haltomdoan.com)
Haltom & Doan
6500 Summerhill Rd., Suite 100
Texarkana, TX  75503
*Counsel for Defendants-Appellees*
*Amazon.com, Inc. and Yahoo! Inc.*

Daryl L. Joseffer (djoseffer@kslaw.com)
King & Spalding LLP
1700 Pennsylvania Ave., NW
Washington, DC 20006
Adam M. Conrad (aconrad@kslaw.com)
King & Spalding LLP
100 N. Tyron St., Suite 3900
Charlotte, NC  28202
*Counsel for Defendants-Appellees*
*Amazon.com, Inc., Google Inc., YouTube, LLC,*
*and J.C. Penney Corporation, Inc.*

Jeffrey H. Dean (jeffdean@amazon.com)
Amazon.com Inc.
440 Terru Avenue, North
Seattle, WA  98109
*Counsel for Defendant-Appellee*
*Amazon.com, Inc.*

Doug Lumish (dlumish@kasowitz.com)
Kasowitz, Benson, Torres & Friedman LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA  94065
*Counsel for Defendants-Appellees*
*Google Inc. and YouTube, LLC*

Kevin Kramer (kramer@yahoo-inc.com)
Yahoo! Inc.
701 First Avenue
Sunnyvale, CA  94089
*Counsel for Defendant-Appellee*
*Yahoo! Inc.*

Christopher M. Joe (chris.joe@bjciplaw.com)
Buether Joe & Carpenter LLC
1700 Pacific Avenue, Suite 4750
Dallas, TX  75201
Diane K. Lettelleir (dlettell@jcp.com)
J.C. Penney Corporation, Inc.
6501 Legacy Dr., MS 1122
Plano, TX  75024
*Counsel for Defendant-Appellee*
*J.C. Penney Corporation, Inc.*


Date: November 28, 2012

/s/ Joel L. Thollander
Joel L. Thollander

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing BRIEF OF PLAINTIFFS-APPELLANTS EOLAS TECHNOLOGIES INC. AND THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

1.    complies with the type-volume limitation of FED. R. APP. P. 28.1(e)(2)(B)(i). This brief contains 13,804 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and FED. CIR. R. 32(b). Microsoft Word 2003 was used to calculate the word count.

2.    complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2003 in 14-point Times New Roman type style.

Date: November 28, 2012

/s/ Joel L. Thollander
Joel L. Thollander